**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| TIG INSURANCE COMPANY, as successor by merger to International Insurance Company and International Surplus Lines Insurance Company; | ) ) ) ) | |
| Plaintiff-Judgment Creditor, | ) ) | Case No. 1:18-mc-00129 |
| v. | ) ) | |
| REPUBLIC OF ARGENTINA as successor to Caja Nacional de Ahorro y Seguro; and CAJA NACIONAL DE AHORRO Y SEGURO; | ) ) ) | |
| Defendants-Judgment Debtors. | ) ) | |

**TIG INSURANCE COMPANY'S OMNIBUS MEMORANDUM
IN SUPPORT OF MOTIONS FOR
(1) EMERGENCY RELIEF CONCERNING REAL PROPERTY
ABOUT TO BE SOLD BY THE REPUBLIC OF ARGENTINA;
(2) ATTACHMENT-RELATED RELIEF IN AID OF EXECUTION ON JUDGMENTS;
AND (3) WRIT OF EXECUTION ON JUDGMENTS**

**\*\*\* <u>ACTION INVOLVING REAL PROPERTY – EXPEDITED ACTION REQUESTED
FROM MOTIONS JUDGE (LCvR 40.8(b)(1))</u> \*\*\***

# TABLE OF CONTENTS

**Page**

Introduction ......................................................................................................... 1

Overview of the Relief Sought and the Basis for Seeking Emergency Relief ............................... 3

Statement of the Case .......................................................................................... 6

I.     The Republic of Argentina's Historical Refusal to Honor Its Commercial Debts ............ 6

II.    The Underlying Debts and the Resulting Judgment Debts Being Enforced Today .......... 8

       A.     The Underlying Debts ........................................................................ 8

       B.     The Resulting Judgment Debts at Issue and Their Status Today ........................... 9

              1.     The 2001 Default Judgment .................................................. 10

              2.     The 2018 Default Judgment .................................................. 12

III.   TIG's Attempts to Collect and the Republic's Long-Awaited and Now-Imminent
       Sale of 2136 R St., NW ......................................................................... 13

Argument ........................................................................................................ 16

I.     The Relief Sought Should Be Ordered. .................................................... 17

       A.     Emergency Relief ............................................................................ 17

       B.     Attachment-Related Relief in Aid of Execution ................................... 19

       C.     Execution ...................................................................................... 21

II.    The FSIA Does Not Bar the Relief Sought Here. ......................................... 22

       A.     Because the Requirements of Section 1610 of the FSIA Are Met, The Subject
              Property Is Not Immune from Attachment and Execution. ...................... 22

              1.     The Relief Sought Pertains to Default Judgments "Based on Orders
                     Confirming Arbitral Awards." ................................................ 23

              2.     The Relief Sought Concerns Property Being "Used for a Commercial
                     Activity in the United States." .............................................. 24

              3.     The Relief Sought Is Also Permitted Because a "Reasonable Period of
                     Time Has Elapsed" Following Service of the Default Judgments ........... 27

       B.     Because the Relief Sought Applies Directly to Property, There Is No Need to
              Separately Establish This Court's Jurisdiction Over the Republic Itself .............. 29

III.   The Relief Sought Should Not Be Delayed on Account of Any Contention That the
       Republic and Caja Nacional Were Separate Entities. ................................... 31

Conclusion ........................................................................................................ 33

# **TABLE OF AUTHORITIES**

**Page**

**CASES**

*Af-Cap, Inc. v. Chevron Overseas (Congo), Inc.*, 475 F. 3d 1080 (9th Cir. 2007) .......................24

*Am. Int'l Grp., Inc. v. Islamic Republic of Iran*,
   657 F.2d 430 (D.C. Cir. 1981) ...........................................................................26, 27

*Bennett v. Islamic Republic of Iran*,
   605 F. Supp. 2d 152 (D.D.C. 2009) ...........................................................................20

*Bennett v. Islamic Rep. of Iran*,
   No. 11-80065, 2011 WL 3157089 (N.D. Cal. July 26, 2011) ..................................5

*Bingham v. Goldberg, Marchesano, Kohlman, Inc.*,
   637 A.2d 81 (D.C. 1994) ...........................................................................31

*Blackmer v. United States*,
   49 F.2d 523 (D.C. Cir. 1931) ...........................................................................29

*Byrd v. Corporacion Forestal y Industrial De Olancho, S.A.*,
   974 F. Supp. 2d 264 (S.D.N.Y. 2013) ...........................................................................30, 32

*Centerpoint Energy Servs. v. Halim*,
   743 F.3d 503 (7th Cir. 2014) ...........................................................................32

*Conn. Bank of Commerce v. Republic of Congo*,
   309 F.3d 240 (5th Cir. 2002) ...........................................................................25

*EM Ltd. v. Republic of Argentina*,
   473 F.3d 463 (2d Cir. 2007)...........................................................................1, 6

*EM Ltd. v. Republic of Argentina*,
   720 F. Supp. 2d 273 (S.D.N.Y. 2010)...........................................................................6

*Ferrostaal Metals Corp. v. S.S. Lash Pacifico*,
   652 F. Supp. 420 (S.D.N.Y. 1987) ...........................................................................28

*FG Hemisphere Assocs., LLC v. Democratic Republic of Congo*,
   637 F.3d 373 (D.C. Cir. 2011) ...........................................................................23, 26

*First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*,
   462 U.S. 611 (1983)...........................................................................32

**TABLE OF AUTHORITIES**
(continued)

Page

*Gen. Star Nat'l Ins. Co. v. Administratia Asigurarilor de Stat, Carom, S.A.*,
    713 F. Supp. 2d 267 (S.D.N.Y. 2010) ..................................................................32

*Gen. Star Nat'l Ins. Co. v. Administratia Asigurarilor de Stat*,
    No. C2 98-1051 (S.D. Ohio Sept. 16, 2002) .........................................................33

*Int'l Ins. Co. v. Caja Nacional de Ahorro y Seguro*,
    No. 00-cv-02189 (N.D. Ill.) .................................................................................10

*International Insurance Co. v. Caja Nacional de Ahorro y Seguro*,
    293 F.3d 392 (7th Cir. 2002) ..........................................................................11, 30

*Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*,
    No. H 01-0634, 2002 U.S. Dist. LEXIS 3976 (S.D. Tex. Jan. 25, 2002) ...............28

*Lomax v. Spriggs*,
    404 A.2d 943 (D.C. Ct. App. 1979) ...................................................17, 19, 21, 22

*Ned Chartering & Trading, Inc. v. Republic of Pakistan*,
    130 F. Supp. 2d 64 (D.D.C. 2001) .......................................................................28

*NML Capital, Ltd. v. Banco Central de la República Argentina*,
    652 F.3d 172 (2d Cir. 2011) ..................................................................................6

*NML Capital, Ltd. v. Republic of Argentina*,
    No. 04-00197, 2005 U.S. Dist. LEXIS 47027 (D.D.C. Aug. 3, 2005) .........2, 14, 25

*Owens v. Republic of Sudan*,
    141 F. Supp. 3d 1 (D.D.C. 2015) .........................................................................29

*Peterson v. Islamic Republic of Iran*,
    627 F.3d 1117 (9th Cir. 2010) ...............................................................................5

*Puricelli v. Republic of Argentina*,
    797 F.3d 213 (2d Cir. 2015) ..................................................................................7

*Republic of Argentina v. AWG Grp. Ltd.*,
    No. 15-01057, 2016 U.S. Dist. LEXIS 136318 (D. D.C. Sept. 30, 2016) ...............30

*Republic of Argentina v. NML Capital, Ltd.*,
    134 S. Ct. 2250 (2014) ..................................................................7, 22, 26, 29

*Republic of Argentina v. Weltover, Inc.*,
    504 U.S. 607 (1992) ............................................................................................24

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Republic of Austria v. Altmann,*
   541 U.S. 677 (2004)..................................................................................8

*Resolution Trust Corp. v. Ruggiero,*
   994 F.2d 1221 (7th Cir. 1993) ...........................................................1, 17

*Rubin v. Islamic Republic of Iran,*
   830 F.3d 470 (7th Cir. 2016) ...............................................................32

*Seijas v. Republic of Argentina,*
   606 F.3d 53 (2d Cir. 2010).....................................................................7

*Shaffer v. Heitner,*
   433 U.S. 186 (1977).............................................................................29

*Sodexo Operations, LLC v. Not-For-Profit Hosp. Corp.,*
   930 F. Supp. 2d 234 (D.D.C. 2013) .....................................................32

*Vernon v. Schuster,*
   179 Ill.2d 338 (1997) ...........................................................................31

*Weinstein v. Islamic Republic of Iran,*
   624 F. Supp. 2d 272 (E.D.N.Y. 2009) .................................................32

### STATUTES

28 U.S.C. § 1602................................................................................................8

28 U.S.C. § 1603(d) ...................................................................................24, 25

28 U.S.C. § 1605(a)(2).....................................................................................30

28 U.S.C. § 1605(a)(6).....................................................................................31

28 U.S.C. § 1608...............................................................................................12

28 U.S.C. § 1608(a)(1)......................................................................................27

28 U.S.C. § 1608(a)(2)......................................................................................28

28 U.S.C. § 1608(e) ....................................................................................23, 27

28 U.S.C. § 1610........................................................................................12, 27

28 U.S.C. § 1683...............................................................................................17

**TABLE OF AUTHORITIES**
(continued)

**Page**

D.C. Code § 15-102 ..................................................................................5, 19

D.C. Code § 15-103 ......................................................................................11

D.C. Code § 15-307 ..................................................................................6, 22

D.C. Code § 15-311 ............................................................................6, 20, 21

D.C. Code § 15-320 ......................................................................................19

D.C. Code § 15-321 ......................................................................................19

D.C. Code § 16-515 ......................................................................................20

D.C. Code § 16-518 ................................................................................18, 19

D.C. Code § 16-532 ..................................................................................6, 21

D.C. Code § 16-542 ......................................................................................21

D.C. Code § 16-543 ......................................................................................21

D.C. Code § 16-544 ......................................................................................20

D.C. Code § 16-549 ......................................................................................20

D.C. Code § 16-550 ..............................................................4, 5, 18, 19, 20, 26

D.C. Code § 42-2107 ....................................................................................20

**ATTACHMENTS**

Declaration of Julie Rodriguez Aldort and Exhibits 1-49

Declaration of Mark N. Bravin and Exhibits A-J

Declaration of Bernardo Gustavo Custo and Exhibits A-H

Declaration of Christopher LeGros and Exhibits A-D

<u>INTRODUCTION</u>

"*We note that Argentina has made many contributions to the law of foreign insolvency through its numerous defaults on its sovereign obligations, as well as through what we might term a diplomacy of default.*"

- *EM Ltd. v. Republic of Argentina*, 473 F.3d 463, 466 n.2 (2d Cir. 2007)

"*Proceedings to enforce judgments are meant to be swift, cheap, informal.*"

- *Resolution Trust Corp. v. Ruggiero*, 994 F.2d 1221, 1226 (7th Cir. 1993)

\* \* \*

This action presents a vanishingly rare opportunity for TIG Insurance Company ("TIG") to collect on judgment debts that the Republic of Argentina ("The Republic") has long evaded. After nearly three decades' worth of effort, TIG holds two judgments payable by the Republic, accounting for over $33 million in debt, with post-judgment interest still accruing. The judgments arise out of arbitral awards, duly confirmed in federal court, issued pursuant to commercial contracts with a company that the Republic created, owned, and then dissolved long ago. The Republic, however, has continually refused to honor its judgment debts. And its inaction is no surprise: the Republic also has a longstanding pattern of racking up debt obligations in the U.S. and then shirking them. Worse yet for judgment creditors, the path to satisfaction is harder because the Republic has coupled its myriad defaults with a marked tendency to spirit away assets from the U.S. or shield them from judicial process, as soon as they become the target of execution efforts.

Now, however, there is an opportunity for TIG to start obtaining a small measure of satisfaction – provided this Court acts expeditiously. Recently, the Republic has taken one of its former diplomatic properties in the District of Columbia (at 2136 R St., NW) and put it up for

1

public auction.  By putting the property up for sale, and conducting a public auction no less, the

Republic is now undoubtedly "us[ing the property] for a commercial activity" in the U.S. within

the plain meaning of Section 1610(a) of the Foreign Sovereign Immunities Act ("FSIA").  Thus,

under the FSIA, 2136 R St., NW is now eligible to be attached and executed against to satisfy

TIG's judgments.

Critically, however, the window for TIG to get any measure of satisfaction is fleeting.

The Republic at any moment could pull the property off the market, ostensibly to take it out of

the realm of "commercial activity" and to shield it from execution.  The Republic did just that

over a decade ago with the very same property at 2136 R St., NW.  *See NML Capital, Ltd. v.

Rep. of Arg.*, No. 04-00197, 2005 U.S. Dist. LEXIS 47027, at *16 (D.D.C. Aug. 3, 2005).

Alternatively, if the auction goes as planned, the property would be sold to a third party

imminently, with the high risk (if history is any indication) of the Republic then squirreling away

the proceeds to shield them from the reach of creditors.  The looming nature of the sale is

illustrated by the official flyer for the auction (shown below), setting forth a schedule for the

auction winner to be notified in a matter of weeks, no later than October 8, 2018:



**2136 R Street, NW**
**Washington, DC 20008**

**Important Dates:**
Initial Bids Due to:                                    September 12, 2018 at noon
    Washington Fine Properties
    3201 New Mexico Ave, NW, Suite 220
    Washington, D.C. 20016
Initial Bids Opened at:                                September 12, 2018 at 3pm
    Embassy of Argentina
    1600 New Hampshire Ave, NW
    Washington, D.C. 20009
Finalists Selected                                      by September 21, 2018 (w/in 10 days)
Final Bids Due to:                                      by September 28, 2018 (w/in 8 days)
    Washington Fine Properties
    3201 New Mexico Ave, NW, Suite 220
    Washington, D.C. 20016
Awarded Bidder Notified                                 by October 8, 2018 (w/in 10 days)

**Pertinent Information:**
- Legal Owner: The Argentine Republic
- Property Tax ID: 2513//0007
- Offer must be above the Base Price of $2,500,000

Ultimately, if TIG is to get even a fraction of its $33-million+ in judgment-related credits finally paid off, it therefore must obtain prompt enforcement action by this Court. As detailed further below, successful enforcement includes emergency steps taken by the Court to maintain the status quo concerning the property and any attendant sale proceeds, pending this Court's consideration of any sovereign-immunity defenses that the Republic will no doubt try to mount.

In the end, TIG has waited for decades for relief, even pursuing negotiations to resolve the matter, only to be continually stonewalled by the Republic. TIG should not be made to wait any longer.

## Overview of the Relief Sought and the Basis for Seeking Emergency Relief

As explained further below, the underlying judgments at issue here are default judgments that arise out of arbitral awards. Under the FSIA, the Republic's property is not immune from attachment or execution to enforce a judgment, if, as is relevant here, the judgment is based on

an order confirming an arbitral award, and the property is being "used for a commercial activity in the United States."  28 U.S.C. § 1610(a).

Given the auction context here, successful enforcement requires navigating between two contingencies:  First, on one hand, the Republic might take the property off the market to evade execution by seeking to deprive the property of its "commercial activity" status.  Second, on the other hand, a looming and imminent sale would lead to the transfer of the property to a third party, with the sale proceeds almost certainly directed to an account outside of the United States.

To navigate between these two contingencies, TIG accordingly requests the following tailored and interlocking methods of relief:

**(1) EMERGENCY RELIEF REGARDING SALE STATUS OF PROPERTY & PROCEEDS FROM ANY SALE:**  This Court has the inherent authority to order procedural relief and regulate the practice of litigation before it in any manner it chooses, consistent with federal law.  *See* Fed. R. Civ. P. 83(b).  Further, D.C. Code Section 16-550 further provides that "[t]he court may make all orders necessary for the preservation of the property attached," including "order[ing] that the property be sold and its proceeds paid into court and held subject to its order on the final decision of the case."

To ensure that the Republic cannot frustrate enforcement efforts by either selling the property and exporting the proceeds, or, conversely, by removing the property from the market, TIG requests that the Court issue orders to preserve the property ***forthwith*** directing that:

**A.**  for the next 180 days, or until this Court is able to address the instant motions for attachment-related relief and execution on judgments, 2136 R St., NW may not be withdrawn from the auction market;

**B.**  if 2136 R St., NW is sold, the proceeds of any sale shall be paid to the Court Registry Investment System (CRIS), pending final outcome of this enforcement action; and

4

**C.** if 2136 R St., NW is not sold within the next 180 days, then an order to show cause should issue for why the Court should not appoint a receiver and force the sale of 2136 R St., NW on terms that are just and proper, with any sale proceeds to be turned over to TIG.

Such relief can be ordered on an *ex parte* emergency basis even in an FSIA case. *See, e.g.*, *Peterson v. Islamic Rep. of Iran*, 627 F.3d 1117, 1130 (9th Cir. 2010) ("Service of post-judgment motions is not required."); *Bennett v. Islamic Rep. of Iran*, No. 11-80065, 2011 WL 3157089 (N.D. Cal. July 26, 2011) ("[t]he Court notes that Plaintiffs were not required to serve their post-judgment motions, such as their ex parte [1610(c)] motion, on Iran.")

**(2) ATTACHMENT-RELATED RELIEF IN AID OF EXECUTION:** In addition to the emergency relief set forth above – which is meant to safeguard the property and proceeds – it is also vital to ensure that TIG's ***rights*** with respect to the property and/or any sale proceeds be adequately maintained during the pendency of this enforcement proceeding. Consistent with D.C. Code Section 16-550 ("all orders necessary for the preservation of the property") and the practices of courts in this District, the Court may order attachment in aid of execution. Additionally, pursuant to D.C. Code Section 15-102(a)(1) & (2), any "final judgment or decree for the payment of money … shall constitute a lien on [the judgment debtor's] freehold and leasehold estates … from the date such judgment … is filed and recorded in the office of the Recorder of Deeds of the District of Columbia[.]" Accordingly, and bearing in mind the need to safeguard TIG's rights during the pendency of this enforcement proceeding, TIG also requests that the Court issue orders ***forthwith*** providing for:

**A.** a writ of attachment on the Republic of Argentina's interest in any future proceeds from the sale of 2136 R St., NW, in an amount not to exceed $33,666,021.17;

**B.** a writ of attachment issued directly by this Court on the property at 2136 R St., NW; and

**C.** leave for TIG to file and record the judgments at issue with the Recorder of Deeds of the

District of Columbia in order to attach the property at 2136 R St., NW.

**(3) EXECUTION:** Finally, TIG also requests that, following notice to the Republic and an

opportunity to be heard, the Court issue orders pursuant to, without limitation, D.C. Code

Sections 15-307, 15-311, and 16-532, providing for either:

**A.** a writ of execution (i.e., a writ of *fieri facias*) on the Republic of Argentina's interest in

any future proceeds from the sale of 2136 R St., NW, in an amount not to exceed

$33,666,021.17; and/or

**B.** a writ of execution (i.e., a writ of *fieri facias*) on any proceeds, then existing at the time

of the writ's issuance, from the sale of 2136 R St., NW, in an amount not to exceed

$33,666,021.17.

TIG also reserves the right to seek a writ of execution against 2136 R St., NW itself if the

property does not sell.

<u>STATEMENT OF THE CASE</u>

**I.      The Republic of Argentina's Historical Refusal to Honor Its Commercial Debts**

Not only has the Republic of Argentina "made many contributions to the law of foreign

insolvency through its numerous defaults," *EM Ltd.*, 473 F.3d at 466 n.2, other courts have

similarly remarked that the Republic "has not acted honestly and in good faith," *EM Ltd. v. Rep.

of Arg.*, 720 F. Supp. 2d 273, 301 (S.D.N.Y. 2010), instead engaging in habitual "willful

defiance" of its legal obligations, *NML Capital, Ltd. v. Banco Central de la República Argentina*,

652 F.3d 172, 196 (2d Cir. 2011).  In fact, Argentina's refusal to pay is so much a "part of the

national psyche" that the University of Buenos Aires erected a special "Museum of Foreign

Debt" to commemorate the at-least-seven times that the country has defaulted on its foreign debt

obligations.  Michael Smith, *¡No!  Why Argentina Refuses to Pay Its Debts, Bloomberg*, (July 15,

2015), https://www.bloomberg.com/news/features/2015-07-17/-no-why-argentina-refuses-to-pay-its-debts (attached as Exhibit A to the accompanying Decl. of Mark N. Bravin).

The Republic of Argentina's questionable repayment history has spawned considerable litigation. For example, following the Argentinian financial crisis of 2001, the Republic defaulted on $80 to $100 billion of sovereign debt, leading to dozens of collection actions around the country. *See, e.g.*, *Rep. of Arg. v. NML Capital, Ltd.*, 134 S. Ct. 2250, 2253 (2014); *Seijas v. Rep. of Argentina*, 606 F.3d 53, 55 (2d Cir. 2010); *Puricelli v. Rep. of Argentina*, 797 F.3d 213, 215 (2d Cir. 2015). Some companies, such as NML Capital, elected to pursue claims and won massive judgments – $2.5 billion in NML Capital's case.

Yet, obtaining a judgment is not the same as collecting on it. And in that regard, the Republic has used the FSIA's enforcement provisions as a shield to render meaningless the many judgments issued against it by federal courts all over the country. The Republic, for example, started funneling assets out of the United States and restructuring its finances to avoid attachment under the FSIA and the laws of other jurisdictions. *See The Government Protects Itself from Seizures,* La Nación, Feb. 5, 2004 (Bravin Decl. Ex. B).

The Republic's conduct has forced judgment-holders to endure years-long – and expensive – endeavors to uncover appropriate assets to be levied upon. For example, in litigation that ended up before our Supreme Court, companies like NML Capital pursued "'lengthy attachment proceedings [including] multiple appeals'" and vast efforts "pursu[ing] discovery of Argentina's property" to "'locate Argentina's assets and accounts, learn how Argentina moves its assets through New York and around the world, and accurately identify the places and times when those assets might be subject to attachment and execution[.]'" *NML*, 134 S. Ct. at 2253.

The Republic of Argentina's gamesmanship far exceeds the reach of the sovereign-immunity protections that Congress intended to afford in the FSIA. Notably, when Congress enacted the FSIA, it did not contemplate one-way protection only for sovereigns. Instead, Congress intended, by the FSIA's plain meaning, to "serve the interests of justice" and to "protect the rights of foreign states *and litigants* in the United States courts." 28 U.S.C. § 1602 (emphasis added). The FSIA accomplishes these purposes, not least of all by putting an end to the prior "regime" of "considerable inconsistency" of immunity determinations previously made solely by the executive branch, which Congress supplanted by "plac[ing] even greater emphasis on the implications that inconsistency had for our citizens[.]" *Rep. of Austria v. Altmann*, 541 U.S. 677, 716 (2004). At bottom, the FSIA was not intended to be wielded by foreign sovereigns as a shield to evade their creditors.

## II.    The Underlying Debts and the Resulting Judgment Debts Being Enforced Today

### A.    The Underlying Debts

Turning to the matter at hand here, the two judgment debts at issue have their roots in longstanding contractual breaches and foreign state-level insolvency. In 1979, TIG's predecessors-in-interest – which we refer to collectively as TIG[1] – entered into commercial reinsurance contracts with an Argentinian instrumentality, Caja Nacional de Ahorro y Seguro, S.A. ("Caja Nacional"). *See* Decl. of Christopher LeGros ¶¶ 2-4 & Exs. B & C. Founded in 1915 by the Republic of Argentina, Caja Nacional was a state-owned company that conducted insurance, reinsurance, and other related businesses. *See* Decl. of Bernardo Gustavo Custo ¶ 5.

---

[1] The reinsurance contracts were entered into by International Surplus Lines Insurance Company as well as L.W. Biegler, Inc. on behalf of International Insurance Company, The North River Insurance Company, United States Fire Insurance Company, Westchester Fire Insurance Company, Industrial Indemnity Company, United States Fire Insurance Company of Canada, and Herald Insurance of Canada. Today, following a series of mergers, International Insurance Company is now known as TIG Insurance Company. *See* LeGros Decl. ¶ 2 & Ex. A.

Pursuant to the underlying reinsurance contracts, TIG issued individual insurance policies as the insurer. Caja Nacional then "reinsured" those policies, agreeing to accept a portion of the risk initially shouldered by TIG. *See* LeGros Decl. ¶ 5. Consistent with the contracts, Caja Nacional received a share of premiums collected for the reinsured policies. *Id.* And TIG was *supposed* to receive reimbursement from Caja Nacional for a share of losses paid out under the policies. *Id.* But problematically, while Caja Nacional accepted its share of the premiums, it never paid TIG its share of the losses – which is the very foundation of the underlying arbitral awards and resulting judgment debts TIG seeks to enforce today. *Id.*

To complicate matters further, starting in the 1990s Argentina started proceedings to liquidate Caja Nacional – something no doubt related to Argentina's ongoing solvency problems. *See* Custo Decl. ¶¶ 5-12 & Exs. A-C. In 1994, some 15 years after entering into the reinsurance contracts at issue, Caja Nacional, then 100% owned by the Government of Argentina, was declared dissolved by the Government of Argentina and put into liquidation. *Id.* ¶ 7 & Ex. A. The dissolution process would continue. And among other milestones, in 2005, the Government of Argentina officially declared that "the liquidated assets and liabilities, and the contingent assets and liabilities of CAJA NACIONAL DE AHORRO Y SEGURO (in liquidation process) are declared as transferred" to Argentina. *Id.* ¶¶ 10-11 & Ex. C at Art. 5, 6. Caja Nacional's liabilities and debt obligations were accordingly absorbed by the Republic, as detailed further in the accompanying Declaration of Bernardo Gustavo Custo. And as a result, TIG had to look to the Republic for satisfaction as successor-in-interest to Caja Nacional's debt obligations.

### B.    The Resulting Judgment Debts at Issue and Their Status Today

Caja Nacional's and the Republic's failure to pay under the reinsurance contracts led directly to the two default judgments at issue here. Pursuant to the underlying reinsurance contracts, which specified that disputes would go to arbitration, *see* LeGros Decl. Exs. B & C

(both at Article XXI), the two default judgments at issue here both arose initially out of arbitral awards.[2] The key details of each default judgment are as follows:

### 1.    The 2001 Default Judgment

In the first case, initiated in 2000, TIG petitioned for arbitration against Caja Nacional. Caja Nacional defaulted, leading to an award in TIG's favor. Decl. of Julie Rodriguez Aldort ¶¶ 2-4 & Exs. 2, 3.

TIG then sought confirmation of the arbitral award in federal court, in the Northern District of Illinois. *Id.* ¶ 7 & Ex. 4. There, Caja Nacional appeared through counsel – but only for its answer to be stricken for failure to post a security bond as required under Illinois law. *Id.* ¶¶ 6-7 & Exs. 5-10. Caja Nacional never posted the bond and never answered. *Id.* ¶ 8. As a result, the Northern District of Illinois, on July 5, 2001, entered a default judgment against Caja Nacional, confirming the final arbitral award. *Id.* ¶ 10 & Ex. 13.

Caja Nacional appealed, claiming that, as an instrumentality of the Argentinian state, Caja Nacional should have been immune from having to post a bond. *Id.* ¶ 13. The Seventh Circuit affirmed the default judgment, holding that, even if Caja Nacional proved it were an instrumentality of the Republic, the Republic itself had waived immunity. The Republic had waived, the Seventh Circuit held, by agreeing in the reinsurance contracts to arbitrate disputes in Illinois, and by entering into the New York and Panama Conventions, which provide for the

---

[2] For reference, in previous proceedings, the reinsurance contracts were referred to as the "Casualty Reinsurance Agreement" (LeGros Decl. Ex. B) and the "Casualty Excess Reinsurance Agreement" (LeGros Decl. Ex. C).

Separately, TIG sued Caja Nacional directly in federal court under six other reinsurance contracts which did not have arbitration provisions. TIG ended up obtaining a judgment against Caja Nacional in that suit for $2,276,637.09, which still remains unpaid. *See Int'l Ins. Co. v. Caja Nacional de Ahorro y Seguro*, No. 00-cv-02189 (N.D. Ill.). That judgment is not the subject of the present execution action.

enforcement of arbitration awards against sovereign entities.  *See Int'l Ins. Co. v. Caja Nacional de Ahorro y Seguro*, 293 F.3d 392 (7th Cir. 2002).

After the default judgment was affirmed, TIG began the arduous process of attempting to collect on the judgment.  Caja Nacional, in defiance of orders from the Northern District of Illinois, refused to disclose what U.S.-based assets it had.  Aldort Decl. ¶¶ 14-15 & Exs. 44-46.  The Northern District sanctioned Caja Nacional, in a series of orders that eventually escalated to $4,000 a day in penalties.  *Id.*  Those sanctions are still in place today.

In 2014, TIG filed a petition to revive the judgment so that it could continue its collection efforts.  *Id.* ¶ 16 & Ex. 47.  The Northern District granted the petition and revived the judgment, extending the time for it to remain in effect.  *Id.* ¶ 16 & Ex. 48; *see also* D.C. Code § 15-103 (revival of judgment "extends the effect and operation of the judgment or decree with the lien thereby created and all the remedies for its enforcement for the period of twelve years from the date of the order").

TIG then served the default judgment, and the order reviving it, on the Republic of Argentina pursuant to the procedures set forth in the Hague Convention.  *See* Bravin Decl. ¶ 8.  On April 11, 2018, TIG received a return notice from the Argentina's Central Authority confirming that Hague Convention service was completed on April 5, 2018.  *Id.* ¶ 9 & Ex. G.  Concurrently with TIG's motions here, TIG has also registered the 2001 default judgment in this District, as well as the Northern District of Illinois's order granting TIG's petition to revive the judgment.  (*See* ECF No. 1.)  *See* 28 U.S.C. § 1963 ("A judgment so registered shall have the same effect as a judgment of the district court of the district where registered and may be enforced in like manner.").

Today, including post-judgment interest and associated penalties, the 2001 default judgment is worth $30,163,010.13.  *See* LeGros Decl. ¶ 16 (setting forth calculation of debt

amount). The events surrounding the 2001 default judgment are set forth in greater detail in the accompanying Declaration of Julie Rodriguez Aldort.

## 2. The 2018 Default Judgment

While TIG struggled to get satisfaction on its 2001 default judgment, it also had to initiate a second arbitral proceeding in 2017. This second proceeding sought reimbursement, under the same reinsurance contracts, for more-recent, ongoing asbestos-related losses occurring after the initiation of the earlier arbitration. In this second arbitral proceeding, TIG claimed directly against the Republic of Argentina. Aldort Decl. ¶ 19 & Ex. 18, 49. TIG presented to the arbitral panel evidence that the Republic assumed Caja Nacional's liabilities and debt obligations. *Id.* ¶ 20. The Republic defaulted. *Id.* The arbitral panel issued an award in TIG's favor. *Id.* & Ex. 49. The panel concluded, among other things, that the Republic was now the successor to Caja Nacional's debts and any judgments, making it appropriate for TIG to proceed directly against the Republic itself. Aldort Ex. 49 at 1.

Following the Republic's default in the arbitral proceeding, TIG then sought confirmation of the arbitral award in federal court, in the Northern District of Illinois. Aldort Decl. ¶ 21. There, the Republic defaulted again. *Id.* ¶¶ 22-24 & Exs. 25, 27. This time, however, the Republic attempted to challenge service of process. *Id.* ¶ 25 & Ex. 31. The Republic claimed that, in the arbitration and subsequent confirmation proceedings, it was improper to be served through various agents that were specified in the reinsurance contracts; instead, the Republic argued, it should have been served under the more-elaborate procedures of the Hague Convention. *Id.* The Northern District of Illinois rejected the Republic's challenge, finding that "TIG has established that service was appropriate under 28 USC 1608 because … what TIG has established is that there was a special arrangement within the meaning of 1608 in the insurance

contracts for the insurance company to serve Argentina via their lawyers at … Locke Lord and the Illinois Department of Insurance." *Id.* ¶ 27 & Ex. 39.

On January 8, 2018, the Northern District of Illinois issued a default judgment against the Republic of Argentina. *Id.* ¶ 28 & Exs. 40-41. Concurrently, the Northern District also, on its own order, served the default judgment on the Republic of Argentina by mail and email via the Illinois Department of Insurance, the Consulate, and its outside lawyers (Locke Lord), consistent with the procedures set forth in the reinsurance contracts. *Id.* ¶ 28 & Ex. 42. TIG also served the default judgment on the Republic via registered and certified mail to the Illinois Department of Insurance and Locke Lord in accordance with the procedure specified in the reinsurance contracts. *Id.* ¶ 28 & Ex. 43. Nevertheless, TIG in an abundance of caution has gone on to serve the default judgment on the Republic through Hague Convention procedures by sending the default judgment on March 16, 2018 to the Republic's Central Authority, within the Argentine Ministry of Foreign Affairs, with a request for Hague Convention service on the Republic. *See* Bravin Decl. ¶ 11. That service was effected on June 14, 2018 through Argentine judicial channels, pursuant to Article 5(a) of the Hague Convention. *Id*. & Ex. H.

Today, the 2018 default judgment is worth $3,459,489.31 and has been registered in this District. *See* LeGros Decl. ¶ 17 (setting forth calculation of debt amount). The events surrounding the 2018 default judgment are set forth in greater detail in the accompanying Declaration of Julie Rodriguez Aldort.

III.    **TIG's Attempts to Collect and the Republic's Long-Awaited and Now-Imminent Sale of 2136 R St., NW**

Over the course of several years, TIG repeatedly contacted Caja Nacional and then the Republic directly to demand payment. *See* LeGros Decl. ¶¶ 9-15 (summarizing TIG's efforts); Custo Decl. ¶¶ 13-17 (similar). Among other efforts, in April 2016 senior TIG personnel met with the Argentinean Ambassador to the United States and the Argentinean Attorney General to

13

bring the outstanding debts to the attention of a newly elected Argentinian administration. *See* Custo Decl. ¶ 15; LeGros Decl. ¶ 15.

Meanwhile came rumblings that the Republic would start selling its properties in the various countries, including the United States. On October 5, 2016, the then-recently elected president, Mauricio Macri, issued a decree, authorizing that several previously government-owned or -used properties would be put up for sale on the open market. *See* Custo Decl. ¶ 18 & Ex. G.

Listed among the properties in President Macri's decree were five lots in the Dupont Circle neighborhood of the District. *See* Custo Decl. ¶ 18 & Ex. G. One of those lots was 2136 R St., NW, a former diplomatic property with a checkered history. Previously, in or around 2005, the Republic put 2136 R St., NW up for sale, only for the property to narrowly escape execution efforts by judgment creditors. By the time the judgment creditors initiated their action, the property was immune from attachment, this Court concluded, because "[t]he Listing Agreement between the Ministry of Defense and Weichert provided that the contract would expire" and "[t]he property did not sell and remains off the market," thereby falling back outside of "use for a commercial activity." *NML Capital*, No. 04-00197, 2005 U.S. Dist. LEXIS 47027 at *16. Today, the property at 2136 R St., NW is uninhabited and long-unused. *See* Bravin Decl. ¶ 4 & Ex. C. ("It is a building that functioned as the official residence of the Argentine mission in the Organization of American States (OAS) and that has been in a state of neglect and advanced deterioration for more than 20 years.").

* * *

Despite President Macri's decree in October 2016, it would not be until the summer of 2018 that any of the D.C. properties owned by Argentina would hit the market. And even then, only one – 2136 R St., NW – actually did, via auction, *see* Bravin Decl. ¶¶ 5-6 & Ex. E. The

listed base price for the property is $2.5 million, *see* Bravin Decl. ¶¶ 5-6 & Ex. E, and various estimates suggest the property will sell at around $3 million – less than even the amount of TIG's 2018 default judgment worth $3,459,489.31. *See* Aldort Decl. ¶ 20, 28 & Ex. 40, 41, 49.

The listing notice from the broker heading the auction (Washington Fine Properties, LLC) confirms that the auction process is well underway. *See* Bravin Decl. Ex. D. The property is still listed today on the Washington Fine Properties website and various others. *See* Bravin Decl. Ex. E.

Importantly, as far as enforcement is concerned, the listing notice and accompanying terms and conditions confirm that once the auction is completed, a transfer of title to the property should be imminent. Also, the auction apparently contemplates that full sale proceeds (i.e., money) will be paid in full immediately, with proceeds going directly to the Republic, potentially without any U.S.-based escrow involved. The listing notice and accompanying terms and conditions for the auction (Bravin Decl. Ex. D) state in pertinent part as follows:

- **"Finalists Selected … by September 21, 2018"** (***id.***, cover page)

- **"Final Bids Due … by September 28, 2018"** (***id.***)

- **"Awarded Bidder Notified … by October 8, 2018"** (***id.***)

- **Republic's Ability to Stop the Sale (*id.* at Article 1):** "[T]he Argentine Republic may withdraw the Property from sale at any time and at its sole discretion[.]"

- **Mandatory Award to Highest Bidder (*id.* at Article 10.5):** "Following the submission of the Final Bids, the Argentine Republic shall award the Bid to the Bidder who has made the highest purchase price offer and such bidder shall be awarded the bidding process … within TEN (10) days subsequent to the submission of the Final Bids."

- **Purchase Price Paid in Full (*id.* at Article 11):** "The purchase price offered by the Awarded Bidder shall be paid in full at the time of the transfer of ownership title over the

Property.  *Bids containing deferred payment Price schemes shall be automatically dismissed.*"  (Emphasis added.)

- **Escrow Only for Initial Bids; No Mention of Escrow for Full Purchase Price (*id.* at Article 16):**  While the listing notice specifies use of an escrow to hold deposits of 10% of initial bids, the listing notice does not specify use of an escrow for the remainder of the purchase price, which could be paid directly to the Republic (*compare* Article 11).

- **Title to Vest Immediately Upon Execution of Sales Contract, Albeit with Final Sale Contingent on State Department Approval (*id.* at Articles 18.1 & 18.3):**  "Unless otherwise provided in these Terms and Conditions, title to the Property sold hereunder shall vest in the Awarded Bidder *upon execution of the Sale Contract*."  But curiously, the terms and conditions also provide, notwithstanding apparent execution of a sales contract and vesting of title, that the "contract shall provide that the sale … is conditioned upon the approval of the sale by the … Department of State … which approval is typically granted or denied within SIXTY (60) days subsequent to its request."

* * *

For nearly two decades now, TIG has tried to avail itself of diplomatic and other negotiating channels to resolve the underlying judgment debts – but to no avail.  Having waited to see whether any of Argentina's properties would hit the open market, and having waited to see if the auction on 2136 R. St., NW would proceed substantially towards its conclusion – which it appears it now will – this enforcement proceeding now follows.

## ARGUMENT

TIG is entitled to the relief sought here – namely, emergency relief regarding the sale of the property and disposition of any proceeds from sale, attachment-related relief in aid of

execution, and ultimately execution itself.  Meanwhile, the FSIA does not immunize the property against the relief sought here, not least because the default judgments at issue here are "based on orders confirming arbitral awards," and because the relief sought concerns property now being "used for a commercial activity in the United States."

## I.    The Relief Sought Should Be Ordered.

Supplementary proceedings "to enforce judgments are meant to be swift, cheap, and informal."  *Resolution Tr. Corp. v. Ruggiero*, 994 F.2d 1221, 1226 (7th Cir. 1993).  Key to enforcement is timing:  To ensure that there is something to enforce against, a host of related interim mechanisms function to safeguard the asset to be collected against.  For instance, as the D.C. Court of Appeals has noted, the "main purpose" of attachment of assets prior to execution is "to secure the debt," such that speed is critical – "*Surprise is often the key to a successful attachment*."  *Lomax v. Spriggs*, 404 A.2d 943, 946, 948 (D.C. Ct. App. 1979) (emphasis added).

As shown below, the District of Columbia's judgment-enforcement scheme, which is made applicable here by Rule 69(a)(1),[3] allows for the Court to order the bulk of the relief sought here on an emergency basis.  This Court is further empowered by its inherent power to order procedural relief and regulate the practice of litigation before it in any manner it chooses, consistent with federal law.  *See* Fed. R. Civ. P. 83(b).

### A.    Emergency Relief

The need for emergency relief is apparent, given the palpable risk – borne out by previous history – that the Republic could either (a) take the property off the market in an attempt to immunize it from execution or attachment; or (b) rush a sale within a matter of days or

---

[3] *See* Fed. R. Civ. P. 69(a)(1) ("A money judgment is enforced by a writ of execution, unless the court directs otherwise.  The procedure on execution – and in proceedings supplementary to and in aid of judgment or execution – must accord with the procedure of the state where the court is located, but a federal statute governs to the extent it applies.").

weeks and spirit away the proceeds.  Accordingly, to safeguard assets for execution, TIG

requests the following narrowly tailored relief:

A.  for the next 180 days, or until this Court is able to address the instant motions for

attachment-related relief and execution on judgments, 2136 R St., NW may not be

withdrawn from the auction market;

B.  if 2136 R St., NW is sold, the proceeds of any sale shall be paid to the Court Registry

Investment System (CRIS), pending final outcome of this enforcement action; and

C.  if 2136 R St., NW is not sold within the next 180 days, then an order to show cause

should issue for why the Court should not appoint a receiver and force the sale of 2136 R

St., NW on terms that are just and proper, with any sale proceeds to be turned over to

TIG.

The emergency relief sought is grounded soundly in multiple provisions of the D.C.

Code.  In particular, D.C. Code § 16-550, by its very plain language, affords the Court the

authority to issue catchall relief to preserve property in aid of execution, including directing that

sale proceeds be paid first to the Court pending the outcome of an enforcement action.  As the

statute provides (emphases added):

> **Section 16-550.  Preservation of property; sale.**
>
> The court may make <u>all orders necessary for the preservation of the property attached</u>.
> When the property is perishable, or for other reasons a sale of it appears expedient, <u>the</u>
> <u>court may order that the property be sold</u> and <u>its proceeds paid into court and held subject</u>
> <u>to its order on the final decision of the case.</u>

Other provisions similarly grant the Court wide-ranging powers to preserve property

while the Court makes determinations that may impact its title.  As another illustration, while

TIG is not immediately asking for the Court to appoint a receiver to force a sale (at least not yet),

it would be within the Court's power to order so – which is what D.C. Code Section 16-518

contemplates (emphases added):

**Section 16-518.  Preservation of property; sale; receiver.**

….

When it seems expedient, <u>the court may appoint a receiver to take possession of the property</u>.  The receiver shall give bond for the due performance of his duties, and, under the direction of the court, <u>shall have the same powers and perform the same duties as a receiver appointed according to the practice in civil actions</u>.

Meanwhile, other provisions make clear that the Court has ample authority to issue wide-ranging emergency and interlocutory relief to safeguard property in aid of execution.  *See, e.g.*, D.C. Code § 15-321 ("An interlocutory order may be enforced by such process as might be had upon a final judgment or decree to the like effect[.]"); D.C. Code § 15-320(a)(2), (3) ("For the purpose of executing a decree, … the [court] may: order an <u>immediate sequestration</u> of his real and personal estate[.]") (emphasis added).

That the D.C. Code allows, among other things, for "immediate sequestration" (D.C. Code § 15-320(a)(2)) and for "all orders necessary for the preservation of the property attached" (D.C. Code § 16-550).  No prior notice or hearing is necessary; the relief should issue immediately to preserve the status quo.  *See Lomax*, 404 A.2d at 948 ("Surprise is often the key[.]"); *see also* Fed. R. Civ. P. 5(a)(1)(D) (no prior service required for *ex parte* motions).

**B.      Attachment-Related Relief in Aid of Execution**

In addition to emergency relief, and consistent with the "main purpose" of attachment which is "to secure the debt" to be executed upon, (*Lomax*, 404 A.2d at 946), the Court should issue the attachment-related relief sought after here forthwith, so as to safeguard TIG's rights in the property and any proceeds from any sale, pending this enforcement action.  As to the components of the relief sought:

**Filing and Recording of Judgment to Create Lien Rights.**  The D.C. Code contemplates that TIG record its judgments in order to create lien rights (i.e., an attachment) over the property.  As Section 15-102(a)(1) & (2) provides, any "final judgment or decree for the

19

payment of money … shall constitute a lien on [the judgment debtor's] freehold and leasehold

estates … *from the date such judgment … is filed and recorded in the office of the Recorder of*

*Deeds of the District of Columbia*[.]"  (Emphasis added.)  TIG accordingly requests leave from

the Court to record the lien.[4]  And recording of the judgments is furthermore necessary as a

stepping stone to later execution.  As Section 15-311 of the D.C. Code provides, a later writ of

execution "may be levied on all legal leasehold and freehold estates of the debtor in land, *but*

*only after such judgment has been filed and recorded in the office of the Recorder of Deeds of*

*the District of Columbia*."  (Emphasis added.)

**Attachment of Property and Proceeds.**  Consistent with D.C. Code § 16-550 ("all

orders necessary for the preservation of the property") and the practices of courts in this District,

the Court additionally may directly order attachment of the property itself in aid of execution.

*See Bennett v. Islamic Rep. of Iran*, 605 F. Supp. 2d 152 (D.D.C. 2009) (granting writs of

attachment issued against real property belonging to a foreign sovereign before considering

attempts to quash).  The Republic's interest in any sales proceeds are eligible to be attached, too,

particularly if any proceeds are directed to be paid to the Court first.  *See* D.C. Code § 16-544

("An attachment may be levied upon the judgment debtor's goods, chattels, and credits."); *see*

*also* D.C. Code § 16-549 ("An attachment may be levied upon money or property of the

defendant in the hands of an executor or administrator[.]"); D.C. Code § 16-515 (attachment may

---

[4] In the ordinary course, a litigant could record a judgment without seeking court permission.
But because Section 1610 of the FSIA, by its terms, appears to contemplate only *court-ordered*
attachment or execution relief for sovereigns, TIG accordingly seeks court permission first to
record its judgments and create lien rights.

Separately, on September 25, 2018, TIG filed a lis pendens with the District of Columbia
Recorder of Deeds, in accordance with D.C. Code § 42-2107, alerting a purchaser to the
pendency of this action.  *See* Bravin Decl. ¶ 16 & Ex. J.  While purchasers are now on notice of
this enforcement proceeding, the lis pendens does not itself vest in TIG an enforceable lien right
in the property – hence the need for the additional attachment-type relief sought here.

also be "levied upon money or property of the defendant in the hands of the marshal").  And

finally, the D.C. Code explicitly contemplates that a writ of attachment can issue without notice:

"Attachment may be issued at any time during the life of the judgment[.]"  D.C. Code § 16-543;

*see also* D.C. Code § 16-542 ("An attachment may be issued upon a judgment either before or

after or at the same time with a fieri facias [a writ of execution].");  *Lomax*, 404 A.2d at 948; Fed.

R. Civ. P. 5(a)(1)(D).

>        **C.    Execution**

After attachment, it is of course important to ensure that TIG is actually paid the money it

is due – namely, through execution of the judgment.  "In contrast to a writ of attachment, which

freezes or seizes property to maintain the status quo, a writ of execution is the means by which a

judgment is satisfied."  *Lomax*, 404 A.2d at 947.  The purpose of any writ of execution is "to

place the parties in the relative positions mandated by the judgment[.]"  *Id.*

The D.C. Code specifically authorizes execution against the Republic's right, title, and

interest in 2136 R St., NW.  *See* D.C. Code § 16-532 (judgment creditor may "enforce his

judgment against an equitable interest in real or personal estate of the judgment defendant[.]").

As well, the D.C. Code allows for execution against the Republic's interest in any proceeds from

a sale of the property or in any proceeds then-existing at the time of the issuance of the execution

writ.[5]  As D.C. Code Section 15-311 provides, "[t]he writ of fieri facias" – which is a type of

writ of execution – "may be levied upon all goods and chattels of the debtor … , and upon

money, bills, checks, promissory notes, or bonds … , and upon his money in the hands of the

---

[5] At this time, TIG seeks only a writ of attachment, not execution, as to the property at 2136 R. St, NW itself.  Execution against the property itself would, as things stand now, potentially require additional court involvement in turning the property over to TIG or in forcing a sale.  Of course, TIG reserves the right to execute directly against the property itself, especially if it appears no sale will occur within 180 days, and if it appears none will occur without further action by the Court.

marshal[.]" Likewise, D.C. Code Section 15-307 specifically allows for the "writ of fieri facias" to serve as a "lien upon the equitable interest of the judgment defendant in goods and chattels in his possession," such as an interest in the proceeds from the sale of real property.

That said, for the final step of execution, there will need to be notice to the Republic and an opportunity to be heard. *See Lomax*, 404 A.2d at 947 ("Surprise is often the key to a successful attachment, whereas notice is the touchstone to execution."). Accordingly, TIG requests the issuance of an order to the Republic to show cause for why such writs of execution should not issue.

## II.    The FSIA Does Not Bar the Relief Sought Here.

With the relief here soundly grounded in the D.C. Code, we now turn to potential claims of immunity under the FSIA. Congress enacted the FSIA to create a "'comprehensive set of legal standards governing claims of immunity" where property of foreign states is concerned. *NML*, 134 S. Ct. at 2255 (quoting *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 488 (1983)). As shown below, the relief sought here is not barred by the FSIA.

### A.    Because the Requirements of Section 1610 of the FSIA Are Met, the Subject Property Is Not Immune from Attachment and Execution.

The FSIA "confers on [property of] foreign states" immunity against attachment and execution "except as provided in sections 1610 and 1611" of the Act. *NML*, 134 S. Ct. at 2256 (quoting 28 U.S.C. § 1609). As we demonstrate below, Section 1610's exceptions to attachment-and-execution immunity are met. Section 1610's requirements for overcoming such immunity turn on the nature of the property being acted upon, whether an enumerated exception to such immunity is established, and whether there has been sufficient notice to the sovereign of the underlying judgment debt. For our purposes, the relevant language of Section 1610 is the following:

(a) The property in the United States of a foreign state, … , <u>used for a commercial activity in the United States</u>, shall not be immune from attachment in aid of execution, or from execution, upon a judgment entered by a court of the United States … , if –

….

(6) the judgment is <u>based on an order confirming an arbitral award rendered against the foreign state</u>, provided that attachment in aid of execution, or execution, would not be inconsistent with any provision in the arbitral agreement[.]

….

(c) No attachment or execution … shall be permitted until the court has ordered such attachment and execution after having determined that <u>a reasonable period of time has elapsed following the entry of judgment and the giving of any notice required under section 1608(e) of this chapter</u>.

(Emphasis added.)  *See also FG Hemisphere Assocs., LLC v. Demo. Rep. of Congo*, 637 F.3d 373, 375-76 (D.C. Cir. 2011) ("Where 'the judgment is based on an order confirming an arbitration award,' a plaintiff may only execute on '[t]he property in the United States of a foreign state … used for commercial activity in the United States.'").

As we now show, the requirements underlined above are met, starting with a judgment "based on an order confirming an arbitral award against the foreign state."

**1.      The Relief Sought Pertains to Default Judgments "Based on Orders Confirming Arbitral Awards."**

As should be evident from the fact that both default judgments arise out of confirmations of arbitral awards, the two judgment debts at issue are "based on an order confirming an arbitral award rendered against the foreign state."  28 U.S.C. § 1610(a)(6).  Nor is there any reason to think that attachment or execution would be "inconsistent with any provision in the arbitral agreement."  *Id.*  Neither of the two relevant reinsurance agreements includes any limitations on TIG's ability to collect on a duly confirmed arbitral award.  *See* LeGros Decl. Ex. B, Art. XXI (arbitration provision); LeGros Decl. Ex. C, Art. XXI (arbitration provision).

## 2. The Relief Sought Concerns Property Being "Used for a Commercial Activity in the United States."

Regardless of its preexisting use, now that 2136 R St., NW is being sold at auction on the open market for purchase by private commercial buyers, the property is being "used for a commercial activity" within the meaning of Section 1610(a) of the FSIA. Accordingly, the property would be eligible to be attached or executed against.

As the Supreme Court has elaborated, *commercial activity* is satisfied when a foreign government acts in the same manner as a private market actor would. Notably, it does not matter exactly *why* the property is being sold – i.e., what the government's motive is – only that the property is being sold:

> [W]hen a foreign government acts, not as regulator of a market, *but in the manner of a private player within it*, the foreign sovereign's actions are "commercial" within the meaning of the FSIA. *Moreover, because the Act provides that the commercial character of an act is to be determined by reference to its "nature" rather than its "purpose," 28 U.S.C. § 1603(d), the question is not whether the foreign government is acting with a profit motive or instead with the aim of fulfilling uniquely sovereign objectives.* Rather, the issue is whether the particular actions that the foreign state performs (whatever the motive behind them) *are the type of actions by which a private party engages in "trade and traffic or commerce."*

*Rep. of Arg. v. Weltover, Inc.*, 504 U.S. 607, 614 (1992) (emphases added); *see also* 28 U.S.C. § 1603(d) (in defining *commercial activity*, "[t]he commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose"). As well, it does not matter what the historical usage of the property previously was – again, only that is it *now* being sold. The FSIA itself specifies that "*either* a regular course of commercial conduct or *a particular commercial transaction or act*" qualifies as *commercial activity*. 28 U.S.C. § 1603(d) (emphases added). Consistent with that usage, courts have recognized that "attempting to quantify the number of commercial uses associated with the property … would unnecessarily complicate the determination." *Af-Cap, Inc. v. Chevron Overseas (Congo), Inc.*, 475 F. 3d 1080, 1091 (9th Cir. 2007).

Here, it is clear that the property is being used by Argentina to solicit and enter into a particular commercial transaction in the United States.  By taking 2136 R St., NW and selling it on the open market through an ostensibly "arm's length" auction process, complete with the assistance of a commercial real-estate broker, the Republic is participating in "a particular commercial transaction or act" (28 U.S.C. § 1603(d)) just like any other private market actor would.  The auction here bears all the hallmarks of selling a property to generate revenue.  And that revenue-generating nature makes the auction an activity whose "nature" is quintessentially "commercial."  *See* H.R. Rep. No. 1487, 94th Cong., 2d Sess. 16, *reprinted in* 1976 U.S.C.C.A.N. 6604, 6615 ("[C]ertainly, if an activity is customarily carried on for profit, its commercial nature could readily be assumed.").  Likewise, it also follows that, since 2136 R St., NW has been "put … in the service of the commercial activity" by virtue of being put up for auction, the property is accordingly being *used for* such commercial activity.  *Conn. Bank of Commerce v. Rep. of Congo*, 309 F.3d 240, 254 (5th Cir. 2002).   In fact, when 2136 R St. NW was previously the subject of attachment proceedings, this Court suggested that the only thing immunizing the property was the fact that, by the time the earlier action was brought, "[t]he property did not sell and remains off the market," whereas things would have been different "if the property was still listed for sale" – which of course now it is.  *NML*, No. 04-00197, 2005 U.S. Dist. LEXIS 47027, at *16, *52.  So there should be no question, then, that as things stand, 2136 R St., NW, should be subject to execution and attachment, notwithstanding the FSIA.

Nor does the FSIA bar the Court from ordering the supplementary relief of directing that any proceeds generated from the sale of 2136 R St., NW be paid to a Court registry. Supplementary relief – distinct from attachment and execution itself – has independent grounding in the Federal Rules, which separately authorize "proceedings supplementary to and in aid of judgment or execution" under the laws of the state where the Court is located.  Fed. R.

Civ. P. 69(a)(1); *see also* Fed. R. Civ. P. 64 ("[E]very remedy is available that, under the law of the state where the court is located, provides for seizing a person or property to secure satisfaction of the potential judgment."). Here, of course, D.C. Code Section 16-550 separately authorizes that, "[w]hen the property is perishable, or for other reasons a sale of it appears expedient, the court may order that the property be sold and its proceeds paid into court and held subject to its order on the final decision of the case."

Both the Supreme Court and this Circuit have held that the FSIA does not preclude the application of supplementary federal rules that bear on enforcement proceedings. For instance, global post-judgment asset discovery against a sovereign is allowed, and so too are contempt orders against sovereigns to pay money into the court's registry – and both because the FSIA does not contain any provision specifically and clearly abrogating those procedures. *See NML*, 134 S. Ct. at 2252 (global post-judgment asset discovery upheld because the FSIA does not contain "the 'plain statement' necessary to preclude application of" an otherwise available mechanism in aid of enforcement under federal law); *FG Hemisphere Assocs., LLC v. Demo. Rep. of Congo*, 637 F.3d 373, 378 (D.C. Cir. 2011) (upholding a contempt order against a foreign sovereign and rejecting the view that "a contempt order requiring the Republic of Congo to pay money into the court's registry" is inconsistent with the FSIA).

Here, by the same token, there is no such clear command within the FSIA that limits this Court's use of otherwise-available post-judgment mechanisms to preserve and execute against otherwise attachable real property of a foreign sovereign. To the contrary, this Court has previously ordered similar equitable relief. In *Am. Int'l Grp., Inc. v. Islamic Rep. of Iran*, 657 F.2d 430, 434 (D.C. Cir. 1981), this Circuit upheld a 1981 executive agreement between the U.S. and the Islamic Republic of Iran to, *inter alia*, repatriate Iranian assets in the United States. Of special relevance, some of the assets were subject to a preliminary injunction that "prevent[ed]

Iran or Central Insurance of Iran from taking any action that would remove their assets from the jurisdiction of the court." *Id.* Not only did the D.C. Circuit ultimately uphold the right of the President to enforce the bilateral agreement regardless of the lower court's orders, but critically, this Circuit did not question the availability of such supplementary relief under the FSIA.

* * *

In the end, then, 2136 R St. NW is now "used for a commercial activity" and thus subject to attachment and execution under the FSIA. TIG ultimately seeks satisfaction of its debt through the sale of 2136 R St. NW and recovery of the attendant proceeds. TIG asks that this sale occur either as a result of the conclusion of the currently pending auction process, or through additional court involvement later, should it come to that. And as part of ensuring that such enforcement can occur, this Court has the supplementary authority under the D.C. Code, and notwithstanding the FSIA, to further prevent the Republic "from taking any [other] action that would remove their assets from the jurisdiction of the court" and instead direct any sale proceeds to the Court first. *AIG*, 657 F.2d at 434.

### 3.    The Relief Sought Is Also Permitted Because a "Reasonable Period of Time Has Elapsed" Following Service of the Default Judgments.

In addition to Section 1610(a)'s exceptions for execution immunity, subsection (c) further provides that "[n]o attachment or execution … shall be permitted until the court has … determined that a reasonable period of time has elapsed following the entry of judgment and the giving of any notice required under section 1608(e)[.]" Section 1608(e), in turn, provides that "[a] copy of any such default judgment shall be sent to the foreign state or political subdivision in the manner prescribed for service in this section."

Those requirements are met. As to the 2018 default judgment, Section 1608(a)(1) provides for service to be made pursuant to "any special arrangement for service between the plaintiff and the foreign state[.]" In rendering the 2018 default judgment, the Northern District

27

of Illinois found that just such a special arrangement existed.  As that court found, the reinsurance contracts to which the Republic was bound as successor-in-interest specified a manner of service, consistent with which the Republic was then served by both TIG, as well as the Northern District on its own order.  *See* Aldort Decl. ¶ 28 & Exs. 40-41.  TIG's service of the 2018 default judgment through Hague Convention procedures is a route that would independently satisfy the service procedures enunciated in Section 1608(a)(2) of the FSIA.  *See* Bravin Decl. ¶¶ 11-15 & Exs. G, H, and I.

Meanwhile, the 2001 default judgment itself was served on the Republic pursuant to Hague Convention procedures, which commenced on November 3, 2017 and completed on November 9, 2017.  On April 11, 2018, TIG received from the Argentine Central Authority Certificates of Service, dated April 5, 2018.  *See* Bravin Decl. ¶¶ 9 & Exs. F.  So that service was completed several months prior, as well.

The Republic, then, has had at least several months' notice of the two default judgments – and that is more than enough.  "[T]he necessary interim 'will of course vary according to the nuances of each case,'" *Ned Chartering & Trading, Inc. v. Republic of Pakistan*, 130 F. Supp. 2d 64, 67 (D.D.C. 2001), but courts have found periods as little as six weeks to be reasonable notice.  *See id.* (six weeks reasonable); *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, No. H 01-0634, 2002 U.S. Dist. LEXIS 3976, at *4-6 (S.D. Tex. Jan. 25, 2002); *Ferrostaal Metals Corp. v. S.S. Lash Pacifico*, 652 F. Supp. 420, 423 (S.D.N.Y. 1987) (three months reasonable).  Also worth bearing in mind is the fact that, much earlier, the Republic had *actual* notice of both judgment debts at issue.  The Republic has received notice of the judgment through various channels, and it has even been engaged in protracted negotiations with TIG concerning the debts at issue.  *See* LeGros Decl. ¶¶ 9-15 (summarizing such efforts); Custo Decl. ¶¶ 13-17 & Exs. D, E, & F (similar).  Courts have considered "evidence that the

foreign state is attempting to evade payment of the judgment" as evidence that a reasonable

period of time has elapsed.  *Owens v. Rep. of Sudan*, 141 F. Supp. 3d 1, 8 (D.D.C. 2015)

(quoting *Ned Chartering*, 130 F. Supp. at 67).

There can be no doubt, then, that Section 1610(c)'s notice requirements have been met.

Since the default judgments at issue are "based on an orders confirming arbitral awards," and

since 2136 R St., NW is undoubtedly now "property used in a commercial activity," TIG has

accordingly overcome any attachment-and-execution immunity that might otherwise apply.

> **B.    Because the Relief Sought Applies Directly to Property, There Is No Need to
> Separately Establish This Court's Jurisdiction Over the Republic Itself.**

With an exception to attachment-and-execution immunity firmly established, we briefly

address any contention the Republic might eventually raise that it is "jurisdictionally immune."

*Compare NML*, 134 S. Ct. at 2256 (distinguishing between attachment-and-execution immunity

pertaining to a sovereign's property versus the sovereign's own jurisdictional immunity from

suit).  Crucially, there is no need for TIG to overcome any separate "jurisdictional immunity" the

Republic might claim – and thus no reason to delay on account of such a hypothetical claim,

either.  Fundamentally, the relief sought here is simply *as to specific non-immune property for

use in satisfying a judgment*, as opposed to relief sought against the Republic itself.

This distinction matters:  There is a long heritage of proceeding directly against property

itself – as opposed to against its owner – in satisfaction of a judgment.  The Supreme Court itself

has recognized that a "quasi in rem" proceeding "affects the interests of particular persons in

designated property," and importantly allows a plaintiff "to apply what he concedes to be the

property of the defendant to the satisfaction of a claim against him."  *Shaffer v. Heitner*, 433 U.S.

186, 199 n.17 (1977).  Where "proceedings were quasi in rem," like here, "a judgment binds

*nothing but the property attached*."  *Blackmer v. United States*, 49 F.2d 523, 529 (D.C. Cir.

1931) (emphasis added) (citing *Pennoyer v. Neff*, 95 U.S. 714 (1878)).

It makes all the difference, then, if one is acting on property versus acting on a foreign sovereign itself.  A proceeding against property in satisfaction of a judgment does not require a separate determination that its sovereign owner is also subject to jurisdiction under the FSIA.  As the Southern District of New York explained:

> In contending that this Court was required to determine whether Honduras itself is subject to any of the exceptions to sovereign immunity under section 1605, Honduras "mistakenly conflates jurisdiction and execution immunity" which "operate independently."  In this proceeding, Plaintiffs do not attempt to join Honduras as a party, rather, they seek to satisfy the prerequisites to attachment of Honduran assets in satisfaction of their default judgment against [the initial judgment debtor].

*Byrd v. Corporacion Forestal y Industrial De Olancho, S.A.*, 974 F. Supp. 2d 264, 268 (quoting *Walters v. Indus. & Comm'l Bank of China, Ltd.*, 651 F.3d 280, 292, 295 (2d Cir. 2011)).

Accordingly, all that need be established is an exception to immunity from attachment and execution as to the subject property itself pursuant to Section 1610.  Conversely, TIG need not demonstrate any exception pursuant to Section 1605's "jurisdictional immunity" provisions as to the Republic itself.[6]

---

[6] Should TIG need to prove an exception to the "jurisdictional immunity" over the Republic itself, multiple exceptions would apply:

**First**, consistent with Section 1605(a)(1) of the FSIA, the Republic of Argentina itself "waived its immunity either explicitly or by implication" by virtue of being a signatory to the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards.  *See Rep. of Arg. v. AWG Grp. Ltd.*, No. 15-01057, 2016 U.S. Dist. LEXIS 136318, at *20 (D.D.C. Sept. 30, 2016).  Likewise, as the Seventh Circuit already opined in connection with the underlying proceedings between TIG and Caja Nacional, "[b]ecause Argentina signed the New York and Panama Conventions, it has waived the immunity protections of the FSIA for their instrumentalities[.]"  *Int'l Ins. Co.,* 293 F.3d at 400.

**Second**, it would also be true that this enforcement action itself would be "based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere[]."  28 U.S.C. § 1605(a)(2).  This proceeding, after all, is to enforce default judgments on debts arising out of commercial reinsurance contracts issued by a domestic insurance company.

**III.    The Relief Sought Should Not Be Delayed on Account of Any Contention That the Republic and Caja Nacional Were Separate Entities.**

Finally, TIG's relief should not be delayed, let alone blocked, on account of any claim by the Republic that it was a separate entity from Caja Nacional.  That is so for a host of practical reasons:  First, and most importantly, the 2018 default judgment was rendered *against the Republic itself.*  Aldort Decl. Exs. 40-41.  With a judgment against the Republic, that straightforwardly allows relief to proceed against property titled in the Republic's name.  Moreover, the arbitral panel already found that the Republic was a successor to Caja Nacional's debt obligations, *see* Aldort Decl. Ex. 49 at 1, the confirmation of which led to the default judgment today against the Republic itself.  No more is needed to award relief here.  And as a final practical matter, the property at issue is expected to sell for about $3 million – less than the $3,459,489.31 due under the 2018 default judgment.  Accordingly, *and at an absolute bare minimum*, regardless of whether the Court sees any need to consider the 2001 default judgment in further detail, the presence of the 2018 default judgment should facilitate relief issuing immediately.

\* \* \*

Otherwise, as far as the 2001 default judgment is concerned, while it is true as a general matter that a successor is not liable for its predecessor's liabilities, *see, e.g.*, *Bingham v. Goldberg, Marchesano, Kohlman, Inc.*, 637 A.2d 81, 89 (D.C. 1994), one well-recognized exception to that general rule is where, as here, there is *an express or implied agreement to assume the liabilities of the predecessor.  See, e.g.*, *Vernon v. Schuster*, 179 Ill. 2d 338, 345

---

*Third*, because this proceeding is ultimately to enforce a default judgment arising out of the confirmation of an arbitral award, it would also satisfy the arbitral exception in 28 U.S.C. § 1605(a)(6).

(1997).  Such an arrangement exists here.  As detailed further in the Declaration of Bernardo

Gustavo Custo, the Republic of Argentina, in a series of resolutions and decrees, *expressly* stated

that it assumed the assets and liabilities of Caja Nacional, which today no longer exists.  *See*

Custo Decl. ¶¶ 5-12 & Exs. A-C.  Even if "the purchase … of a company's entire assets

ordinarily does not cause the purchaser to assume the company's liabilities," there "are

exceptions, of which the most common and obvious is if the purchaser expressly assumes those

liabilities."  *Centerpoint Energy Servs. v. Halim*, 743 F.3d 503, 507 (7th Cir. 2014); *see also,*

*e.g.*, *Sodexo Operations, LLC v. Not-For-Profit Hosp. Corp.*, 930 F. Supp. 2d 234, 237 (D.D.C.

2013) (successor is liable if it expressly agrees to assume predecessor's debts).[7]

Nor should a determination over the Republic's successor-in-interest status hold things

up, either.  A determination that the Republic is a successor-in-interest can be made at an early

juncture on these Motions.  Other courts have decided similar issues early on, too.  *See, e.g.*,

*Byrd*, 974 F. Supp. 2d at 266 (where plaintiffs obtained a judgment in another district against an

instrumentality of the Republic of Honduras, the Southern District of New York found "that the

---

[7] Separately, as well, any alleged presumption of separateness between a foreign sovereign and
its instrumentalities breaks down "if the sovereign and its instrumentality are alter egos or if
adherence to the rule of separateness would work an injustice," with the result being that "[t]he
holder of a judgment" may "execute on the property" held by another entity.  *Rubin v. Islamic*
*Rep. of Iran*, 830 F.3d 470, 474 (7th Cir. 2016) (citing *First Nat'l City Bank v. Banco Para El*
*Comercio Exterior de Cuba*, 462 U.S. 611, 626-29 (1983)); *see also, e.g.*, *Weinstein v. Islamic*
*Rep. of Iran*, 624 F. Supp. 2d 272, 275 (E.D.N.Y. 2009) (similar); *Gen. Star Nat'l Ins. Co. v.*
*Administratia Asigurarilor de Stat, Carom, S.A.*, 713 F. Supp. 2d 267, 270 (S.D.N.Y. 2010)
(assets of Government of Romania attached as alter ego of state-owned insurance companies).

While the Republic of Argentina should also be liable for Caja Nacional's judgment debt on an
"alter ego" theory, it is even more straightforward that the Republic expressly *assumed* such
liabilities in the first place as Caja Nacional's successor-in-interest.  Applying the factors to
determine "alter ego" status, *see Bancec*, 462 U.S. at 626-29, would weigh in favor of TIG's
position, but is neither helpful nor relevant here.  *See Gen. Star*, 289 F.3d at 439 ("The Supreme
Court in *First National City Bank [v. Bancec]*, however, did not consider the type of
successorship question presented in this case.  Instead, the Court determined that international
law governed whether a Cuban national bank could be held liable in an American court for
actions taken by the Cuban government.").

Republic of Honduras was the successor in interest of [its instrumentality]" and "enabled Plaintiffs to seek execution of their judgment against Honduras directly"); *see also, e.g.*, *Gen. Star Nat'l Ins. Co. v. Administratia Asigurarilor de Stat*, No. C2 98-1051, Slip Op. at *1-2 (S.D. Ohio Sept. 16, 2002).

Here, there is already a default judgment against the Republic, a finding that the Republic is the successor-in-interest to Caja Nacional's liabilities, and clear decrees by the Republic itself to that effect. With the need for exigent relief clear, there should be no delay on account of any alleged separateness between the Republic and the long-defunct entity of Caja Nacional.

### CONCLUSION

For over a decade, TIG has been forced to chase after the debts owed here. With a fleeting and rare opportunity for TIG to be able to collect, the Court should issue forthwith the narrowly tailored relief sought. The Motions should be granted.

DATED:  September 25, 2018                Respectfully submitted,

MITCHELL SILBERBERG & KNUPP LLP


By:  *Mark N. Bravin*
         Mark N. Bravin (D.C. Bar No. 249433)
         Gilbert S. Lee (*pro hac vice app. forthcoming*)
         Attorneys for TIG Insurance Company

33