**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| TIG INSURANCE COMPANY, as successor by merger to International Insurance Company and International Surplus Lines Insurance Company; | ) ) ) ) ) | |
| Plaintiff-Judgment Creditor, | ) ) | Case No. |
| v. | ) ) ) | |
| REPUBLIC OF ARGENTINA as successor to Caja Nacional de Ahorro y Seguro; and CAJA NACIONAL DE AHORRO Y SEGURO; | ) ) ) ) | |
| Defendants-Judgment Debtors. | ) ) | |

**DECLARATION OF CHRISTOPHER LEGROS**

I, Christopher LeGros, declare as follows:

1.      I am a Senior Reinsurance Collections Specialist at RiverStone Resources LLC, which acts on behalf of, and manages claims for its affiliate TIG Insurance Company. I have been an employee of RiverStone Resources LLC since 2001. Since 2007, I have been directly involved in TIG's efforts to collect on outstanding balances due to TIG under various reinsurance contracts initially entered to with Caja Nacional de Ahorro y Seguro, which has since been succeeded by the Republic of Argentina (collectively referred to herein as the "Republic," and referred to where necessary for historic purposes as "Caja Nacional"). Some of TIG's efforts to collect on the various debts at issue pre-date my personal involvement with this matter. However, I have reviewed and analyzed documents evidencing such efforts, which are maintained by TIG in the ordinary course of business. I make the statements below based on my personal knowledge and based on my review of TIG's business records maintained in the ordinary course.

## Overview of the Underlying Debts at Issue and How They Arose

2.      The debt obligations that today have resulted in two default judgments arise out of two reinsurance agreements. These two reinsurance contracts were entered into by International Surplus Lines Insurance Company as well as L.W. Biegler, Inc. on behalf of International Insurance Company, The North River Insurance Company, United States Fire Insurance Company, Westchester Fire Insurance Company, Industrial Indemnity Company, United States Fire Insurance Company of Canada, and Herald Insurance of Canada. Today, following a series of mergers, International Insurance Company is now known as TIG Insurance Company. Attached hereto as **Exhibit A** is a true and correct copy of the Certificate of Merger for International Insurance Company and TIG Insurance Company, effective December 16, 2002. For convenience, from here on out, we will simply refer to TIG and its predecessors as simply TIG.

3.      As for the first of the two reinsurance contracts, Caja Nacional reinsured TIG pursuant to a Casualty Reinsurance Agreement that incepted on January 1, 1979 and terminated its participation on January 1, 1984. A true and correct copy of this agreement is attached hereto as **Exhibit B**. Caja Nacional agreed to participate for .583%. *See* Ex. B at 13.

4.      As for the second of the two reinsurance contracts, Caja Nacional also reinsured TIG pursuant to a Casualty Excess Reinsurance Agreement that incepted on March 15, 1979 and terminated its participation on December 31, 1981. A true and correct copy of this agreement is attached hereto as **Exhibit C**. Caja Nacional agreed to participate for 6.67%. *See* Ex. C at 15.

5.      Both reinsurance agreements were continuous until terminated. The business written was classified by TIG's predecessors-in-interest as casualty business. *See* Exs. B & C, Art. III. Under the reinsurance agreements, TIG paid Caja Nacional a share of premiums in

2

exchange for Caja Nacional's agreement that it would reimburse TIG for a share of the losses that TIG paid under insurance policies classified as casualty business and reinsured under the agreements. I have reviewed TIG's records and confirmed payment of this premium. I have also reviewed TIG's records and confirmed that TIG has billed Caja Nacional continually for its overdue balances. Despite TIG having paid to Caja Nacional all premiums owed with respect to each of the reinsurance agreements, the Republic, as Caja Nacional's successor, has repeatedly failed to pay TIG for its portion of the losses under the Treaties. As a result, TIG was forced to initiate multiple arbitral proceedings.

## The Arbitral Proceedings Leading to the 2001 Default Judgment

6.      TIG previously initiated arbitration against Caja Nacional in 2000. After Caja Nacional failed to appear in the arbitration, TIG moved for a default final award. On October 17, 2000, after submitting evidence to support its claims including amounts due, TIG obtained a "Final Award" against Caja Nacional in the amount of $4,702.428.12. That arbitral award was confirmed by the Northern District of Illinois District Court on July 5, 2001 in a proceeding captioned *International Insurance Co. v. Caja Nacional de Ahorro Seguro*, 00 C 6703. The award was also affirmed by the Seventh Circuit on June 7, 2002, in *International Insurance Co. v. Caja Nacional de Ahorro Seguro*, 293 F.3d 392 (7th Cir. 2002). I am informed that TIG is submitting concurrent declarations from its outside counsel offering further details about the 2001 default judgment, the Seventh Circuit's affirmation of it, various sanctions issued in connection with that action, and the service of the default judgment on the Republic, among other topics.

### The Arbitral Proceedings Leading to the 2018 Default Judgment

7.    On July 1, 2016, TIG initiated a separate arbitral proceeding against the Republic under the reinsurance agreements detailed above. The amounts at issue in this later arbitral proceeding are billings issued since the initiation of the earlier arbitration in 2000. Although the Republic was repeatedly notified of the arbitral proceedings, the Republic again failed to appear, after which TIG moved for a default final award. After submitting evidence to support its claims including amounts due, TIG obtained a "Final Award" against the Republic in the amount of $2,827,912.20 in overdue balances; $473,320.92 in interest; $32,812.44 representing the Republic's 50% share of the arbitration costs and arbitrator fees; and $125,443.75 in attorneys' fees incurred by TIG in pursuing the arbitration.

8.    This second arbitral award was confirmed by the Northern District of Illinois District Court, who issued a default judgment against the Republic for $3,459,489.31 on January 8, 2018 in a proceeding captioned *TIG Insurance Co. v. Republic of Argentina*, No. 17-cv-02835. I am informed that TIG is submitting concurrent declarations from its outside counsel offering further details about the 2018 default judgment and its service on the Republic, among other topics.

### TIG's Efforts to Obtain Payment and Engage the Republic

9.    In connection with the debts at issue and resulting default judgments, TIG has undergone myriad efforts to try and obtain satisfaction.

10.    For instance, following the 2001 default judgment, TIG immediately sought to enforce the confirmed judgment through court proceedings to discover Caja Nacional's assets. During the course of those proceedings, Caja Nacional, through its counsel, expressed a

4

willingness to resolve the matter. TIG promptly reciprocated a mutual willingness. But Caja Nacional never paid.

11.    Over the next several years, from May 2003 to early 2007, TIG also communicated with a number of officials from the Government of Argentina regarding a resolution of the outstanding judgment. The Argentine officials included the Argentine Ambassador to the United States; various representatives from the Ministry of Economy and Production; and representatives from Instituto Nacional de Reaseguro ("INDER"), an Argentine governmental entity which, as I understand, was for a time entrusted with management of Caja Nacional's liabilities and assets.

12.    As well, during the course of the aforementioned negotiations, the Argentine Ministry of Economy and Production (through its outside counsel) represented that Argentina had assumed responsibility for Caja Nacional's obligations, including the judgment debt to TIG. Attached as **Exhibit D** is a true and correct copy of a September 23, 2003 letter on behalf of the Argentine Ministry of Economy and Production to TIG to this effect. It is my understanding that as of January 2006, Caja Nacional ceased to exist and all of its assets and liabilities were transferred to the Republic of Argentina.

13.    After I became directly involved in TIG's negotiations with the Republic, in 2007, TIG's efforts to collect continued. For example, TIG representatives met with members of the Argentine Mission on April 25, 2007. At the meeting, TIG proposed a potential settlement, but Argentina never responded. Counsel for TIG attempted to arrange follow-up settlement meetings, but to my knowledge those meetings did not occur.

14.    Almost three years passed from 2007 to 2010, and the Republic remained unwilling to pay the outstanding judgment, despite its assumption of Caja Nacional's liabilities.

In March 2010, TIG once again sought to re-open settlement negotiations after nearly three years of stalled negotiations.   During that time, TIG made yet another settlement proposal, to which Argentina never responded.

15.     TIG even sought the aid of the U.S. Department of State and Congress in trying to collect on the 2001 default judgment as well as the subsequent billings that would later lead to the 2018 default judgment.  For example, most recently, in April 2016, TIG met with the Argentinean Ambassador to the United States and the Attorney General of the Argentinean Treasury to notify the new administration of President Mauricio Macri (who took office in 2015) of the unpaid judgment and other debts.  TIG also resubmitted to the new administration all documentation regarding the reinsurance agreements, the unpaid 2001 default judgment, and other background information to assist it in processing payment of that judgment as well as other outstanding debts.  TIG still has not been paid.

## Calculation of the Judgment Debts Owed

### I.    The 2001 Default Judgment

16.     By my calculations, the total amount due to TIG under the 2001 Default Judgment, which TIG now seeks to enforce upon or attach in an amount up to, is $30,163,010.13.  That amount due comprises the following elements and is drawn from various orders which I am informed are included in the Declaration of Julie Rodriguez Aldort, citations to which I have included:

- **Judgment Debt – $4,702,428.12:**  When the Northern District of Illinois confirmed the final award issued in the initial arbitration proceeding against Caja

Nacional and entered a default judgment on July 5, 2001, the Northern District

entered a judgment amount of $4,702,428.12. *See* Aldort Decl. Ex. 13.

- **Post-Judgment Interest – $3,942,521.13:** This represents post-judgment interest

  owed, as of September 18, 2018. Interest has been calculated pursuant to 28

  U.S.C. § 1961, which I understand to be the statute that governs post-judgment

  interest calculations for all federal judgments ("Interest shall be allowed on any

  money judgment in a civil case recovered in a district court"). Under 28 U.S.C. §

  1961(a), the post-judgment interest rate is be calculated "from the date of the

  entry of the judgment, at a rate equal to the weekly average 1-year constant

  maturity Treasury yield, as published by the Board of Governors of the Federal

  Reserve System, for the calendar week preceding[] the date of the judgment." In

  the calendar week preceding the date of the judgment (July 5, 2001), the

  applicable rate was 3.60%.[1] The federal post-judgment interest statute (28 U.S.C.

  § 1961(b)) also provides that "[i]nterest shall be computed daily to the date of

  payment … , and shall be compounded annually." Pursuant to the statute, I have

  compounded the interest annually, yielding the total amount listed above.[2]

- **Post-Judgment Sanctions ($2,000/day from Dec. 2, 2002 through Jan. 20,**

  **2005) – $1,554,000 –** On December 4, 2002, the Northern District of Illinois

  awarded sanctions for $2,000 per day, arising out of Caja Nacional's failure to

  comply with a citation to discover assets. *See* Aldort Decl. Ex. 44 at 1. The

---

[1] The treasury-yield rates can be located from the Department of Treasury's website: https://www.treasury.gov/resource-center/data-chart-center/interest-rates/Pages/TextView.aspx?data=yieldYear&year=2001.

[2] For completeness, I will note that, in TIG's petition to revive the 2001 default judgment (dated July 1, 2014), the post-judgment interest rate was quoted at different rate, 9%. I am informed that the figure was drawn from Illinois state laws concerning post-judgment interest. I am also informed by counsel that the 9% interest rate was erroneous;

Northern District of Illinois would go on to include monetary amounts from these sanctions in its July 11, 2014 order reviving the judgment. *See* Aldort Decl. Exs. 47 & 48. The $2,000-per-day sanctions would eventually be increased, as detailed below. The total of $2,000 per day, from December 4, 2002 through January 20, 2005 (when the sanctions were increased), amounts to $1,554,000.

- **Post-Judgment Sanctions ($4,000/day from Jan. 20, 2015 through present) – $19,956,000** – After Caja Nacional continued to fail to comply with the Northern District's orders to provide discovery on its executable assets, the Northern District increased sanctions to $4,000 per day. *See* Aldort Decl. Ex. 46 at 1. The $4,000-per-day sanctions awarded was included in the Northern District's July 11, 2014 order reviving the judgment. *See* Aldort Decl. Exs. 47 & 48. To my knowledge, the $4,000-per-day sanctions order remains in place. From January 20, 2005 through September 18, 2018, I calculate the amount of sanctions due to be $19,956,000.

- **Attorneys' Fees – $8,060** – The Northern District of Illinois also awarded to TIG attorneys' fees in an order dated March 13, 2003. *See* Aldort Decl. Ex. 45 at 1. The fees awarded in that order were included in the July 11, 2014 Order reviving the judgment. *See* Aldort Decl. Exs. 47 & 48.

---

the proper interest for a judgment rendered by a federal court is determined in accordance with federal law, pursuant to which I offer the calculations set forth above.

## II.    The 2018 Default Judgment

17.    By my calculations, the total amount due to TIG under the 2018 Default Judgment, which TIG now seeks to enforce upon or attach in an amount up to, is $3,503,011.04. That amount due comprises the following elements:

- **Judgment Debt – $3,459,489.31:**  When the Northern District of Illinois confirmed the final award issued in later arbitration proceeding against the Republic and entered a default judgment, the Northern District entered a judgment amount of $3,459,489.31. *See* Aldort Decl. Exs. 40 & 41.

- **Post-Judgment Interest – $43,522.73** – this represents post-judgment interest owed, as of September 18, 2018.  Interest has been calculated pursuant to 28 U.S.C. § 1961.  Under 28 U.S.C. § 1961(a), the post-judgment interest rate is be calculated "from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding[] the date of the judgment."  In the calendar week preceding the date of the judgment (January 8, 2018), the applicable rate was 1.82%.[3]  The federal post-judgment interest statute (28 U.S.C. § 1961(b)) also provides that "[i]nterest shall be computed daily to the date of payment … , and shall be compounded annually."  Pursuant to the statute, I have compounded the interest annually, yielding the total amount listed above.

---

[3] The treasury-yield rates can be located from the Department of Treasury's website:  https://www.treasury.gov/ resource-center/data-chart-center/interest-rates/Pages/TextView.aspx?data=yieldYear&year=2018

III.    **Summary of Calculations**

18.    The total amount due for the 2001 default judgment is $30,163,010.13.  The total amount due for the 2018 default judgment is $3,503,011.04.  The sum total of the two amounts due is $33,666,021.17.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed at Manchester, New Hampshire, this 24th day of September, 2018

Christopher LeGros
Senior Reinsurance Collections Specialist

# Exhibit A



### STATE OF ILLINOIS
## DEPARTMENT OF INSURANCE

320 WEST WASHINGTON STREET
SPRINGFIELD, ILLINOIS 62767-0001



I, the undersigned, Director of Insurance of the State of Illinois, hereby certify that the document to which this Certification is attached is a true and correct copy of the original now on file in and forming a part of the records of the Illinois Department of Insurance.

In witness whereof, I hereto set my hand and cause to be affixed this Seal in Springfield, Illinois.

Date: __JAN 1 4 2015__

Acting Director of Insurance   MMS

IL446-0135 (6/09)

*Printed on Recycled Paper*



### CERTIFICATE OF MERGER

WHEREAS, certain Agreement of Merger entered into on November 27, 2002 by and between INTERNATIONAL INSURANCE COMPANY a company organized and existing under and by virtue of the laws of the State of ILLINOIS and the TIG INSURANCE COMPANY, a company organized and existing under and by virtue of the laws of the State of CALIFORNIA, whereby the said INTERNATIONAL INSURANCE COMPANY has been merged into the TIG INSURANCE COMPANY, the surviving company, has been presented to the Director of Insurance of the State of Illinois for approval.

And it appearing from the documents filed with the Director of Insurance of the State of Illinois that the said parties to said Agreement of Merger have in all respects complied with the laws of the State of Illinois and with all applicable provisions of an Act of the General Assembly of the State of Illinois, entitled: The "Illinois Insurance Code," approved June 29, 1937, as amended, and that said Agreement is in accordance with the provisions of Article X of the said "Illinois Insurance Code" and is not inconsistent with the laws or constitution of the State of Illinois or of the United States, and the undersigned Director of Insurance of the State of Illinois being satisfied that no reasonable objection exists thereto.

NOW, THEREFORE, I, Director of Insurance of the State of Illinois, by virtue of the powers vested in me by law do hereby issue this Certificate of Merger. To be effective December 16, 2002.

IN TESTIMONY WHEREOF, I hereto set my hand
and cause to be affixed the Seal of my office.

Done at the City of Springfield, this _13th_
day of _December_, A. D. _2002_

_Nat Shapo_

Nathaniel S. Shapo
Director

B 4

**EXECUTION COPY**

## AGREEMENT AND PLAN OF MERGER

THIS AGREEMENT AND PLAN OF MERGER (this "Agreement"), dated as of the 27th day of November, 2002, is by and among INTERNATIONAL INSURANCE COMPANY, an Illinois insurance corporation ("IIC"), THE RESOLUTION GROUP, INC. a corporation duly organized and existing under the laws of the State of Delaware ("TRG"), TIG INSURANCE COMPANY, a California insurance corporation ("TIC") and TIG INSURANCE GROUP, a corporation duly organized and existing under the laws of the State of California ("TIG Group").

WHEREAS, IIC is a corporation duly organized, validly existing and in good standing under the laws of the State of Illinois with an authorized capital of 25,000 shares of $168.00 par value common stock ("IIC Common Stock"), all of which are issued and outstanding; and

WHEREAS, TIC is a corporation duly organized, validly existing and in good standing under the laws of the State of California with an authorized capital of 50,000 shares of $140.00 par value common stock ("TIC Common Stock"), of which 30,000 shares are issued and outstanding; and

WHEREAS, TRG owns all of the issued and outstanding shares of IIC Common Stock; and

WHEREAS, TIG Group owns all of the issued and outstanding shares of TIC Common Stock; and

WHEREAS, Section 215 ILCS 5/156 of the Illinois Insurance Code authorizes the merger of a stock insurance corporation organized under the laws of Illinois into a stock insurance corporation organized under the laws of another state and Sections 1100 and 1108 of the California General Corporation Law authorize the merger of an insurance corporation organized under the laws of another state into an insurance corporation organized under the laws of the State of California; and

WHEREAS, IIC and its sole shareholder desire for IIC to merge into TIC, which will survive the merger, in a transaction structured to qualify as a tax-free reorganization under Section 368 of the Internal Revenue Code of 1986, as amended; and

WHEREAS, at some time following the merger of IIC into TIC, TIG Group intends to transfer to one or more affiliates TIG Group's equity interests in Commonwealth Insurance Company ("Commonwealth") and Odyssey Re Holdings Corporation ("ORHC"); and

WHEREAS, the respective Boards of Directors of IIC, TRG, TIC and TIG Group have approved the transaction contemplated hereby and have authorized the respective parties hereto to enter into this Agreement; and

WHEREAS, TRG and TIG Group, as the sole shareholders of IIC and TIC, respectively, have approved IIC's and TIC's entering into this Agreement; and

NOW THEREFORE, the parties hereto, in consideration of the mutual covenants, agreements and provisions hereinafter contained, do hereby agree upon and prescribe the terms and conditions of such merger and the mode of carrying it into effect, as follows:

## ARTICLE I.

## MERGER AND SURVIVING CORPORATION

1.1.    The Merger.    Upon the terms and subject to the conditions hereof and in accordance with the provisions pertaining to the merging of domestic and foreign corporations contained in the Illinois Insurance Code and the California General Corporation Law and subject to the receipt of all required approvals of the Illinois Department of Insurance and the California Department of Insurance, upon the filing of all required documents with the Departments of Insurance and Secretaries of State in Illinois and California, respectively, at the Effective Time (as defined in Section 4.1 below) IIC shall be merged with and into TIC (the "Merger").

1.2.    Surviving Corporation.    TIC shall be the surviving corporation in the Merger under the name TIG Insurance Company (the "Surviving Corporation"). At the Effective Time, the separate existence of IIC shall cease.

## ARTICLE II.

## TERMS, CONDITIONS AND EFFECTS OF MERGER

2.1.    Articles of Incorporation.    The Amended and Restated Articles of Incorporation of TIC as in effect immediately prior to the Effective Time shall be the Articles of Incorporation of the Surviving Corporation, and shall not be amended by the Merger.

2.2.    Bylaws.    The Bylaws of TIC as in effect immediately prior to the Effective Time shall be the Bylaws of the Surviving Corporation, and shall not be amended by the Merger.

2.3.    Directors and Officers.    The directors and officers of TIC immediately prior to the Effective Time shall continue to be the directors and officers of the Surviving Corporation until their respective successors shall have been elected and qualified as provided by the Bylaws of the Surviving Corporation and California law.

2.4.    Preferred Stock.    The Board of Directors of TIG Group shall have authorized (i) the creation of Series A Preferred Stock (the "Preferred Stock") with terms and conditions as set forth in a Certificate of Designations in substantially the form set forth as Exhibit A hereto and (ii) the issuance of the Preferred Stock as Merger Consideration pursuant to, and in the amounts as set forth in, this Agreement.

2.5.    Class B Common Stock.    The Articles of Incorporation of TIG Group shall have been amended to create a new class of common stock which includes the terms

2

and conditions as set forth in <u>Exhibit B</u> hereto (the "Class B Common Stock"), and the Board of Directors of TIG Group shall have authorized the issuance of the Class B Common Stock as Merger Consideration pursuant to, and in the amounts as set forth in, this Agreement.

2.6.  <u>Further Action</u>.  IIC hereby agrees, as and when requested by the Surviving Corporation, to execute and deliver or cause to be executed and delivered all such documents, deeds and instruments and to take or cause to be taken such further or other action as the Surviving Corporation may deem necessary or desirable in order to vest in and confirm to the Surviving Corporation title to and possession of any property of IIC acquired or to be acquired by reason of or as a result of the Merger and otherwise to evidence or carry out the intent and purposes hereof.

2.7.  <u>Effects of the Merger</u>.

(a)  At the Effective Time, all the property, rights, privileges, franchises, patents, trademarks, licenses, registrations, choses in action, and other assets of every kind and description of IIC shall, to the extent permitted by law, transfer to, vest in and devolve upon the Surviving Corporation without further act or deed.

(b)  All liens upon the property of IIC and all rights of creditors of IIC shall be preserved unimpaired as the liens upon the property and obligations of the Surviving Corporation, including, without limitation, the rights of insurance policyholders and certificate holders, and all debts, liabilities and duties of IIC shall become the debts, liabilities and duties of the Surviving Corporation and may be enforced against it to the same extent as if said debts, liabilities and duties had been incurred or contracted by the Surviving Corporation.

(c)  All appointments heretofore made, and in effect as of the Effective Time, by IIC of persons to act as its licensed agents are hereby ratified and accepted as its own by the Surviving Corporation, effective as of the Effective Time.  The Surviving Corporation shall be bound by the acts of said agents in the same manner and to the same degree as was IIC.

## ARTICLE III.

## TREATMENT OF SHARES

3.1.  <u>TIC Common Stock</u>.  Each issued and outstanding share of TIC Common Stock shall not be affected by the Merger and shall continue to be outstanding at and after the Effective Time without any change and shall continue as a share of common stock of the Surviving Corporation.

3.2.  <u>IIC Common Stock</u>.

(a)  At the Effective Time, by virtue of the Merger and without any action on the part of IIC, TIC or any holder of TIC Common Stock or IIC Common Stock, all of the shares of IIC Stock issued and outstanding immediately prior to the

3

Effective Time shall by virtue of the Merger be converted into, and become exchangeable for (i) 43,000 shares of newly issued Preferred Stock and (ii) 84 shares of newly issued Class B Common Stock (collectively, the "Merger Consideration").

(b)      At the Effective Time, all IIC Common Stock shall no longer be outstanding and shall be cancelled and retired and shall cease to exist, and each certificate formerly representing any of such IIC Common Stock shall thereafter represent only the right to the Merger Consideration. Each share of issued and outstanding TIC Common Stock at the Effective Time shall continue to evidence the same number of shares of the capital stock of the Surviving Corporation.

## ARTICLE IV.

## EFFECTIVE TIME

4.1.      Effective Time. Subject to the receipt of all required approvals of the Illinois Department of Insurance and the California Department of Insurance and the filing of all required documents with the Departments of Insurance and Secretaries of State in Illinois and California, the Merger shall become effective as of 11:59 p.m., December 31, 2002, or at such other date or time as the parties may mutually agree (such date and time, "Effective Time").

## ARTICLE V.

## MISCELLANEOUS

5.1.      Acknowledgement. TRG hereby acknowledges and agrees that at some time following the Merger, and subject to receipt of applicable regulatory approvals, TIG Group may in one or more transactions transfer its interests in Commonwealth and OHC to an affiliate as consideration for TIG Group's periodic redemption of TIG Group capital stock from such affiliate.

5.2.      Termination. Notwithstanding anything to the contrary in this Agreement, this Agreement may be terminated at any time before the Effective Time by the consent of the Boards of Directors of all of the parties hereto or by the unilateral action of any of these Boards, if the terminating Board determines, in its sole discretion, that the consummation of this Agreement is, for any reason, inadvisable. None of the parties hereto shall have any liability to any other person by reason of the termination of this Agreement.

5.3.      Governing Law. This Agreement shall be governed by, and construed in accordance with, the laws of the State of California without regard to principles of conflict of laws.

5.4.      Amendment. Anything herein or elsewhere to the contrary notwithstanding, to the extent permitted by law, this Agreement may be amended, supplemented or interpreted at any time by action taken by the respective Boards of Directors of

4

parties hereto, and in the case of an interpretation, the actions of such Boards of Directors shall be binding.

5.5.    Binding Agreement.  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

5.6.    Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall be deemed one and the same agreement.

NW 182249.7

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective duly authorized officers on this     day of November, 2002.

INTERNATIONAL INSURANCE COMPANY

By: _____
Name:
Title:  President

By: _____
Name:
Title:  Secretary

THE RESOLUTION GROUP

By: _____
Name:
Title:

TIG INSURANCE COMPANY

By: _____
Name:
Title:  President

By: _____
Name:
Title:  Secretary

TIG INSURANCE GROUP

By: _____
Name:
Title:

6

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective duly authorized officers on this     day of November, 2002.

INTERNATIONAL INSURANCE COMPANY

By: _____
     Name:
     Title: President

By: _____
     Name:
     Title: Secretary

THE RESOLUTION GROUP, INC.

By: _____
     Name:
     Title:

TIG INSURANCE COMPANY

By: _____
     Name: R. Scott Donovan
     Title: President

By: _____
     Name: WILLIAM N. HUFF
     Title: Secretary

TIG INSURANCE GROUP

By: _____
     Name: WILLIAM N. HUFF
     Title: SECRETARY

Approved 12/13/02
State of Illinois
Department of Insurance
by: Nat Shapo
Director of Insurance

TO BE EFFECTIVE DECEMBER 16, 2002.

NW 183580

# Exhibit B



## CASUALTY REINSURANCE AGREEMENT

| ARTICLE | | PAGE |
|---|---|---|
| I | TERM | 1 |
| II | TERRITORY | 1 |
| III | BUSINESS REINSURED | 1 |
| IV | DEFINITIONS | 2 |
| V | COVER | 3 |
| VI | WARRANTY | 3 |
| VII | NET RETAINED LINES | 3 |
| VIII | EXCLUSIONS | 4 |
| IX | CLAIMS | 5 |
| X | SALVAGE | 6 |
| XI | PREMIUM | 6 |
| XII | REPORTS | 7 |
| XIII | ORIGINAL CONDITIONS | 8 |
| XIV | ERRORS AND OMISSION | 8 |
| XV | TAXES | 8 |
| XVI | ADVANCES | 9 |
| XVII | INSPECTION | 9 |
| XVIII | CURRENCY | 10 |
| XIX | INSOLVENCY | 10 |
| XX | SERVICE OF SUIT | 11 |
| XXI | ARBITRATION | 12 |
| XXII | TERMINATION | 12 |
| XXIII | INTERMEDIARY | 13 |
| XXIV | PARTICIPATION | 13 |

This CASUALTY REINSURANCE AGREEMENT entered
into by and between INTERNATIONAL SURPLUS
LINES INSURANCE COMPANY, Chicago, Illinois
and L. W. BIEGLER INC., Chicago, Illinois,
acting for and on behalf of the Companies
more fully described in ARTICLE III, (here-
inafter together called the "Company") of
the one part, and

(hereinafter called the "Reinsurer") of the
other part.

<u>WITNESSETH</u>:

In consideration of the mutual covenants hereinafter contained and upon
the terms and conditions hereinafter set forth, the parties hereto agree as
follows:

<u>ARTICLE I</u>

<u>TERM</u>:

This Agreement shall become effective at 12:01 A.M., Central Standard
Time, January 1, 1979 and shall continue in force until terminated in accordance
with ARTICLE XXII, TERMINATION.

<u>ARTICLE II</u>

<u>TERRITORY</u>:

This Agreement shall cover losses occurring within the territorial
limits of the Company's Policies.

<u>ARTICLE III</u>

<u>BUSINESS REINSURED</u>:

This Agreement is to cover the net excess liability of the Company aris-
ing out of losses occurring during the term of this Agreement on all Policies
written by International Surplus Lines Insurance Company, or through the agency
of L. W. Biegler Inc., for the account of United States Fire Insurance Company
and/or Westchester Fire Insurance Company, both of New York, New York and/or
International Insurance Company, Chicago, Illinois and/or Industrial Indemnity
Company, San Francisco, California and/or United States Fire Insurance Company
of Canada, Toronto, Ontario and/or North River Insurance Company, Morristown,
New Jersey and/or Herald Insurance Company of Canada, Toronto, Ontario covering
business classified by the Company as casualty business and specifically declared
to this Agreement subject to the further terms, conditions and exclusions con-
tained herein.

-1-

In the event a claim is reported or threatened under any Policy before declaration of cession to this Agreement has been made on the Company's records, the portion of such policy which the Company may consider reinsured hereunder shall be based upon the established practice of the Company in reinsuring Policies of similar amount and classification. It is understood, however, that upon request by the Reinsurer, the Company will produce evidence of its practice applicable to any such case forming the subject of inquiry or investigation.

## ARTICLE IV

DEFINITIONS:

A.   The term "Casualty Business" as used in this Agreement shall mean all business classified by the Company as casualty business including but not limited to:

Accident & Sickness Insurance
Burglary & Theft Insurance
Directors' & Officers' Insurance
Commercial Multi-Peril Insurance, Section II only
Elevator Insurance
Glass Insurance
Comprehensive Personal Liability Insurance alone or as part of
    Homeowners' or Farmowners' Insurance
Water Damage Insurance
Workmen's Compensation and Employers' Liability Insurance
Personal Injury Liability Insurance including Professional Liability
Property Damage Liability Insurance
Automobile Liability Insurance

B.   The term "Policies" as used in this Agreement shall mean any and all binders, policies, and contracts of insurance or reinsurance issued, accepted or held covered provisionally or otherwise by or on behalf of the Company.

C.   The term "Ultimate Net Loss" as used in this Agreement shall mean the sum actually paid in the settlement of losses for which the Company is liable, such sum to exclude costs and expenses as described in ARTICLE IX, CLAIMS, but salvages and any recoveries including recoveries under any other reinsurances whether recovered or not are first to be deducted from any such sum to arrive at the amount of liability, if any, attaching hereunder.

Nothing, however, contained herein shall be construed as meaning that losses are not recoverable hereunder until the Ultimate Net Loss to the Company has been ascertained.

D.   The term "Loss Occurrence" as used in this Agreement shall mean any one occurrence or accident as defined in the Policy out of which the loss arose; or in the absence of a definition, a loss, accident, casualty, disaster or series of losses, accidents

-2-

casualties or disasters arising out of one event or occur-
rence; but when the applicable policy limit is in the aggregate,
the exhaustion of the underlying aggregate limit shall be
deemed an "occurrence".

## ARTICLE V

COVER:

A. With respect to Casualty Business other than Directors'
   and Officers' Business, the Reinsurer shall be liable for
   the Ultimate Net Loss in excess of the retention declared
   by the Company of not less than $250,000 nor more than
   $500,000 each and every insured, each and every Loss Occur-
   rence, subject to a limit of liability to the Reinsurer
   to be declared by the Company, but not to exceed $500,000
   each and every insured, each and every Loss Occurrence;
   provided that, declaration shall be made in accord with the
   schedule appearing in ARTICLE XI, PREMIUM.

B. With respect to Directors' and Officers' Business the
   Company may cede on a pro rata basis, and may choose the
   proportion of any Policy to be ceded as reinsured and the
   Reinsurer shall be liable in respect of losses arising out
   of such cessions in the proportion chosen by the Company;
   provided that the Reinsurer's share shall never exceed
   $500,000 any one insured, any one Loss Occurrence.

It is understood that the Company shall be the sole judge of what
constitutes one insured.

## ARTICLE VI

WARRANTY:

With respect to Directors' and Officers' Insurance Policies ceded to
this Agreement on a pro rata basis it is warranted that such Policies shall be
at least $5,000,000 from first loss on any occurrence giving rise to a claim
hereunder.

## ARTICLE VII

NET RETAINED LINES:

This Agreement applies only to that portion of any insurance or rein-
surances covered by this Agreement which the Company retains net, or net and
quota share reinsurance, and in calculating the amount of any loss hereunder
and also in computing the amount in excess of which this Agreement attaches,
only loss or losses in respect of that portion of any insurances or reinsurance
which the Company retains net or net and quota share reinsurance, shall be
included, it being understood and agreed that the amount of the Reinsurer's
liability hereunder in respect of any loss or losses shall not be increased by
reason of the inability of the Company to collect from any other reinsurer
whether specific or general, any amount which may have become due from them,
whether such inability arises from the insolvency of such other Reinsurer or
otherwise.

-3-

It is understood that underlying excess of loss reinsurances may be utilized by the Company, and any such underlying excess of loss reinsurances shall be ignored for purposes of this Agreement.

## ARTICLE VIII

EXCLUSIONS:

This Agreement does not cover:

A. Liability excluded under the provisions of the Nuclear Incident Clauses attached being:

    1. Nuclear Incident Exclusion Clause - Liability - Reinsurance.
    2. Nuclear Incident Exclusion Clause - Physical Damage - Reinsurance.
    3. Nuclear Incident Exclusion Clause - Physical Damage and Liability (Boiler and Machinery Policies) - Reinsurance.

B. Reinsurance assumed by the Company (other than facultative and Agency reinsurance);

C. Liability assumed as a member of any Pool or Association;

D. Business classified by the Company as:

    1. Aviation Liability (except when such aviation liability is incorporated in a policy covering Comprehensive General Liability);
    2. Ocean Marine Business, except that this exclusion applies only to Ocean Marine Business when written as such, and does not apply when the original insured's operations insurable as Ocean Marine Business constitute only an incidental and minor part of his main operations provided the main operations are written by the Company;
    3. Workmen's Compensation (except when written Excess of Loss); or Employers' Liability (applies only to risks reinsured with the Workmen's Compensation Reinsurance Bureau). As respects Workmen's Compensation written Excess of Loss, this Agreement does not cover and specifically excludes the following operations carried on by an original insured as a principle operation.

        (a) Coal Mining involving underground operations;
        (b) Operation of Aircraft;
        (c) Operations involving an explosive substance as follows:
            (i) The manufacturing of any explosive substance intended for use as an explosive,
            (ii) the loading of any explosive substance into containers for use as explosive objects, propellant charges, or detonating devices, (including storage in connection therewith); or the dismantling of, or the unloading of explosive substance from such containers;

-4-

(iii)   the processing or destruction of any explosive sub-
        stance (including storage in connection therewith),
(iv)    the manufacturing of any product, including but not
        limited to Fireworks and Fuse, in which any explosive
        substance is an ingredient.

It is specially agreed, however, this exclusion D.3. (c)
shall not apply where use of an explosive substance is
purely incidental to the main operations.

An explosive substance is defined as any substance
the express purpose of which is to explode, as dif-
ferentiated from commodities used industrially and
which are only incidentally explosive such as, but
not limited to, gasoline, celluloid, fuel gases, and
dyestuffs.

(d)   Aggregate Excess Workmen's Compensation Insurance;

E.   Business classified by the Company as Boiler and Machinery;

F.   Surety;

G.   Medical Malpractice business;

H.   Railroad Business.

Except for A,B and C, it is understood that the foregoing shall not
apply where the operations outlined are only incidental to the original assurd's
main operations.

If the Company, without the knowledge and contrary to the instructions
of its Home Office, is bound on a risk falling within one of the foregoing
classes, such risk is covered hereunder until said Home Office receives knowledge
thereof, and pending concellation of such risk by the Company, for a further
period of thirty (30) days after the receipt of such knowledge by the Home
Office of the Company.

## ARTICLE IX

CLAIMS:

The Company will advise the Reinsurer promptly of all claims and any
subsequent developments pertaining thereto, which involve the Reinsurer, or
which are reserved or which are paid in an amount in excess of one-half of the
Company's retention.

All payments of claims in which this reinsurance is involved shall be
binding upon the Reinsurer, which shall be bound to pay or allow, as the case
may be, its proportion of such payments immediately upon receipt of the Company'
proof of loss.  All court costs and expenses, including interest, paid by the
Company (excluding salaries of permanent officials and employees of the Company)
connected with any resistance to, investigation of, or negotiations concerning

settlement of such claims shall be apportioned in proportion of the respective interests as finally determined; provided, however, that with respect to excess cessions, in the event a verdict or judgment is reduced by litigation or otherwise (other than by the trial court), resulting in an ultimate saving to the Reinsurer, or a judgment is reversed outright, the expenses incurred in securing such reduction or reversal shall be pro-rated between the Company and the Reinsurer in the proportion that each benefits from such reduction or reversal, and the expenses incurred up to the time of the original verdict or judgment shall be pro-rated in proportion to each party's interest in such verdict or judgment.

Transactions shall be made payable, directly to the other party.

It is understood that, when so requested, the Company will afford the Reinsurer an opportunity to be associated with the Company, at the expense of the Reinsurer, in the defense or control of any claim or suit or proceeding involving this reinsurance, and the Company and the Reinsurer shall cooperate in every respect in the defense of such claim or suit or proceeding.

### ARTICLE X

SALVAGE:

A.  As respects excess cessions, salvage (i.e., reimbursement obtained or recovery made by the Company, less the actual cost, excluding salaries of officials and permanent employees of the Company, of obtaining such reimbursement or making such recovery) applying to risks covered under this Agreement shall always be used to reimburse the excess carriers in the reverse order of their priority, according to their participation, before being used in any way to reimburse the Company for its primary loss.

Should a recovery effort be unsuccessful, or should the expenses of making a recovery exceed the recovery, then the Company and the Reinsurer shall share such expense in proportion to their interest in the loss.

B.  As respects pro-rata cessions, all salvage recoveries and all attendant expense (excluding salaries of officials and permanent employees of the Company) shall be shared in proportion to the cession of the Policy out of which the loss arose.

### ARTICLE XI

PREMIUM:

Within forty-five (45) days following the end of each calendar quarter that this Agreement remains in effect the Company shall pay to the Reinsurer a premium based on the rates in the following schedules:

-6-

As respects excess cessions:

| Company's Declared Retention: | Reinsurer's Liability Declared by the Company may be: | Rate Gross . P. | Rate Net . P. |
|---|---|---|---|
| A) $250,000 | 1. Less than or equal to the Co's retention | a) 19.0% | b) 23.0% |
| | 2. More than the Co's retention, but not greater than twice the Co's retention | a) 22.5% | b) 28.0% |
| B) Greater than $250,000 but not more than $500,000 | 1. Less than or equal to the Co's retention | a) 19.0% | b) 23.0% |
| | 2. More than the Co's retention, but not to exceed the limits of liability as shown in ARTICLE V, COVER | a) 22.5% | b) 28.0% |

** Directors' and Officers' Liability may be ceded on a pro-rata share basis with premiums payable pro-rata subject to a ceding commission of 27.5% of the Original Gross Earned Premium.

## ARTICLE XII

REPORTS:

    A.  Within forty-five (45) days following the end of each calendar quarter that this Agreement remains in effect the Company shall supply the Reinsurer with a report covering the following:

        1.  Premium earned during the calendar quarter;

        2.  Loss and loss expense paid during the calendar quarter;

        3.  Loss and loss expense outstanding at the end of the calendar quarter.

    B.  Within forty-five (45) days following the end of each Agreement Year that this Agreement remains in effect the Company shall supply the Reinsurer with a report covering the following:

        1.  Premium ceded to this Agreement during the Agreement Year segregated by major class;

-7-

** Earned basis for non-admitted Reinsurers.

2.  Loss and loss expense paid during the Agreement Year
    segregated by major class and year of occurrence;

3.  Loss and loss expense outstanding at the end of the Agreement
    Year segregated by major class and year of occurrence.

## ARTICLE XIII

ORIGINAL CONDITIONS:

All reinsurance ceded to this Agreement on a pro-rata basis shall be subject to the same terms, rates, conditions and waivers, and to the same modification, alterations, and cancelments as the respective Policies of the Company; except in the case of the insolvency of the Company, in which case the provisions of the INSOLVENCY ARTICLE shall take precedence.

## ARTICLE XIV

ERRORS AND OMISSIONS:

Inadvertent delays, errors or omissions made in connection with this Agreement or any transaction hereunder shall not relieve either party from any liability which would have attached had such delay, error or omission not occurred, provided always that such error or omission will be rectified as soon as possible after discovery.

## ARTICLE XV

TAXES:

The Company will be liable for taxes (except Federal Excise Tax) on premiums reported to the Reinsurer hereunder.

Federal Excise Tax applies only to those Reinsurers, excepting Underwriters at Lloyds, London, and other reinsurers exempt from the Federal Excise Tax, who are domiciled outside the United States of America.

The Reinsurer has agreed to allow, for the purpose of paying the Federal Excise Tax, 1% of the premium payable hereon to the extent such premium is subject to Federal Excise Tax.

In the event of any return of premium becoming due hereunder, the Reinsurer will deduct 1% from the amount of the return, and the Company or its agent should take steps to recover the tax from the U.S. Government.

--8--

## ARTICLE XVI

ADVANCES:

If the Reinsurer is unauthorized in any state of the United States of America or the District of Columbia where authorization is required by insurance regulatory authorities, the Reinsurer will fund (provided particulars are received forty-five days prior to the date funding is required by the Company) outstanding losses by either cash advances, escrow accounts for the benefit of the Company, Letters of Credit, or a combination thereof, if a penalty would accrue to the Company on its statement without such funding. The Reinsurer shall have the sole option of determining the method of funding referred to above provided it is acceptable to the insurance regulatory authorities involved.

LOSS RESERVES: (Applies only to Lloyd's Underwriters and certain other Reinsurers who are domiciled outside the United States of America at the sole option of such other Reinsurers).

As regards policies or bonds issued by the Company coming within the scope of this Agreement, the Company agrees that when it shall file with the Insurance Department or set up on its books reserves for losses which it shall be required to set up by law it will forward to the Reinsurers a statement showing the proportion of such loss reserves which is applicable to them. The Reinsurers hereby agree that they will apply for and secure delivery to the Company a clean irrevocable Letter of Credit issued by Citibank NA of New York in an amount equal to Reinsurers' proportion of said loss reserves.

The Company undertakes to use and apply any amounts which it may draw upon such credit for the following purposes only:

a)  To pay the Reinsurers' share or to reimburse the Company for the Reinsurers' share of any liability for loss reinsured by this Agreement.

b)  To make refund of any sum which is in excess of the actual amount required to pay Reinsurers' share of any liability reinsured by this Agreement.

First National City Bank of New York shall have no responsibility whatsoever in connection with the propriety of withdrawals made by the Company or the disposition of funds withdrawn except to see that withdrawals are made only upon the order of properly authorized representatives of the Company.

## ARTICLE XVII

INSPECTION:

The Company shall place at the disposal of the Reinsurer at all reasonable times, and the Reinsurer shall have the right ot inspect, through its authorized representatives, all books, records and papers of the Company in

connection with any reinsurance hereunder, or claims in connection herewith. The Company will maintain reports of pro-rata cessions separately from excess cessions.

## ARTICLE XVIII

CURRENCY:

All transactions shall be in United States currency, with the exception of Canadian dollars which shall remain as Canadian dollars. Premiums and losses shall for the purpose of this Reinsurance, be converted into United States dollars, except Canadian currency, at the rates of exchange at which they are entered in the books of the Company.

## ARTICLE XIX

INSOLVENCY:

In the event of the insolvency of the Company, reinsurance under this Agreement shall be payable by the Reinsurer on the basis of the liability of the Company under contract or contracts reinsured without diminution because of the insolvency of the Company to the Company or to its liquidator, receiver, or statutory successor, except as provided by Section 315 of the New York Insurance Law or except:

    a)   where the Agreement specifically provides another payee of such reinsurance in the event of the insolvency of the Company, and;

    b)   where the Reinsurer with the consent of the direct insured or insureds has assumed such Policy obligations of the Company as direct obligations of the Reinsurer to the payees under such Policies and in substitution for the obligations of the Company to such payees.

It is agreed, however, that the liquidator or receiver or statutory successor of the insolvent Company shall give written notice to the Reinsurer of the pendency of a claim against the insolvent Company on the Contract or Contracts reinsured within a reasonable time after such claim is filed in the insolvency proceeding and that during the pendency of such claim the Reinsurer may investigate such claim and interpose, at its own expense, in the proceeding where such claim is to be adjudicated any defense or defenses which it may deem available to the Company or its liquidator or receiver or statutory successor. The expense thus incurred by the Reinsurer shall be chargeable, subject to court approval, against the insolvent Company as part of the expense of liquidation to the extent of a proportionate share of the benefit which may accrue to the Company solely as a result of the defense undertaken by the Reinsurer.

-10-

Where two or more Reinsurers are involved in the same claim and a majority in interest elect to interpose defense to such claim, the expense shall be apportioned in accordance with the terms of this Agreement as though such expense had been incurred by the insolvent Company.

Should the Company go into liquidation or should a receiver be appointed the Reinsurer shall be entitled to deduct from any sums which may be or may become due to the Company under this Reinsurance Agreement, any sums which are due to the Reinsurer by the Company under this Reinsurance Agreement and which are payable at a fixed or stated date, as well as any other sums due the Reinsurer which are permitted to be offset under applicable law.

ARTICLE XX

SERVICE OF SUIT:

This Article applies only to Reinsurers domiciled outside the United States of America.

It is agreed that, in the event of the failure of Reinsurers hereon to pay any amount claimed to be due hereunder, Reinsurers hereon, at the request of the Company will submit to the jurisdiction of any court of competent jurisdiction within the United States and will comply with all requirements necessary to give such court jurisdiction and all matters arising hereunder shall be determined in accordance with the law and practice of such court.

It is further agreed that service of process in such suit may be made upon John G. Smith, Attorney-In-Fact, as respects Lloyd's admitted, and Lord Bissell & Brook as respects other underwriters, both of 115 LaSalle Street, Chicago, Illinois 60603, and that in any suit instituted against any one of them upon this Agreement, Reinsurers will abide by the final decision of such Court or of any Appellate Court in the event of any appeal.

The above-named are authorized and directed to accept service of process on behalf of Reinsurers in any suit and/or upon request of the Company, to give a written undertaking to the Company that they will enter a general appearance upon Reinsurers' behalf in the event such a suit shall be instituted.

Further, pursuant to any statute of any state, territory, or district of the United States which makes provisions therefor, Reinsurers hereon hereby designate the Superintendent, Commissioner, or Director of Insurance or other officer specified for that purpose in the statute, or his successor or successors in office, as their true and lawful attorney upon whom may be served any lawful process in any action, suit, or proceeding instituted by or on behalf of the Company or any beneficiary hereunder arising out of this Agreement of reinsurance, and hereby designate the above-named as the person to whom the said officer is authorized to mail such process or a true copy thereof.

## ARTICLE XXI

ARBITRATION:

If any dispute shall arise between the Company and the Reinsurer, either before or after the termination of this Agreement, with reference to the inter- pretation of this Agreement or the rights of either party with respect to any transactions under this Agreement, the dispute shall be referred to three Arbitrators, one to be chosen by each party and the third by the two so chosen. If either party refuses or neglects to appoint an Arbitrator within thirty days after the receipt of written notice from the other party requesting it to do so, the requesting party may nominate two Arbitrators who shall choose the third. In the event the two Arbitrators do not agree on the selection of the third Arbitrator within thirty days after both Arbitrators have been named, the Company shall petition the American Arbitration Association to appoint an Arbitrator. Each party shall submit its case to the Arbitrators within thirty days of the appointment of the Arbitrators. The Arbitrators shall consider this Agreement an honorable engagement rather than merely a legal obligation; they are relieved of all judicial formalities and may abstain from following the strict rules of law. The decision of a majority of the Arbitrators shall be final and binding on both the Company and the Reinsurer. Judgment may be entered upon the award of the Arbitrators in any court having jurisdiction. The expense of the Arbitrators and of the arbitration shall be equally divided between the Company and the Reinsurer. Any such arbitration shall take place in Chicago, Illinois unless some other location is mutually agreed upon by the parties.

## ARTICLE XXII

TERMINATION:

This Agreement may be terminated at any January 1, 12:01 A.M., Central Standard Time, by either party giving at least ninety (90) days prior written notice by Registered Mail to the other party. The Reinsurer shall continue to be liable for losses under Policies in force until the natural expiration or termination or anniversary date of such policies ceded to this Agreement or the first anniversary date of the termination of this Agreement, whichever occurs first.

Notice of cancellation on the part of either the Company or Reinsurer will be mailed directly to the other party.

The Company shall have the option to terminate all liability of the Reinsurer as of the termination date for losses occurring subsequent to the termination date.

Immediately following the time that the Reinsurer is relieved of liability for losses occurring thereafter, the Reinsurer shall return to the Company an appropriate unearned premium portfolio.

-12-

The Reinsurer, may however, cancel this Agreement absolutely on thirty (30) days notice for non-payment of premium due. Such cancellation shall not take effect if premium due is paid promptly after notice of cancellation is received by the Company.

### ARTICLE XXIII

INTERMEDIARY:

J. L. Kelley, Inc., P. O. Box 267, Franklin Lakes, New Jersey 07417 is hereby recognized as the Broker negotiating this Agreement through whom all communications (including but not limited to notices, statements, premiums, written premiums, commissions, taxes, losses, loss adjustment of the expense, salvage and loss settlements) relating thereto shall be transmitted to the Company or the Reinsurer. Payments by the Company to the Broker shall be deemed to constitute payment to the Reinsurer. Payments by the Reinsurer to the Broker shall be deemed only to constitute payment to the Company to the extent that such payments are actually received by the Company.

### ARTICLE XXIV

PARTICIPATION:   CASUALTY REINSURANCE AGREEMENT
                 EFFECTIVE January 1, 1979

This Agreement is for .583 % of the liability and amounts set forth in this Agreement and the Reinsurer is entitled to a proportionate share of the premium provided.

IN WITNESS WHEREOF, the parties hereto, by their respective duly authorized officers, have executed this Agreement in duplicate as of the dates recorded below:

At Chicago, Illinois this _10th_ day of _Oct_ 1979.

INTERNATIONAL SURPLUS LINES INSURANCE COMPANY

ATTEST:

**NORMAN R. REID**
**SENIOR VICE PRESIDENT**

At Chicago, Illinois this _10th_ day of _Oct_ 1979.

L. W. BIEGLER INC. for and on behalf of the Companies listed in ARTICLE III, pursuant to the authority granted by such Companies.

ATTEST:

**NORMAN R. REID**
**SENIOR VICE PRESIDENT**

At Buenos Aires, this 17 day of Abril 1979

CAJA NACIONAL DE AMORRO Y SEGURO

OUR REF.: 1358

ATTEST:

OSVALDO N. ANCONATANI
3° JEFE DEPARTAMENTO COBERTURAS ESPECIALES

-13-

U.S.A.

**NUCLEAR INCIDENT EXCLUSION CLAUSE — PHYSICAL DAMAGE — REINSURANCE.**

1. This Reinsurance does not cover any loss or liability accruing to the Reassured, directly or indirectly and whether as Insurer or Reinsurer, from any Pool of Insurers or Reinsurers formed for the purpose of covering Atomic or Nuclear Energy risks.

2. Without in any way restricting the operation of paragraph (1) of this Clause, this Reinsurance does not cover any loss or liability accruing to the Reassured, directly or indirectly and whether as Insurer or Reinsurer, from any insurance against Physical Damage (including business interruption or consequential loss arising out of such Physical Damage) to:

    I. Nuclear reactor power plants including all auxiliary property on the site, or

    II. Any other nuclear reactor installation, including laboratories handling radioactive materials in connection with reactor installations, and "critical facilities" as such, or

    III. Installations for fabricating complete fuel elements or for processing substantial quantities of "special nuclear material", and for reprocessing, salvaging, chemically separating, storing or disposing of "spent" nuclear fuel or waste materials, or

    IV. Installations other than those listed in paragraph (2) III above using substantial quantities of radioactive isotopes or other products of nuclear fission.

3. Without in any way restricting the operations of paragraphs (1) and (2) hereof, this Reinsurance does not cover any loss or liability by radioactive contamination accruing to the Reassured, directly or indirectly, and whether as Insurer or Reinsurer, from any insurance on property which is on the same site as a nuclear reactor power plant or other nuclear installation and which normally would be insured therewith except that this paragraph (3) shall not operate
    (a)   where Reassured does not have knowledge of such nuclear reactor power plant or nuclear installation, or
    (b)   where said insurance contains a provision excluding coverage for damage to property caused by or resulting from radioactive contamination, however caused. However on and after 1st January 1960 this sub-paragraph (b) shall only apply provided the said radioactive contamination exclusion provision has been approved by the Governmental Authority having jurisdiction thereof.

4. Without in any way restricting the operations of paragraphs (1), (2) and (3) hereof, this Reinsurance does not cover any loss or liability by radioactive contamination accruing to the Reassured, directly or indirectly, and whether as Insurer or Reinsurer, when such radioactive contamination is a named hazard specifically insured against.

5. It is understood and agreed that this Clause shall not extend to risks using radioactive isotopes in any form where the nuclear exposure is not considered by the Reassured to be the primary hazard.

6. The term "special nuclear material" shall have the meaning given it in the Atomic Energy Act of 1954 or by any law amendatory thereof.

7. Reassured to be sole judge of what constitutes:
    (a)   substantial quantities, and
    (b)   the extent of installation, plant or site.

Note. — Without in any way restricting the operation of paragraph (1) hereof, it is understood and agreed that
    (a)   all policies issued by the Reassured on or before 31st December 1957 shall be free from the application of the other provisions of this Clause until expiry date or 31st December 1960 whichever first occurs whereupon all the provisions of this Clause shall apply,
    (b)   with respect to any risk located in Canada policies issued by the Reassured on or before 31st December 1958 shall be free from the application of the other provisions of this Clause until expiry date or 31st December 1960 whichever first occurs whereupon all the provisions of this Clause shall apply.

## NUCLEAR INCIDENT EXCLUSION CLAUSE—LIABILITY-REINSURANCE

(1) This reinsurance does not cover any loss or liability accruing to the Reassured as a member of, or subscriber to, any association of insurers or reinsurers formed for the purpose of covering nuclear energy risks or as a direct or indirect reinsurer of any such member, subscriber or association.

(2) Without in any way restricting the operation of paragraph (1) of this Clause it is understood and agreed that for all purposes of this reinsurance all the original policies of the Reassured (new, renewal and replacement) of the classes specified in Clause II of this paragraph (2) from the time specified in Clause III in this paragraph (2) shall be deemed to include the following provision (specified as the Limited Exclusion Provision):

Limited Exclusion Provision.*

I. It is agreed that the policy does not apply under any liability coverage, to { *injury, sickness, disease, death or destruction* / bodily injury or property damage } with respect to which an insured under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability.

II. Family Automobile Policies (liability only), Special Automobile Policies (private passenger automobiles, liability only), Farmers Comprehensive Personal Liability Policies (liability only), Comprehensive Personal Liability Policies (liability only) or policies of a similar nature; and the liability portion of combination forms related to the four classes of policies stated above, such as the Comprehensive Dwelling Policy and the applicable types of Homeowners' Policies.

III. The inception dates and thereafter of all original policies as described in II above, whether new, renewal or replacement, being policies which either

(a) become effective on or after 1st May, 1960, or

(b) become effective before that date and contain the Limited Exclusion Provision set out above;

provided this paragraph (2) shall not be applicable to Family Automobile Policies, Special Automobile Policies, or policies or combination policies of a similar nature, issued by the Reassured on New York risks, until 90 days following approval of the Limited Exclusion Provision by the Governmental Authority having jurisdiction thereof.

(3) Except for those classes of policies specified in Clause II of paragraph (2) and without in any way restricting the operation of paragraph (1) of this Clause, it is understood and agreed that for all purposes of this reinsurance the original liability policies of the Reassured (new, renewal and replacement) affording the following coverages:

Owners, Landlords and Tenants Liability, Contractual Liability, Elevator Liability, Owners or Contractors (including railroad) Protective Liability, Manufacturers and Contractors Liability, Product Liability, Professional and Malpractice Liability, Storekeepers Liability, Garage Liability, Automobile Liability (including Massachusetts Motor Vehicle or Garage Liability)

shall be deemed to include, with respect to such coverages, from the time specified in Clause V of this paragraph (3), the following provision (specified as the Broad Exclusion Provision):

Broad Exclusion Provision.*

It is agreed that the policy does not apply:

I. Under any Liability Coverage, to { *injury, sickness, disease, death or destruction* / bodily injury or property damage }

(a) with respect to which an insured under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

(b) resulting from the hazardous properties of nuclear material and with respect to which (1) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (2) the insured is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

II. Under any Medical Payments Coverage, or under any Supplementary Payments Provision relating to { *immediate medical or surgical relief,* / first aid, } to expenses incurred with respect to { *bodily injury, sickness, disease or death* / bodily injury } resulting from the hazardous properties of nuclear material and arising out of the operation of a nuclear facility by any person or organization.

III. Under any Liability ⌐⌐ːⁿage, to { *injury, sickness, disease, death o.*   *ction* resulting from
                                      { bodily injury or property damage
the hazardous properties of nuclear material, if

(a)  the nuclear material (1) is at any nuclear facility owned by, or operated by or on behalf of, an insured or (2) has been discharged or dispersed therefrom;

(b)  the nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an insured; or

(c)  the { *injury, sickness, disease, death or destruction*  arises out of the furnishing by an in-
          { bodily injury or property damage
     sured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility, but if such facility is located within the United States of America, its territories, or possessions or Canada, this exclusion

     (c) applies only to { *injury to or destruction of property at such nuclear facility.*
                         { property damage to such nuclear facility and any property thereat.

IV. As used in this endorsement:

"hazardous properties" include radioactive, toxic or explosive properties; "nuclear material" means source material, special nuclear material or byproduct material; "source material," "special nuclear material," and "byproduct material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof; "spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor; "waste" means any waste material (1) containing byproduct material and (2) resulting from the operation by any person or organization of any nuclear facility included within the definition of nuclear facility under paragraph (a) or (b) thereof; "nuclear facility" means

(a)  any nuclear reactor,

(b)  any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing spent fuel, or (3) handling, processing or packaging waste,

(c)  any equipment or device used for the processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams or uranium 235,

(d)  any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste,

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations; "nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material;
{ *With respect to injury to or destruction of property, the word "injury" or "destruction" includes*
{ *all "property damage" includes all forms of radioactive contamination of property.*
{ *forms of radioactive contamination of property.*

V.  The inception dates and thereafter of all original policies affording coverages specified in this paragraph (3), whether new, renewal or replacement, being policies which become effective on or after 1st May, 1960, provided this paragraph (3) shall not be applicable to
(i)   Garage and Automobile Policies issued by the Reassured on New York risks, or
(ii)  statutory liability insurance required under Chapter 90, General Laws of Massachusetts, until 90 days following approval of the Broad Exclusion Provision by the Governmental Authority having jurisdiction thereof.

(4)  Without in any way restricting the operation of paragraph (1) of this Clause, it is understood and agreed that paragraphs (2) and (3) above are not applicable to original liability policies of the Reassured in Canada and that with respect to such policies this Clause shall be deemed to include the Nuclear Energy Liability Exclusion Provisions adopted by the Canadian Underwriters' Association or the Independent Insurance Conference of Canada.

---

*NOTE.  The words printed in italics in the Limited Exclusion Provision and in the Broad Exclusion Provision shall apply only in relation to original liability policies which include a Limited Exclusion Provision or a Broad Exclusion Provision containing those words.

## NUCLEAR INCIDENT EXCLUSION CLAUSE—PHYSICAL DAMAGE AND LIABILITY (BOILER AND MACHINERY POLICIES)—REINSURANCE

(1) This reinsurance does not cover any loss or liability accruing to the Reassured as a member of, or subscriber to, any association of insurers or reinsurers formed for the purpose of covering nuclear energy risks or as a direct or indirect reinsurer of any such member, subscriber or association.

(2) Without in any way restricting the operation of paragraph (1) of this Clause it is understood and agreed that for all purposes of this reinsurance all original Boiler and Machinery Insurance or Reinsurance contracts of the Reassured shall be deemed to include the following provisions of this paragraph;

This policy does not apply to "loss", whether it be direct or indirect, proximate or remote

    (a)    from an Accident caused directly or indirectly by nuclear reaction, nuclear radiation or radioactive contamination, all whether controlled or uncontrolled; or

    (b)    from nuclear reaction, nuclear radiation or radioactive contamination, all whether controlled or uncontrolled, caused directly or indirectly by,contributed to or aggravated by an Accident.

(3) However, it is agreed that loss arising out of the use of Radioactive Isotopes in any form is not hereby excluded from reinsurance protection.

(4) Without in any way restricting the operation of paragraph (1) hereof, it is understood and agreed that

    (a)    all policies issued by the Reassured effective on or before 30th April, 1958, shall be free from the application of the other provisions of this Clause until expiry date or 30th April, 1961, whichever first occurs, whereupon all the provisions of this Clause shall apply,

    (b)    with respect to any risk located in Canada policies issued by the Reassured effective on or before 30th June, 1958, shall be free from the application of the other provisions of this Clause until expiry date or 30th June, 1961, whichever first occurs, whereupon all the provisions of this Clause shall apply.

57

## TERMINATION ENDORSEMENT

This Endorsement attaches to and becomes part of
CASUALTY REINSURANCE AGREEMENT entered into
by and between INTERNATIONAL SURPLUS LINES
INSURANCE COMPANY, Chicago, Illinois and L. W.
BIEGLER INC., Chicago, Illinois, acting for and
on behalf of the Companies more fully described in
ARTICLE III, (hereinafter together called the
"Company") of the one part, and

CAJA NACIONAL DE AMORRO Y SEGURO

(hereinafter called the "Reinsurer") of the other
part.

IT IS AGREED that, effective 12:01 A.M., Central Standard Time, January 1
1984 this Agreement is terminated in accordance with the run-off provisions
of ARTICLE XXII, TERMINATION.

ALL OTHER TERMS AND CONDITIONS OF THIS AGREEMENT REMAIN UNCHANGED.

IN WITNESS WHEREOF, the parties hereto, by their respective duly autho-
rized officer, have executed this Agreement in duplicate as of the dates
recorded below:

At Chicago, Illinois this 20 _DH_ day of _MARCH_, 198 _5_.

INTERNATIONAL SURPLUS LINES INSURANCE COMPANY

ATTEST:

NORMAN R. REID, SENIOR VICE PRESIDENT

At Chicago, Illinois this 20 _th_ day of _MARCH_, 198 5.

L. W. BIEGLER INC. for and on behalf of the
Companies listed in ARTICLE III, pursuant to
the authority granted by such Companies.

ATTEST:

NORMAN R. REID, SENIOR VICE PRESIDENT

At _____ this ____ day of _____, 198 __

CAJA NACIONAL DE AMORRO Y SEGURO
CAJA NACIONAL DE AHORRO Y SEGURO
OUR Nº: 1.358
1 3 AGO. 1984

ATTEST:

ALBERTO O. AVILA
JEFE DEPARTAMENTO SUSCRIP. DE REASEGUROS ACTIVOS

# Exhibit C

This CASUALTY EXCESS REINSURANCE AGREEMENT entered into by and between INTERNATIONAL SURPLUS LINES INSURANCE COMPANY, Chicago, Illinois and L. W. BIEGLER INC., Chicago, Illinois, acting for and on behalf of the Companies more fully described in ARTICLE III, (hereinafter together called the "Company") of the one part, and

(hereinafter called the "Reinsurer") of the other part.

WITNESSETH:

In consideration of the mutual covenants hereinafter contained and upon the terms and conditions hereinafter set forth, the parties hereto agree as follows:

## ARTICLE I

TERM:

This Agreement shall become effective at 12:01 A.M., Central Standard Time, March 15, 1979 and shall continue in force until terminated in accordance with ARTICLE XXII, TERMINATION.

## ARTICLE II

TERRITORY:

This Agreement shall cover losses occurring within the territorial limits of the Company's policies.

## ARTICLE III

BUSINESS REINSURED:

This Agreement is to cover the excess liability of the Company arising out of losses occurring during the term of this Agreement on all policies written by International Surplus Lines Insurance Company, or through the agency of L. W. Biegler Inc., for the account of United States Fire Insurance Company and/or Westchester Fire Insurance Company, both of New York, New York and/or International Insurance Company, Chicago, Illinois and/or Industrial Indemnity Company, San Francisco, California and/or United States Fire Insurance Company of Canada, Toronto, Ontario and/or North River Insurance Company, Morristown, New Jersey and/or Herald Insurance Company of Canada, Toronto, Ontario covering business classified by the Company as casualty business and specifically declared to this Agreement subject to the further terms, conditions and exclusions contained herein.

-1-

In the event a claim is reported or threatened under any Policy before declaration of cession to this Agreement has been made on the Company's record the portion of such policy which the Company may consider reinsured hereunder shall be based upon the established practice of the Company in reinsuring Policies of similar amount and classification. It is understood, however, that upon request by the Reinsurer, the Company will produce evidence of its practice applicable to any such case forming the subject of inquiry or investigation.

ARTICLE IV

DEFINITIONS:

A.  The term "Casualty Business" as used in this Agreement shall mean all business classified by the Company as casualty business including but not limited to:

Accident & Sickness Insurance
Burglary & Theft Insurance
Commercial Multi-Peril Insurance, Section II only
Elevator Insurance
Glass Insurance
Comprehensive Personal Liability Insurance alone or as part of
         Homeowners' or Farmowners' Insurance
Water Damage Insurance
Workmen's Compensation and Employers' Liability Insurance
Personal Injury Liability Insurance, including Professional Liability
Property Damage Liability Insurance
Automobile Liability Insurance

B.  The term "Policies" as used in this Agreement shall mean any and all binders, policies, and contracts of insurance or reinsurance issued, accepted or held covered provisionally or otherwise by or on behalf of the Company.

C.  The term "Ultimate Net Loss" as used in this Agreement shall mean the sum actually paid in the settlement of losses for which the Company is liable, such sum to exclude costs and expenses as described in ARTICLE IX, CLAIMS, but salvages and any recoveries including recoveries under any other reinsurances whether recovered or not are first to be deducted from any such sum to arrive at the amount of liability, if any, attaching hereunder.

Nothing, however, contained herein shall be construed as meaning that losses are not recoverable hereunder until the Ultimate Net Loss to the Company has been ascertained.

D.  The term "Loss Occurrence" as used in this Agreement shall mean any one occurrence or accident as defined in the Policy out of which the loss arose; or in the absence of a definition, a loss, accident, casualty, disaster or series of losses, accidents

-2-

casualties or disasters arising out of one event or occurrence; but when the applicable policy limit is in the aggregate, the exhaustion of the underlying aggregate limit shall be deemed an "occurrence".

With regards to claims made policies ceded to this Agreement, this agreement covers the Company's loss arising from any claim or claims made during the policy period.

E.  The term "Agreement Year" as used in this Agreement shall mean the 12 consecutive months commencing with each April 1st, except the first Agreement Year shall be from March 15, 1979 to April 1, 1980.

## ARTICLE V

LIMIT:

The Reinsurer shall be liable for the Ultimate Net Loss over and above an initial Ultimate Net Loss of at least $2,000,000 each and every loss Occurrence and aggregate where applicable, each and every insured, Bodily Injury and Property Damage combined, subject to a limit of liability to the Reinsurer of $3,000,000 each and every loss Occurrence and aggregate where applicable, each and every insured, Bodily Injury and Property Damage combined.  The Company shall be sole judge as to what constitutes one insured.

## ARTICLE VI

WARRANTY:

It is warranted for purposes of this Agreement that the Company shall retain 5% pure net participation in this layer of $3,000,000 excess of at least $2,000,000 each and every loss Occurrence and aggregate where applicable, each and every insured, Bodily Injury and Property Damage Liability combined.

## ARTICLE VII

NET RETAINED LINES:

This Agreement applies only to that portion of any insurances or reinsurances covered by the Agreement which the company retains net or net and treaty, and in calculating the amount of any loss hereunder and also in computing the amount in excess of which this Agreement attaches, only loss or losses in respect of that portion of any insurances or reinsurances which the Company retains net or net and treaty shall be included, it being understood and agreed

-3-

that the amount of the Reinsurer's liability hereunder in respect of any loss or losses shall not be increased by reason of the inability of the Company to collect from any other reinsurers, whether specific or general, any amounts which may have become due from them, whether such inability arises from the insolvency of such other reinsurers or otherwise.

It is understood that underlying excess of loss reinsurances may be utilized by the Company, and any such underlying excess of loss reinsurances shall be ignored for purposes of this Agreement.

<u>ARTICLE VIII</u>

EXCLUSIONS:

This Agreement does not cover:

A.  Liability excluded under the provisions of the Nuclear Incident Clauses attached being:

1.  Nuclear Incident Exclusion Clause – Liability – Reinsurance.
2.  Nuclear Incident Exclusion Clause – Physical Damage – Reinsurance.
3.  Nuclear Incident Exclusion Clause – Physical Damage and Liability (Boiler and Machinery Policies) – Reinsurance.

B.  Reinsurance assumed by the Company (other than facultative and Agency reinsurance);

C.  Liability assumed as a member of any Pool or Association;

D.  Business classified by the Company as:

1.  Aviation Liability (except when such aviation liability is incorporated in a policy covering Comprehensive General Liability);
2.  Ocean Marine Business, except that this exclusion applies only to Ocean Marine Business when written as such, and does not apply when the original insured's operations insurable as Ocean Marine Business constitute only an incidental and minor part of his main operations provided the main operations are written by the Company;
3.  Workmen's Compensation (except when written Excess of Loss); or Employers' Liability (applies only to risks reinsured with the Workmen's Compensation Reinsurance Bureau). As respects Workmen's Compensation written Excess of Loss, this Agreement does not cover and specifically excludes the following operations carried on by an original insured as a principle operation

-4-

(a)   Coal Mining involving underground operations;
(b)   Operation of Aircraft;
(c)   Operations involving an explosive substance as follows:
   (i)   The manufacturing of any explosive substance intended for use as an explosive,
   (ii)   the loading of any explosive substance into containers for use as explosive objects, propellant charges, or detonating devices, (including storage in connection therewith); or the dismantling of, or the unloading of explosive substance from such containers,
   (iii)   the processing or destruction of any explosive substance (including storage in connection therewith),
   (iv)   the manufacturing of any product, including but not limited to Fireworks and Fuse, in which any explosive substance is an ingredient.

It is specially agreed, however, this exclusion D.3. (c) shall not apply where use of an explosive substance is purely incidental to the main operations.

An explosive substance is defined as any substance the express purpose of which is to explode, as differentiated from commodities used industrially and which are only incidentally explosive such as, but not limited to, gasoline, celluloid, fuel gases, and dyestuffs.

   (d)   Aggregate Excess Workmen's Compensation Insurance;

E.   Business classified by the Company as Boiler and Machinery;

F.   Surety;

G.   Medical Malpractice business;

H.   Railroad Business.

I.   Directors and Officers Liability

J.   Utilities.

K.   Professional Indemnity.

L.   Accident and Sickness

Except for A,B and C, it is understood that the foregoing shall not apply where the operations outlined are only incidental to the original assured's main operations.

If the Company, without the knowledge and contrary to the instructions of its Home Office, is bound on a risk falling within one of the foregoing classes, such risk is covered hereunder until said Home Office receives knowledge thereof, and pending cancellation of such risk by the Company, for a further period of thirty (30) days after the receipt of such knowledge by the Home Office of the Company.

## ARTICLE IX

CLAIMS:

The Company will advise the Reinsurer promptly of all claims, which in the opinion of the Company may involve the Reinsurer, and all subsequent developments thereto which may materially affect the position of the Reinsurer, and the Reinsurer will abide by the settlements of the Company.

When so requested, the Company will afford the Reinsurer an opportunity to be associated with the Company at the expense of the Reinsurer, in the defense of any claim or suit or proceeding involving this reinsurance, and the Company will cooperate in every respect in the defense or control of such claim, suit or proceeding.

Amounts due hereunder in the settlement of losses shall be payable as soon as practicable after each such settlement has been claimed and proved.

All court costs and expenses, including interest on judgments, paid by the Company (excluding salaries and expenses of permanent officials and employees of the Company) connected with any resistance to, investigation of or negotiations concerning settlement of such claims shall be apportioned in proportion to the respective interests as finally determined. Provided that, in the event a verdict or judgment is reduced by litigation or otherwise (other than by the trial court) resulting in an ultimate saving to the Reinsurer, or a judgment is reversed outright, the expenses incurred in securing such reduction or reversal shall be pro-rated between the Company and the Reinsurer in the proportion that each benefits from such verdict or judgment shall be pro rated in proportion to each party's interest in such verdict or judgment.

Salvage (i.e., reimbursement obtained or recovery made by the Company, less the actual cost, excluding salaries of officials and permanent employees of the Company of obtaining such reimbursement or making such recovery) applying to Policies covered under this Agreement shall always be used to reimburse the excess carriers in the reverse order of their priority, according to their participation, before being used in any way to reimburse the Company for its primary loss.

## ARTICLE X

PREMIUM:

The Company shall pay as a premium for this reinsurance the Original Gross Net Written Premium Income on business ceded to this Agreement less 25% Ceding Commission. Payment shall be made 45 days after the end of each calendar quarter.

Non admitted Reinsurers, if any, will be paid on an earned premium basis.

-6-

ARTICLE XI

REPORTS:

A.  Within forty-five (45) days following the end of each calendar quarter that this Agreement remains in effect the Company shall supply the Reinsurer with a report covering the following:

1.  Premium earned during the calendar quarter;

2.  Loss and loss expense paid during the calendar quarter;

3.  Loss and loss expense outstanding at the end of the calendar quarter.

B.  Within forty-five (45) days following the end of each Agreement Year that this Agreement remains in effect the Company shall supply the Reinsurer with a report covering the following:

1.  Premium ceded to this Agreement during the Agreement Year segregated by major class;

2.  Loss and loss expense paid during the Agreement Year segregated by major class and year of occurrence;

3.  Loss and loss expense outstanding at the end of the Agreement Year segregated by major class and year of occurrence.

ARTICLE XII

CONTINGENT COMMISSION:

The Reinsurer will also allow to the Company a profit commission of twenty percent (20.0%) on the net profits during each Agreement Year period, if any, accruing on all business reinsured under this Agreement, such net profit shall be calculated as follows:

A.  PREMIUMS EARNED TO BE:

1.  The premiums written during the period (less cancellations and returns)

2.  Plus the unearned premium reserve at the end of the previous period;

3.  Less the unearned premium reserve at the end of the period.

B.  LOSSES INCURRED TO BE:

1.  Losses and loss adjustment expenses paid during the period.

2.  Less the reserve for unadjusted losses and loss adjustment expenses, including reserve for incurred but not reported losses from the previous years statement, if any;

3.  Plus the reserve for unadjusted losses and loss adjustment expenses, including reserve for incurred but not reported losses at the close of the period.

C.  EXPENSES INCURRED:

1.  Reinsurer's expenses of 10% earned premium ceded, as in A above;

2.  Deficit or underwriting loss, if any, from the previous contingent commission statement.

D.  NET PROFIT TO BE:

1.  Premium earned, as in A above;

2.  Less net losses incurred, as in B above;

3.  Less net expenses incurred, as in C above.

The first computation of profit commission shall be made as soon as possible following April 1, 1980, covering the first Agreement Year period, succeeding computations shall be at the end of each Agreement Year thereafter.

Should the working of this Agreement result in a loss to the Reinsurer in respect of any one Agreement Year period, the amount of such loss shall be carried forward in succeeding contingent commission statements, and no profit shall be considered as earned during any ensuing period until all previous loss has been balanced and a credit balance has again been restored.

-8-

In the event of termination of this Agreement at other than the end of each Agreement Year period, the time this Agreement remains in effect from inception or from the end of the last Agreement Year period shall be considered as an Agreement Year period for purposes of this Article.

In the event of termination of this Agreement no contingent commission statement shall be prepared in respect of the period ending with the effective date of termination until all liability has expired and all claims have been settled.

## ARTICLE XIII

ORIGINAL CONDITIONS:

All reinsurance ceded to this Agreement on a pro-rata basis shall be subject to the same terms, rates, conditions and waivers and to the same modification, alterations, and cancelments as the respective Policies of the Company; except in the case of the insolvency of the Company, in which case the provisions of the INSOLVENCY ARTICLE shall take precedence.

## ARTICLE XIV

ERRORS AND OMISSIONS:

Inadvertent delays, errors or omissions made in connection with this Agreement or any transaction hereunder shall not relieve either party from any liability which would have attached had such delay, error or omission not occurred, provided always that such error or omission will be rectified as soon as possible after discovery.

## ARTICLE XV

TAXES:

The Company will be liable for taxes (except Federal Excise Tax) on premiums reported to the Reinsurer hereunder.

Federal Excise Tax applies only to thos Reinsurers, excepting Underwriters at Lloyds, London, and other reinsurers exempt from the Federal Excise Tax, who are domiciled outside the United States of America.

The Reinsurer has agreed to allow, for the purpose of paying the Federal Excise Tax, 1% of the premium payable hereon to the extent such premium is subject to Federal Excise Tax.

-9-

In the event of any return of premium becoming due hereunder, the Reinsurer will deduct 1% from the amount of the return, and the Company or its agent should take steps to recover the tax from the U. S. Government.

## ARTICLE XVI

ADVANCES:

If the Reinsurer is unauthorized in any state of the United States of America or the District of Columbia where authorization is required by insurance regulatory authorities, the Reinsurer will fund (provided particulars are received forty-five days prior to the date funding is required by the Company) outstanding losses by either cash advances, escrow accounts for the benefit of the Company, Letters of Credit, or a combination thereof, if a penalty would accrue to the Company on its statement without such funding. The Reinsurer shall have the sole option of determining the method of funding referred to above provided it is acceptable to the insurance regulatory authorities involved.

LOSS RESERVES:   (Applies only to Lloyd's Underwriters and certain other Reinsurers who are domiciled outside the United States of America at the sole option of such other Reinsurers).

As regards policies or bonds issued by the Company coming within the scope of this Agreement, the Company agrees that when it shall file with the Insurance Department or set up on its books reserves for losses which it shall be required to set up by law it will forward to the Reinsurers a statement showing the proportion of such loss reserves which is applicable to them. The Reinsurers hereby agree that they will apply for and secure delivery to the Company a clean irrevocable Letter of Credit issued by Citibank NA in an amount equal to Reinsurers' proportion of said loss reserves.

The Company undertakes to use and apply any amounts which it may draw upon such credit for the following purposes only:

a)   To pay the Reinsurers' share or to reimburse the Company for the Reinsurers' share of any liability for loss reinsured by this Agreement.

b)   To make refund of any sum which is in excess of the actual amount required to pay Reinsurers' share of any liability reinsured by this Agreement.

Citibank NA shall have no responsibility whatsoever in connection with the propriety of withdrawals made by the Company or the disposition of funds withdrawn except to see that withdrawals are made only upon the order of properly authorized representatives of the Company.

-10-

<u>ARTICLE XVII</u>

<u>INSPECTION:</u>

The Company shall place at the disposal of the Reinsurer at all reasonable times, and the Reinsurer shall have the right to inspect, through its authorized representatives, all books, records and papers of the Company in connection with any reinsurance hereunder, or claims in connection herewith. The Company will maintain reports of pro-rata cessions separately from excess cessions.

<u>ARTICLE XVIII</u>

<u>CURRENCY:</u>

All transactions shall be in United States currency, with the exception of Canadian dollars which shall remain as Canadian dollars. Premiums and losses shall for the purpose of this Reinsurance, be converted into United States dollars, except Canadian currency, at the rates of exchange at which they are entered in the books of the Company.

<u>ARTICLE XIX</u>

<u>INSOLVENCY:</u>

In the event of the insolvency of the Company, reinsurance under this Agreement shall be payable by the Reinsurer on the basis of the liability of the Company under contract or contracts reinsured without diminution because of the insolvency of the Company to the Company or to its liquidator, receiver, or statutory successor, except as provided by Section 315 of the New York Insurance Law or except.

    a)   where the Agreement specifically provides another payee of such reinsurance in the event of the insolvency of the Company, and;

    b)   where the Reinsurer with the consent of the direct insured or insureds has assumed such Policy obligations of the Company as direct obligations of the Reinsurer to the payees under such Policies and in substitution for the obligations of the Company to such payees.

It is agreed, however, that the liquidator or receiver or statutory successor of the insolvent Company shall give written notice to the Reinsurer of the pendency of a claim against the insolvent Company on the Contract or Contracts reinsured within a reasonable time after such claim is filed in the insolvency proceeding and that during the pendency of such claim the Reinsurer may investigate such claim and interpose, at its own expense, in the proceeding where such claim is to be adjudicated any defense or defenses which it may deem available to the Company or its liquidator or receiver or statutory successor. The expense thus incurred by the Reinsurer shall be chargeable, subject to court approval, against the insolvent Company as part of the expense of liquidation to the extent of a proportionate share of the benefit which may accrue to the Company soley as a result of the defense undertaken by the Reinsurer.

Where two or more Reinsurers are involved in the same claim and a majority in interest elect to interpose defense to such claim, the expense shall be apportioned in accordance with the terms of this Agreement as though such expense had been incurred by the insolvent Company.

Should the Company go into liquidation or should a receiver be appointed the Reinsurer shall be entitled to deduct from any sums which may be or may become due to the Company under this Reinsurance Agreement, any sums which are due to the Reinsurer by the Company under this Reinsurance Agreement and which are payable at a fixed or stated date, as well as any other sums due the Reinsurer which are permitted to be offset under applicable law.

ARTICLE XX

SERVICE TO SUIT:

This Article applies only to Reinsurers domiciled outside the United States of America.

It is agreed that, in the event of the failure of Reinsurers hereon to pay any amount claimed to be due hereunder, Reinsurers heron, at the request of the Company will submit to the jurisdiction of any court of competent jurisdiction within the United States and will comply with all requirements necessary to give such court jurisdiction and all matters arising hereunder shall be determined in accordance with the law and practice of such court.

It is further agreed that service of process in such suit may be made upon John G. Smith, Attorney-In-Fact, as respects Lloyd's admitted, and Lord Bissell & Brook as respects other underwriters, both of 115 LaSalle Street, Chicago, Illinois  60603, and that in any suit instituted against any one of them upon this Agreement, Reinsurers will abide by the final decision of such Court or any Appellate Court in the event of any appeal.

The above-named are authorized and directed to accept service of process on behalf of Reinsurers in any suit and/or upon request of the Company, to give a written undertaking to the Company that they will enter a general appearance upon Reinsurers' behalf in the event such a suit shall be instituted.

Further, pursuant to any statute of any state, territory, or district of the United States which makes provisions therefor, Reinsurers hereon hereby designate the Superintendent, Commissioner, or Director of Insurance or other officer specified for that purpose in the statute, or his successor or successors in office, as their true and lawful attorney upon whom may be served any lawful process in any action, suit, or proceeding instituted by or on behalf of the Company or any beneficiary hereunder arising out of this Agreement of reinsurance, and hereby designate the above-named as the person to whom the said officer is authorized to mail such process or a true copy thereof.

ARTICLE XXI

ARBITRATION:

If any dispute shall arise between the Company and the Reinsurer, either before or after the termination of this Agreement, with reference to the interpretation of this Agreement or the rights of either party with respect to any transactions under this Agreement, the dispute shall be referred to three Arbitrators, one to be chosen by each party and the third by the two so chosen. If either party refuses or neglects to appoint an Arbitrator within thirty days after the receipt of written notice from the other party requesting it to do so, the requesting party may nominate two Arbitrators who shall choose the third. In the event the two Arbitrators do not agree on the selection of the third Arbitrator within thirty days after both Arbitrators have been named, the Company shall petition the American Arbitration Association to appoint an Arbitrator. Each party shall submit its case to the Arbitrators within thirty days of the appointment of the Arbitrators. The Arbitrators shall consider this Agreement an honorable engagement rather than merely a legal obligation; they are relieved of all judicial formalities and may abstain from following the strict rules of law. The decision of a majority of the Arbitrators shall be final and binding on both the Company and the Reinsurer. Judgment may be entered upon the award of the Arbitrators in any court having jurisdiction. The expense of the Arbitrators and of the arbitration shall be equally divided between the Company and the Reinsurer. Any such arbitration shall take place in Chicago, Illinois unless some other location is mutually agreed upon by the parties.

ARTICLE XXII

TERMINATION:

This Agreement may be terminated at any April 1, 12:01 A.M., Central Standard Time, by either party giving at least ninety (90) days prior written notice by Certified Mail to the other party. The Reinsurer shall continue to

-13-

be liable for losses under Policies in force until the natural expiration or termination or anniversary date of such policies ceded to this Agreement or the first anniversary date of the termination of thsi Agreement, whichever occurs first.

Notice of cancellation on the part of either the Company or Reinsurer will be mailed directly to the other party.

The Company shall have the option to terminate all liability of the Reinsurer as of the termination date for losses occurring subsequent to the termination date.

Immediately following the time that the Reinsurer is relieved of liability for losses occurring thereafter, the Reinsurer (except non-admitted Reinsurers, if any) shall return to the Company an appropriate unearned premium portfolio.

The Reinsurer, may however, cancel this Agreement absolutely on thirty (30) days notice for non-payment of premium due. Such cancellation shall not take effect if premium due is paid promptly after notice of cancellation is received by the Company.

ARTICLE XXIII

INTERMEDIARY:

J. L. Kelley, Inc., P. O. Box 267, Franklin Lakes, New Jersey 07417 is hereby recognized as the Broker negotiating this Agreement through whom all communications (including but not limited to notices, statements, premiums, written premiums, commissions, taxes, losses, loss adjustment of the expense, salvages and loss settlements) relating thereto shall be transmitted to the Company or the Reinsurer. Payments by the Company to the Broker shall be deemed to constitute payment to the Reinsurer. Payments by the Reinsurer to the Broker shall be deemed only to constitute payment to the Company to the extent that such payments are actually received by the Company.

-14-

## NUCLEAR INCIDENT EXCLUSION CLAUSE—LIABILITY-REINSURANCE

(1)   This reinsurance does not cover any loss or liability accruing to the Reassured as a member of, or subscriber to, any association of insurers or reinsurers formed for the purpose of covering nuclear energy risks or as a direct or indirect reinsurer of any such member, subscriber or association.

(2)   Without in any way restricting the operation of paragraph (1) of this Clause it is understood and agreed that for all purposes of this reinsurance all the original policies of the Reassured (new, renewal and replacement) of the classes specified in Clause II of this paragraph (2) from the time specified in Clause III in this paragraph (2) shall be deemed to include the following provision (specified as the Limited Exclusion Provision):

Limited Exclusion Provision.\*

    I.   It is agreed that the policy does not apply under any liability coverage,

          to { *injury, sickness, disease, death or destruction*
             { bodily injury or property damage   with respect to which an insured under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability.

    II.   Family Automobile Policies (liability only), Special Automobile Policies (private passenger automobiles, liability only), Farmers Comprehensive Personal Liability Policies (liability only), Comprehensive Personal Liability Policies (liability only) or policies of a similar nature; and the liability portion of combination forms related to the four classes of policies stated above, such as the Comprehensive Dwelling Policy and the applicable types of Homeowners' Policies.

    III.   The inception dates and thereafter of all original policies as described in II above, whether new, renewal or replacement, being policies which either

        (a)   become effective on or after 1st May, 1960, or

        (b)   become effective before that date and contain the Limited Exclusion Provision set out above;

        provided this paragraph (2) shall not be applicable to Family Automobile Policies, Special Automobile Policies, or policies or combination policies of a similar nature, issued by the Reassured on New York risks, until 90 days following approval of the Limited Exclusion Provision by the Governmental Authority having jurisdiction thereof.

(3)   Except for those classes of policies specified in Clause II of paragraph (2) and without in any way restricting the operation of paragraph (1) of this Clause, it is understood and agreed that for all purposes of this reinsurance the original liability policies of the Reassured (new, renewal and replacement) affording the following coverages:

    Owners, Landlords and Tenants Liability, Contractual Liability, Elevator Liability, Owners or Contractors (including railroad) Protective Liability, Manufacturers and Contractors Liability, Product Liability, Professional and Malpractice Liability, Storekeepers Liability, Garage Liability, Automobile Liability (including Massachusetts Motor Vehicle or Garage Liability)

shall be deemed to include, with respect to such coverages, from the time specified in Clause V of this paragraph (3), the following provision (specified as the Broad Exclusion Provision):

Broad Exclusion Provision.\*

    It is agreed that the policy does not apply:

    I.   Under any Liability Coverage, to { *injury, sickness, disease, death or destruction*
                              { bodily injury or property damage

        (a)   with respect to which an insured under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

        (b)   resulting from the hazardous properties of nuclear material and with respect to which (1) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (2) the insured is, or, had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

    II.   Under any Medical Payments Coverage, or under any Supplementary Payments Provision

          relating to { *immediate medical or surgical relief,*
                  { first aid,   to expenses incurred with respect to

        { *bodily injury, sickness, disease or death*
        { bodily injury   resulting from the hazardous properties of nuclear material and arising out of the operation of a nuclear facility by any person or organization.

the hazardous properties of nuclear material, if

(a) the nuclear material (1) is at any nuclear facility owned by, or operated by or on behalf of, an insured or (2) has been discharged or dispersed therefrom;

(b) the nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an insured; or

(c) the { *injury, sickness, death or destruction* / bodily injury or property damage } arises out of the furnishing by an insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility, but if such facility is located within the United States of America, its territories, or possessions or Canada, this exclusion

(c) applies only to { *injury to or destruction of property at such nuclear facility.* / property damage to such nuclear facility and any property thereat.

IV. As used in this endorsement:
"hazardous properties" include radioactive, toxic or explosive properties; "nuclear material" means source material, special nuclear material or byproduct material; "source material," "special nuclear material," and "byproduct material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof; "spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor; "waste" means any waste material (1) containing byproduct material and (2) resulting from the operation by any person or organization of any nuclear facility included within the definition of nuclear facility under paragraph (a) or (b) thereof; "nuclear facility" means

(a) any nuclear reactor,

(b) any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing spent fuel, or (3) handling, processing or packaging waste,

(c) any equipment or device used for the processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams or uranium 235,

(d) any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste,

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations; "nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material;

{ *With respect to injury to or destruction of property, the word "injury" or "destruction" includes all "property damage" includes all forms of radioactive contamination of property.* / *forms of radioactive contamination of property.*

V. The inception dates and thereafter of all original policies affording coverages specified in this paragraph (3), whether new, renewal or replacement, being policies which become effective on or after 1st May, 1960, provided this paragraph (3) shall not be applicable to
(i) Garage and Automobile Policies issued by the Reassured on New York risks, or
(ii) statutory liability insurance required under Chapter 90, General Laws of Massachusetts, until 90 days following approval of the Broad Exclusion Provision by the Governmental Authority having jurisdiction thereof.

(4) Without in any way restricting the operation of paragraph (1) of this Clause, it is understood and agreed that paragraphs (2) and (3) above are not applicable to original liability policies of the Reassured in Canada and that with respect to such policies this Clause shall be deemed to include the Nuclear Energy Liability Exclusion Provisions adopted by the Canadian Underwriters' Association or the Independent Insurance Conference of Canada.

---

*NOTE. The words printed in italics in the Limited Exclusion Provision and in the Broad Exclusion Provision shall apply only in relation to original liability policies which include a Limited Exclusion Provision or a Broad Exclusion Provision containing those words.

U.S.A.

## NUCLEAR INCIDENT EXCLUSION CLAUSE — PHYSICAL DAMAGE — REINSURANCE.

1. This Reinsurance does not cover any loss or liability accruing to the Reassured, directly or indirectly and whether as Insurer or Reinsurer, from any Pool of Insurers or Reinsurers formed for the purpose of covering Atomic or Nuclear Energy risks.

2. Without in any way restricting the operation of paragraph (1) of this Clause, this Reinsurance does not cover any loss or liability accruing to the Reassured, directly or indirectly and whether as Insurer or Reinsurer, from any insurance against Physical Damage (including business interruption or consequential loss arising out of such Physical Damage) to:

    I.  Nuclear reactor power plants including all auxiliary property on the site, or

    II.  Any other nuclear reactor installation, including laboratories handling radioactive materials in connection with reactor installations, and "critical facilities" as such, or

    III.  Installations for fabricating complete fuel elements or for processing substantial quantities of "special nuclear material", and for reprocessing, salvaging, chemically separating, storing or disposing of "spent" nuclear fuel or waste materials, or

    IV.  Installations other than those listed in paragraph (2) III above using substantial quantities of radioactive isotopes or other products of nuclear fission.

3. Without in any way restricting the operations of paragraphs (1) and (2) hereof, this Reinsurance does not cover any loss or liability by radioactive contamination accruing to the Reassured, directly or indirectly, and whether as Insurer or Reinsurer, from any insurance on property which is on the same site as a nuclear reactor power plant or other nuclear installation and which normally would be insured therewith except that this paragraph (3) shall not operate

    (a)  where Reassured does not have knowledge of such nuclear reactor power plant or nuclear installation, or

    (b)  where said insurance contains a provision excluding coverage for damage to property caused by or resulting from radioactive contamination, however caused. However on and after 1st January 1960 this sub-paragraph (b) shall only apply provided the said radioactive contamination exclusion provision has been approved by the Governmental Authority having jurisdiction thereof.

4. Without in any way restricting the operations of paragraphs (1), (2) and (3) hereof, this Reinsurance does not cover any loss or liability by radioactive contamination accruing to the Reassured, directly or indirectly, and whether as Insurer or Reinsurer, when such radioactive contamination is a named hazard specifically insured against.

5. It is understood and agreed that this Clause shall not extend to risks using radioactive isotopes in any form where the nuclear exposure is not considered by the Reassured to be the primary hazard.

6. The term "special nuclear material" shall have the meaning given it in the Atomic Energy Act of 1954 or by any law amendatory thereof.

7. Reassured to be sole judge of what constitutes:

    (a)  substantial quantities, and

    (b)  the extent of installation, plant or site.

Note. — Without in any way restricting the operation of paragraph (1) hereof, it is understood and agreed that

    (a)  all policies issued by the Reassured on or before 31st December 1957 shall be free from the application of the other provisions of this Clause until expiry date or 31st December 1960 whichever first occurs whereupon all the provisions of this Clause shall apply,

    (b)  with respect to any risk located in Canada policies issued by the Reassured on or before 31st December 1958 shall be free from the application of the other provisions of this Clause until expiry date or 31st December 1960 whichever first occurs whereupon all the provisions of this Clause shall apply.

ARTICLE XXIV

PARTICIPATION:   CASUALTY EXCESS REINSURANCE AGREEMENT
                 EFFECTIVE March 15, 1979

This Agreement is for 6.67% of the liability and amounts set forth in this Agreement and the Reinsurer is entitled to a proportionate share of the premium provided.

IN WITNESS WHEREOF, the parties hereto, by their respective duly authorized officers, have executed this Agreement in duplicate as of the dates recorded below:

At Chicago, Illinois this _Nineteenth_ day of _December_, 1979.

INTERNATIONAL SURPLUS LINES INSURANCE COMPANY

ATTEST:

_Marcia McCann_

Norman Reid, Senior Vice President

At Chicago, Illinois this _____ day of _____ 1979.

L. W. BIGGLER INC. for and on behalf of the Companies listed in ARTICLE III, pursuant to the authority granted by such Companies.

ATTEST:

Norman Reid, Senior Vice President

At _Greenwich, Conn._ this _2nd_ day of _December_ 1979.

CAJA NACIONAL DE AHORRO Y SEGURO, through their Reinsurance Managers, American Treaty Corporation, and/or the Reinsurance Corporation of Connecticut.

DAVID M. PIERSON   (President)

# C. 20016.

ATTEST:

_Michele G. DiAcri_
Michele G. DiAcri

-15-

## ENDORSEMENT NO. 1

This Endorsement attaches to and becomes
part of CASUALTY EXCESS REINSURANCE AGREEMENT
entered into by and between INTERNATIONAL
SURPLUS LINES INSURANCE COMPANY, Chicago,
Illinois and L.W. BIEGLER INC., Chicago, Illinois,
acting for and on behalf of the Companies more
fully described in ARTICLE III, (hereinafter
together called the "Company") of the one part,
and
    CAJA NACIONAL DE AHORRO Y SEGURO

(hereinafter called the "Reinsurer") of the
other part.

IT IS AGREED that, effective January 1, 1980 the first paragraph of
ARTICLE VII, NET RETAINED LINES is amended to read as follows:

This Agreement applies only to that portion of any insurances or rein-
surances covered by the Agreement which the Company retains net or net and
treaty, and in calculating the amount of any loss hereunder and also in comput-
ing the amount in excess of which this Agreement attaches, only loss or losses
in respect of that portion of any insurances or reinsurances which the Company
retains net or net and treaty and facultative shall be included, it being
understood and agreed that the amount of the Reinsurer's liability hereunder
in respect of any loss or losses shall not be increased by reason of the in-
ability of the Company to collect from any other reinsurers, whether specific
or general, any amounts which may have become due from them, whether such
inability arises from the insolvency of such other reinsurers or otherwise.

IT IS FURTHER AGREED that, effective January 1, 1980 the following is
added to ARTICLE XIII, ORIGINAL CONDITIONS:

Further, where policies are written with an underlying limit of
$10,000,000 or higher, the Reinsurer's premium and liability may be pro-rata
with other layer participants.

ALL OTHER TERMS AND CONDITIONS OF THIS AGREEMENT REMAIN UNCHANGED.

-1-

IN WITNESS WHEREOF, the parties hereto, by their respective duly autho-rized officers, have executed this Agreement in duplicate as of the dates recorded below:

At Chicago, Illinois this _6th_ day of _August_ 1980.

INTERNATIONAL SURPLUS LINES INSURANCE COMPANY

ATTEST:

_Marcia McCann_

Norman R. Reid, Senior Vice President

At Chicago, Illinois this _6th_ day of _August_ 1980.

L. W. BIEGLER INC. for and on behalf of the Companies listed in ARTICLE III, pursuant to the authority granted by such Companies.

ATTEST:

_Marcia McCann_

Norman R. Reid, Senior Vice President

At _____ this _____ day of _____ 19__.

CAJA NACIONAL DE AHORRO Y SEGURO

ATTEST:

_____

-2-

# Exhibit D

IIC/CAJA: JIR, RDB,
JRA, JPN, DB

# ALSTON&BIRD LLP

One Atlantic Center
1201 West Peachtree Street
Atlanta, Georgia 30309-3424

404-881-7000
Fax: 404-881-7777
www.alston.com

H. Stephen Harris, Jr.                    **Direct Dial: 404-881-7197**                    **E-mail: sharris@alston.com**

September 23, 2003

*VIA: OVERNIGHT DELIVERY*

Julie Rodriguez Aldort, Esq.
Butler Rubin Saltarelli & Boyd
Three First National Plaza
70 W. Madison Suite 1800
Chicago, IL 60602

      Re:    *Int'l Ins. Co. v. Caja Nacional*, No. 00-CV-6703 in the U.S. District Court
             for the N. District of Illinois

Dear Julie:

      I write pursuant to your request by telephone of September 10, 2003 that we
submit in writing the conditions provided by the Argentine Ministry of Economy and
Production, which has assumed responsibility for Caja Nacional during its liquidation, for
moving forward with settlement efforts between Caja Nacional and TIG, successor to
your client International Insurance Co.

      As per Argentine law, settlement proceedings can move forward only on
condition that TIG agrees to discount its settlement demand by 20 percent of what was
previously demanded of Caja Nacional, in correspondence transmitted to the Ministry of
Economy and Production on or about June 16, 2003 by Mr. Frank J. De Maria.  In that
communication, TIG demanded payment of $5,720,654 for settlement of all claims
associated with the above-referenced action.  The 20 percent discount requested by the
Ministry of Economy and Production would yield a revised settlement demand by TIG of
$4,576,523.20.

      It should be emphasized that TIG's agreement to reduce its settlement demand by
the requested 20 percent does not guarantee that the Ministry of Economy and Production
will ultimately settle for that amount, nor does it constitute any obligation on the part of
the Ministry to remit payment in that amount to TIG.  In other words, this communication
does not constitute a formal offer to settle, nor should it be construed as establishing any
contract of settlement between the parties.  TIG's agreement to reduce its settlement
demand by 20 percent will, however, enable the Ministry, under governing Argentine

Bank of America Plaza        90 Park Avenue        3201 Beechleaf Court, Suite 600      601 Pennsylvania Avenue, N.W.
101 South Tryon Street, Suite 4000    New York, NY 10016       Raleigh, NC 27604-1062       North Building, 10th Floor
Charlotte, NC 28280-4000      212-210-9400          919-862-2200        Washington, DC 20004-2601
704-444-1000        Fax: 212-210-9444       Fax: 919-862-2260         202-756-3300
Fax: 704-444-1111                                        Fax: 202-756-3333

Julie Rodriguez Aldort, Esq.
September 23, 2003
Page 2

law, to commence formal procedures for establishing a mutually agreeable settlement between the parties.

The Ministry of Economy and Production requires written approval from TIG or its counsel agreeing to reduce the settlement demand by the requested 20 percent. When such written approval is received, the settlement process will proceed accordingly.

Please do not hesitate to contact us should you have any questions or comments.

Sincerely,

H. Stephen Harris, Jr.

cc:    Dr. Guadalupe Piqué
       Richard Rettberg
       Jay Smith