IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| TIG INSURANCE COMPANY, as successor by merger to International Insurance Company and International Surplus Lines Insurance Company; <br><br> Plaintiff-Judgment Creditor, <br><br> v. <br><br> REPUBLIC OF ARGENTINA as successor to Caja Nacional de Ahorro y Seguro; and CAJA NACIONAL DE AHORRO Y SEGURO; <br><br> Defendants-Judgment Debtors. | Case No. 1:18-mc-00129-DLF |

**TIG INSURANCE COMPANY'S SUPPLEMENTAL BRIEF
IN RESPONSE TO THE COURT'S OCTOBER 5TH ORDER**

In response to the Court's Order from October 5, 2018, TIG Insurance Company submits the following supplemental briefing. As explained below:

**(1) Service is not required to adjudicate an *ex parte* post-judgment motion.** In its Omnibus Memorandum [ECF 2-1] ("Omnibus Mem.") at 17 (citing *Lomax*), 20 (citing *Bennett*) and 30 (citing *Byrd*), TIG provided the Court with authority to support its request for *ex parte* relief against the property at 2136 R St. NW, Washington, DC, 20008 without service or notice to Argentina and without affording Argentina a right to be heard *before* the requested relief is granted. Although not required to do so, TIG served its pending motion on Argentina in accordance with FSIA § 1608(a)(1) – invoking the special arrangement for service stipulated in the reinsurance contracts on which the district court judgments are based [ECF No. 7, Aff. of

Service] – and took additional steps to notify Argentina of these proceedings.[1]  TIG took these steps in anticipation of a possible Argentine motion for reconsideration of an order granting the requested relief *ex parte* – which would not be well founded – claiming that Argentina should have been served, or notified, in advance of the Court granting the requested relief.

Argentina is aware of the motion, but thus far has chosen not to appear and defend.  On October 11th, while preparing to file this brief, we received a self-described "courtesy" letter from a Washington, D.C. attorney, Mr. Charles Asmar, of Asmar, Schor & McKenna, PLLC.  Mr. Asmar explained that his law firm represents Argentina and is aware of the filings in this case.  He asserted their position that Argentina was not properly served by delivery of TIG's papers to their Embassy.  Today (October 12th), Mark Bravin, undersigned counsel to TIG, called Mr. Asmar.  Mr. Bravin explained that the copy delivered to the Embassy was meant only to give Argentina prompt notice of the filing of an action for expedited relief and that Argentina was served last week in accordance with the parties' special arrangement for service.  Mr. Asmar said that he was not aware of that fact.  In response to a question from Mr. Bravin, Mr. Asmar said he does not presently intend to enter an appearance in this case.

We believe the authority provided with TIG's Omnibus Motion (supplemented with the additional case law provided below) is more than sufficient to establish that the Court has the power to grant, and should grant at this time, the entirety of the requested relief *ex parte*, for both

---

[1] TIG additionally sent the § 1610(c) Motion to Argentina's designated Central Authority in Buenos Aires with a request for Hague Convention service; by hand-delivery to Argentina's Embassy in Washington, D.C.; by international courier service to the relevant government Minister in Buenos Aires; and by hand-delivery to Washington Fine Properties, Argentina's commercial real estate agent for the auction of the property at 2136 R St., NW.  In addition, TIG contacted the Legal Attaché at Argentina's Embassy by telephone and left a message but did not receive a return call.

the 2001 and 2018 Judgments.  Service isn't required, but Argentina has been served.  Argentina may seek reconsideration of an order granting the requested relief if it finds grounds to do so.

If the Court has any doubt about granting *ex parte* relief as to both judgments, however, it nevertheless should authorize TIG immediately to record with the D.C. Recorder of Deeds a judgment lien against 2136 R St. NW for the 2018 Judgment, which was entered directly against the Republic; that is the very least that must be done to prevent the Republic from evading TIG's efforts to collect on that judgment.[2]

**(2)  The uses of 2136 R St., NW, including for commercial activity.**  In its Omnibus Memorandum and accompanying declarations, TIG provided admissible and competent evidence showing that the property at 2136 R St., NW: (a) was used as a diplomatic residence until the late 1990s;[3] (b) fell into disrepair and has remained uninhabited and in disuse for over 20 years; (c) was used for commercial activity in 2003 and 2004 when it was listed with a commercial real estate broker for sale; and (d) was again put to use for a commercial activity starting sometime in the summer of 2018, when the property was listed with Washington Fine Properties for sale by auction.

**(3)  Current status:  2136 R St., NW was delisted on September 28, 2018.**  As of September 25, 2018, when TIG filed its motion (with concurrent notice to Argentina), the

---

[2] The 2001 Judgment was entered against Caja Nacional, to which Argentina became the successor-in-interest in 2005.  *See* Omnibus Mem. at 9; Custo Decl. [ECF 2-4] ¶¶ 5-12 and exhibits thereto.

[3] Attached as Exhibit A to this brief is a letter from the U.S. Department of State dated Sept. 14, 2017 to D.C. Congresswoman Eleanor Holmes Norton, which states that "this property has not been considered 'diplomatic' for many years.  However, OFM [Office of Foreign Missions] was informed earlier this year that the Argentine Government has authorized the Embassy to sell this and several other properties they own in the District."  The letter is also available at https://norton.house.gov/sites/norton.house.gov/files/State%20Department%20Response%20re%20Foreign%20Missions.pdf ) (last accessed Oct. 12, 2018).

auction was still underway. Based on internet research, since confirmed by Mr. Asmar's communication,[4] we have determined that three days after TIG filed its motion, the property was delisted from public-auction listings on the websites of Washington Fine Properties and many other commercial real estate companies.[5] A telephonic inquiry to the Recorder of Deeds on October 11th likewise confirmed that the Republic is still listed as the owner of record (title-holder) of 2136 R St. NW. We have subpoenaed the records of Washington Fine Properties, with prior notice to Argentina, to gain further admissible evidence regarding the de-listing of the property. We contacted the president of Washington Fine Properties by e-mail on October 8th, but so far we have not received a response from Washington Fine Properties to the e-mail or the subpoena. As explained below, this Court may still grant TIG's requested relief regardless of the delisting.

\* \* \*

Below we expound on each of these three issues.

## I.   Issue 1: Service Of An *Ex Parte* Post-Judgment Motion Is Not Required, And Argentina Has Been Served.

This Court requested that TIG "address whether service of process is required and, if so, whether Argentina has been properly served." As demonstrated in TIG's Omnibus Memorandum at 17, 20 and 30, service of its post-judgment motion on Argentina is not required. The fact that TIG, for defensive reasons, elected to serve the Republic anyway, and provided additional notice through multiple channels, does not affect this Court's authority to grant TIG's post-judgment motion *ex parte* without waiting for a response from Argentina. There are

---

[4] Mr. Asmar's letter states that the property was withdrawn from the market at the end of September and that it has not been sold.

[5] *See* Ex. B, Online Property Listings for 2136 R St. NW.

4

compelling reasons why the Court should grant the motion without waiting for a response from Argentina.

**A.** "The FSIA is quite clear what a plaintiff must serve on a foreign state before a court may enforce a default judgment against that state: ***the default judgment***.  ***Service of post-judgment motions is not required***."  *Peterson v. Islamic Rep. of Iran*, 627 F.3d 1117, 1130 (9th Cir. 2010) (emphasis added); *see also Bennett v. Islamic Rep. of Iran*, No. 11-80065, 2011 WL 3157089 (N.D. Cal. July 26, 2011) ("The Court notes that Plaintiffs were not required to serve their post-judgment motions, such as their ex parte [§ 1610(c)] motion, on Iran.").  As the Ninth Circuit explained in *Peterson*, quoting from the FSIA's legislative history, "'Section 1608 [of the FSIA] sets forth the *exclusive procedures* with respect to service on … a foreign state.'"  *Id.* (quoting H.R. Rep. No. 94-1487, 1976 U.S.C.C.A.N. at 6622 and emphasis in original).  In the case of a default judgment, FSIA § 1608 requires only that "[a] copy of any such default judgment shall be sent to the foreign state … in the manner prescribed for service in this section."  28 U.S.C. § 1608(e).  Congress did not require in § 1608, or elsewhere, that post-judgment motions also must be served on a foreign sovereign judgment debtor before they are adjudicated.  A court is not to "add to those requirements," for "[i]f Congress had intended for foreign states to receive notice of every post-judgment motion, it would have said so."  *Peterson*, 627 F.3d at 1130.  Consistent with this rationale, and as Chief Judge Lamberth of this Court concluded contemporaneously, "the FSIA requires *only* that a copy of any default judgment be served on defendants … and does not demand service of additional post-judgment motions."  *Estate of Heiser v. Islamic Rep. of Iran*, 807 F. Supp. 2d 9, 23 (D.D.C. 2011) (emphasis in original and citing 28 U.S.C. § 1608(e)).  *Peterson* and *Heiser* were cases under the FSIA's

5

"Terrorism Exception," but that factor has no bearing on the applicability here of those holdings that service of post-default judgment motions is not required.

TIG complied with FSIA § 1608(e) by properly serving the 2001 and 2018 default judgments on Argentina.  *See* Aldort Decl. [ECF 2-3] ¶¶ 17-18 & Bravin Decl. [ECF 2-4] ¶¶ 8-9 (service of 2001 default judgment); Aldort Decl. ¶¶ 28-29 & Bravin Decl. ¶¶ 10-15 (service of 2018 default judgment).  The FSIA demands nothing more.

The D.C. Code similarly does not require service of post-judgment motions.  As explained in TIG's Omnibus Memorandum, the D.C. Code explicitly contemplates that post-judgment attachment can issue at any time during the life of the judgment and, furthermore, that "[s]urprise is often the key." *Lomax v. Spriggs*, 404 A.2d 943, 946, 948 (D.C. Ct. App. 1979); *see also* D.C. Code § 16-542.  That is consistent with practical reality.  Since judgment debtors generally (and Argentina specifically) have shown a propensity to evade satisfaction of their debts rather than pay up, the order of judicial operations generally tends to be that attachment issues without notice – thereby preserving the asset – only after which notice then issues to the judgment debtor, who then has an opportunity to seek to quash such relief.  *See* D.C. Code § 16-543 (allowing for attachment to issue "at any time during the life of the judgment"); *Bennett v. Islamic Rep. of Iran*, 604 F. Supp. 2d 152 (D.D.C. 2009) (granting writs of attachment before considering attempts to quash).

In addition to the above-cited authority confirming that the FSIA does not require service of a post-judgment motion, other courts confronted with similar § 1610(c) motions have granted requested relief without participation of the foreign sovereign.  In *Byrd v. Corporacion Forestal y Indus. De Olancho, SA*, 974 F. Supp. 2d 264 (S.D.N.Y. 2013), the Southern District of New York initially granted a judgment creditor's §1610(c) motion, holding the Republic of

Honduras liable on a registered judgment against one of its former agencies or instrumentalities and authorizing further attachment of sovereign property. *Id.* After the court entered its order, Honduras chose to participate, filing a motion to reconsider and challenging service and the court's jurisdiction to consider the §1610(c) motion, among other things. *Id.*; *see also Gen. Star Nat. Ins. Co. v. Administratia Asigurarilor de Stat,* 713 F. Supp. 2d 267, 269-270 (S.D.N.Y. 2010) (citing *Gen. Star Nat'l Ins. Co. v. Administratia Asigurarilor de Stat*, No. C2 98-1051, Slip Op. at *1-2 (S.D. Ohio Sept. 16, 2002)).

We have no doubt that this Court is empowered to decide TIG's motion *ex parte*, without waiting for Argentina to decide whether and when it will enter an appearance at some future date.

**B.** For practical purposes, although not required to do so, TIG elected to serve the Republic with the motion, and did so successfully by following the parties' special arrangement for service of process under the reinsurance contracts. *See* Affidavits of Service [ECF 5 and 7]. By serving Argentina, TIG obviated the risk that a dispute about service might cause delay in getting *ex parte* relief.

The Republic is fond of emerging after a period of silence to challenge service after it is facing an adverse ruling. Indeed, the Republic participated only once in the underlying 2017 proceedings – and that was to delay the entry of the 2018 default judgment by challenging service without good cause. Argentina ignored altogether TIG's petition to confirm the 2017 arbitration award. Aldort Decl. [ECF 2-3] ¶¶ 21, 23. But then, in September 2017, the Argentine Consulate sent an *ex parte* letter to the District Court for the Northern District of Illinois challenging service of the petition to confirm the arbitral award, claiming that TIG had not served the Republic under the Hague Convention. Aldort Decl. [ECF 2-3] ¶ 25. The court

7

overruled Argentina's objection and entered judgment in January 2018. The judge concluded that TIG had properly served Argentina under the special arrangement agreed to in the reinsurance contracts (complying with FSIA § 1608(a)(1)), making Hague Convention service (under FSIA § 1608(a)(2)) inapplicable. Aldort Decl. [ECF 2-3] ¶ 27 and Ex. 39 (finding that "TIG has established that service was appropriate under 28 USC 1608 because . . . TIG has established [ ] that there was a special arrangement within the meaning of 1608 in the insurance contracts for the insurance company to serve Argentina"). The Republic's *ex parte* challenge to service of the petition caused TIG to have to prepare a motion to strike and caused nearly two months of delay. Aldort Decl. [ECF 2-3] ¶ 27.

To forestall that same type of gambit here,[6] TIG elected to serve its motion on the Republic in accordance with the FSIA. Consistent with the Northern District of Illinois's holding, TIG followed the parties' contractual special arrangement for service. *See* Aldort Decl. [ECF 2-3] ¶¶ 2, 27. Beyond that, TIG initiated Hague Convention service to further forestall any challenge to service that might delay enforcement. It would not, however, serve the interests of justice for the Court to hold off granting the requested relief until Argentina's Central Authority serves the Republic and issues a Hague Convention Certificate of Service. The Central Authority took eight months to serve the Republic with the 2001 Judgment and deliver a Certificate of Service to TIG. *See* Bravin Decl. [ECF 2-4] ¶¶ 8-9. And after seven months, the Central Authority has yet to send a Certificate of Service for the 2018 Judgment. *Id.*, ¶¶ 11-15.

---

[6] As indicated above, Mr. Asmar's letter asserts that Argentina objects to the notice sent to the Argentine Embassy being construed as effective service, but is electing not to present its views to the Court at this time.

## II.     Issue 2:  The Uses of 2136 R St., NW

This Court requested that "TIG shall inform the Court of the property's uses, including whether and to what extent the property has been used for commercial purposes."  The only use of the property at the time of filing of TIG's motion was for a commercial activity, the long-planned auction to sell the property and generate sales revenue.  *See* Omnibus Mem. at 14-16; Custo Decl. [ECF 2-5] ¶ 18 & Ex. G; Bravin Decl. [ECF 2-4] ¶¶ 5-6 & Ex. E.  The property is a four-story historic building that has been uninhabitable and unoccupied for decades, since at least the 1990s.  Back in 2005, in connection with another creditor's effort to attach the property, this Court summarized the condition and history of the building thusly:

> In the past, the building was used to house the Representative of Argentina before the Inter-American Defense Board, but it is currently uninhabitable and vacant. Its sole current use is the storage of old files of the Argentine Defense Attaché. While currently not used commercially, the building was leased to tenants during the late 1980s and mid-1990s.  *However, since 1997, the building has been uninhabited and in a state of disrepair with heavy restoration cost estimates.*
>
> *****
>
> The building contains doors off of hinges, damages ceilings, destroyed kitchens and bathrooms, and other signs of neglect.

*NML Capital, Ltd. v. Rep. of Argentina*, Case No. 1:04-cv-00197, ECF No. 27 at *10 (D.D.C. Aug. 3, 2005) (emphasis added; internal citations omitted).[7]

Today, 2136 R St., NW is still widely reported as being uninhabited and in disrepair. One media source recently described the property as a "Kalorama fixer-upper" which "needs

---

[7] NML was unsuccessful in attaching the property at that time because, in contrast to TIG's action, the listing agreement between Argentina and its commercial real estate broker had already expired by the time NML commenced its attachment action.  *See* Omnibus Mem. at 14.

some serious TLC[.]"[8]  The *Washington Post*, meanwhile, published a story about former diplomatic properties in the District that have long gone unused, to the frustration of the surrounding community, calling 2136 R St., NW a "dilapidated property."  The *Post* article mentioned that "Alan and Irene Wurtzel, who live next to the R Street property, have watched the building deteriorate since 1994 and have found rats in their basement that they suspect came from the vacant building.  They said they are hopeful that something will finally be done."  A District official remarked about 2136 R St., NW: "'Let's be clear this is not about a functioning embassy, rather it's about abandoned property[.]'"[9]  As noted above, in September 2017, the U.S. Department of State informed the office of Congresswoman Eleanor Holmes Norton that the property "has not been considered 'diplomatic' for many years."  Ex. A, Sept. 14, 2017 U.S. Dept. of State Ltr.  Mr. Asmar indicated that Argentina continues to take the position that all of its properties located within Washington, D.C. are immune from execution, but he did not cite any legal basis for that position and we are not aware of any.

   As of July 2018, the listing photos of the property reveal that the building remains dilapidated.   As of September 2018, when TIG commenced this action, there was no evidence of any repair or improvements since the 2005 description that would be consistent with any period of renewed occupation.  *See* Ex. B; Bravin Decl. [ECF 2-4] Exs. C, E.  No files or storage materials of any kind are visible, and extensive damage remains apparent.  *Id.*

---

[8] "Argentina asks $2.5M for Kalorama fixer-upper where Roald Dahl was once a regular," Curbed D.C. (Aug. 9, 2018), *available at* https://dc.curbed.com/2018/8/9/17672476/roald-dahl-argentina-kalorama-fixer-upper-listing (last accessed Oct. 11, 2018).

[9] "D.C. officials seek accountability for foreign-owned buildings in the city," The Washington Post (Sept. 20, 2017), *available at* https://www.washingtonpost.com/local/dc-politics/dc-officials-seek-accountability-for-foreign-owned-buildings-in-the-city/2017/09/20/0d957ca4-9d79-11e7-9c8d-cf053ff30921_story.html?noredirect=on&utm_term=.fa9c89a19bf9 (last accessed Oct. 11, 2018).

Accordingly, given the property's long-dormant state, its *only* use immediately prior to, and immediately following, the filing of TIG's motion was as an asset to market for sale through commercial realtors to generate revenue.  As explained in the Omnibus Memorandum, and further explained below, it is on the basis of Argentina's use of the property for a commercial activity immediately prior to, and as of, the date of filing of TIG's post-judgment motion that this Court is authorized to grant TIG's motion for post-judgment relief, including registration of judgment liens against the property, attachment in aid of execution, and execution to enforce the judgments.

### III.     Issue 3:  The Property Has Been Delisted For Sale By Auction

Lastly, the Court ordered that "TIG shall inform the Court of the current status of the property" and also address the sovereign-immunity implications "[i]f the property has been sold[.]"  TIG accordingly responds as follows:

**A.**  At the time TIG filed its § 1610(c) motion on September 25, 2018, nearly two years had passed since the Argentine government had decreed that it would sell 2136 R St., NW, and the property had been listed for sale at auction since sometime during the summer.  *See* Bravin Decl. ¶¶ 4-5.  According to the published auction schedule, Bravin Decl. [ECF 2-4], Ex. D, the finalists for the auction should have already been selected on September 21, 2018; final bids were due by September 28, 2018, and the "Awarded Bidder" would be notified of their selection by October 8, 2018.  According to the Bid Specifications, *id.*, the Awarded Bidder and Argentina would then finalize a contract for purchase of the property and payment of the purchase price.  Had things gone to plan, a closing on the purchase would be imminent.

To TIG's knowledge, three days after its motion was filed, on September 28, 2018, the property was suddenly "delisted" – that is, the listing for the property no longer appeared on

11

websites that had been advertising the property and the auction.  *See, e.g.,* Ex. B.  As noted above, an inquiry to the Recorder of Deeds on October 11 indicates that the Republic is still listed as the title holder to 2136 R St., NW, and the letter from Mr. Asmar on behalf of the Republic that same day confirmed that the property was de-listed but not sold.

On October 8, 2018, to inquire further about the status of the property following its delisting, TIG served the attached subpoena on Washington Fine Properties, LLC, the commercial real estate broker that listed the property and was handling the auction.  See Ex. C hereto, WFP Subpoena.  Washington Fine Properties has not responded to the subpoena nor has it responded to our attempts to speak with the company president.

**B.**  The current status of the property is of no moment.  Argentina's recent delisting of the property does not immunize the property from attachment or execution.  As the D.C. Circuit has noted, the FSIA "offers a rather broad definition of commercial activity[.]"  *Agudas Chasidei Chabad of U.S. v. Russian Fed.*, 528 F.3d 934, 947 (D.C. Cir. 2008).  That rather broad definition includes not just continuous commercial activity ("a regular course of commercial conduct"), but also singular activities ("a particular commercial transaction or act") that are far more episodic in nature – like a sale or attempted sale.  28 U.S.C. § 1603(d); *see also* Omnibus Mem. 24-25.

The fact that the Republic was actively marketing 2136 R St., NW for sale – and engaging in a bidding process with potential buyers at the time TIG sought attachment – is more than enough to satisfy the FSIA § 1610(a) exception to the immunity of property of a foreign state "used for a commercial activity in the United States."  All that is required is that "the property must be in active employment for commercial purposes *at the time the writ of attachment or execution is sought*."  *Comm'ns Imp. Exp. S.A. v. Rep. of the Congo*, No.

EDCV16-00656-GHK-SPX, 2016 WL 9281947, at *6 (C.D. Cal. Apr. 21, 2016) (emphasis added); *see also, e.g.*, *NML Capital, Ltd. v. Spaceport Sys. Int'l, L.P.*, 788 F. Supp. 2d 1111, 1120 (C.D. Cal. 2011) (same). This view is practical and makes sense when considering episodic commercial activities under § 1603(d). Congress, after all, contemplated that "[t]he courts would have a great deal of latitude in determining what is a "commercial activity," as "[i]t has seemed unwise to attempt an excessively precise definition of this term," an exercise Congress deemed not "practicable." H.R. Rep. No. 94-1487 at *17. The FSIA, after all, is meant to "protect the rights of *both* foreign states and litigants in the United States courts" and is to be interpreted accordingly. 28 U.S.C. § 1602 (emphasis added).

The timing and scope of the "commercial activity" requirement within FSIA § 1610(a) is not without limits – it cannot be hypothetical, nor could the predicate "commercial activity" occur after attachment – but none of these limits are applicable here. The Second Circuit has held that property "must be used for a commercial activity in the United States *before it is susceptible to attachment and execution.*" *Aurelius Capital Partners, LP v. Rep. of Argentina*, 584 F.3d 120, 130 (2d Cir. 2009) (emphases added; internal quotation marks omitted). "At the time the writ of attachment or execution is issued" there "*must have been*" some actual commercial activity already shown to have taken place. *Id.* (emphasis added). *Aurelius* warns against predicating a finding of commercial activity on some undeveloped commercial activity – akin to if TIG had moved before the property had been put up for auction, which is not what happened here. *Compare id.* at 123 (property not "used for a commercial activity" by the Republic of Argentina because the attachment became effective immediately after the property was transferred from private hands to the Republic and no time had passed for the Republic to yet have any commercial use of the property). By contrast, commercial activity that has already

manifested "at the time the writ … is issued" is sufficient, *see id.* at 130, even where the usage has then been paused, *see, e.g., Crystallex v. Int'l Corp. v. Bolivarian Rep. of Venezuela*, No. 17-mc-151-LPS, 2018 WL 3812153 at *30 (D. Del., Aug. 9, 2018) (property was "used for commercial activity" under § 1610 on the strength of recent past activity, even though at the time of the writ's issuance, the property was then currently "effectively frozen" under an Executive Order).

Not only is the approach enunciated above practical, it also comports with the approach taken by this Court in interpreting other portions of the FSIA. Of significant instructive value here, § 1605(a)(3) (the so-called "expropriation exception" to immunity from suit) contains, *inter alia*, a requirement, phrased in the present tense, that a sovereign agency or instrumentality "is engaged in a commercial activity in the United States." Yet despite § 1605(a)(3)'s phrasing in the present tense, the D.C. Circuit has held that the predicate commercial activity under that provision could "have ceased only recently, at the time a complaint is filed." *Schubarth v. Fed. Republic of Germany*, 891 F.3d 392, 399 (D.C. Cir. 2018).[10] Other cases under § 1605(a)(3) dealing with more episodic commercial activity have likewise been adjudicated in a manner consistent with the kind of flexibility required by § 1603(d). *See, e.g.*, *Chabad*, 528 F.3d at 948 (U.S.-based contracts which had been recently entered into "[a]t the time of the filing of the suit relevant to assessing U.S. commercial activity under Section 1605(a)(3)"); *Altmann v. Rep. of Austria*, 317 F.3d 954, 961, 969 & n.5 (9th Cir. 2002) (book publishing in U.S. months prior to filing of complaint showed relevant commercial activity under Section 1605(a)(3)).

---

[10] In *Schubarth*, the D.C. Circuit did not "decide whether [Section 1605(a)(3)] always requires contemporaneous or recent commercial activity, nor … how recent such activity must be[.]" 891 F.3d at 399.

A similar approach is warranted here.  In the end, the FSIA should not, and indeed must not, be read to countenance gamesmanship by foreign sovereigns.  TIG's entitlement to attachment and execution relief under the FSIA should not be disturbed by the Republic's decision to, for as-yet undisclosed reasons, pause its long-standing intention and effort to market the property for sale by auction.

Date: October 12, 2018

        Respectfully submitted,

        MITCHELL SILBERBERG & KNUPP LLP

        By:  /s/ *Mark N. Bravin*
            Mark N. Bravin (D.C. Bar No. 249433)
            Theresa B. Bowman (D.C. Bar No. 1012776)
            Gilbert S. Lee (*pro hac vice app. forthcoming*)
            Attorneys for TIG Insurance Company