# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| |
|---|
| TIG INSURANCE COMPANY, |
| *Plaintiff*, |
| v. |
| REPUBLIC OF ARGENTINA, |
| *Defendant.* |

No. 18-mc-0129 (DLF)

## MEMORANDUM OPINION

Plaintiff TIG Insurance Company seeks to collect on default judgments against defendant Republic of Argentina by attaching an Argentinian property located at 2136 R St., NW, Washington, D.C. 20008. Before the Court are TIG's Motions for Emergency Relief, Attachment-Related Relief, and a Writ of Execution, Dkt. 2. For the reasons that follow, the Court will deny TIG's motions.

## I.  BACKGROUND

The facts are undisputed. In 2000 and 2017, TIG instigated arbitral proceedings and ultimately obtained default judgments against Argentina and its predecessor-in-interest, Caja Nacional. *See* TIG's Br. at 10, 12–13, Dkt. 2-1. Argentina's debt now totals $33,666,021.17, including interest and penalties, and TIG has yet to receive a single payment. *Id.* at 11, 13.

TIG's motion was prompted by Argentina's recent decision to list a particular property in the District of Columbia for sale. Until the late 1990s, the property, which is located at 2136 R St., NW, was used as a diplomatic residence. TIG's Suppl. Br. at 9, Dkt. 9. Since then, it has fallen into disrepair and has become uninhabitable. *Id.* In 2003 and 2004, it was briefly listed for sale, but it was taken off the market before any sale was consummated. *Id.* at 3. It was then

again listed for sale in the summer of 2018. *Id.* In response to this recent listing, TIG filed motions for emergency relief, attachment-related relief, and a writ of execution. TIG's Br. at 4–6. But three days after TIG filed its emergency motions, and before this matter was assigned to the undersigned, Argentina took its property off the market.[1] TIG's Suppl. Br. at 4.

Argentina originally appeared specially for the limited purpose of seeking dismissal for lack of personal jurisdiction and insufficient service of process. Argentina's Mot. to Dismiss at 1, Dkt. 13. However, it later conceded both grounds for dismissal, *see* Argentina's Notice Regarding Mot. to Dismiss at 1, Dkt. 14, and the Court denied its motion as moot, *see* Nov. 30, 2018 Minute Order. Argentina now opposes TIG's motions, among other reasons, on the ground that the property enjoys execution immunity under the Foreign Sovereign Immunities Act (FSIA).

## II. LEGAL STANDARD

The FSIA governs "claims of immunity in every civil action against a foreign state or its political subdivisions, agencies or instrumentalities." *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 488 (1983). "[A]ny sort of immunity defense made by a foreign sovereign in an American court must stand on the Act's text." *Republic of Argentina v. NML Capital, Ltd.*, 573 U.S. 134, 141–42 (2014).

Two types of immunity exist under the FSIA: jurisdictional and execution immunity. *Id.* at 142. First, foreign states are immune from the *jurisdiction* of United States courts "except as provided in sections 1605 to 1607." 28 U.S.C. § 1604. Jurisdictional immunity is not at issue

---

[1] In a footnote in its reply, TIG mentions in passing that "the [p]roperty continues to be marketed for sale in Washington Fine Properties' biannual publication." TIG's Reply at 12 n.4, Dkt. 18. But it does not suggest that the property remains on the market because of this publication, and it concedes in other sections of the same filing that Argentina took its property off the market. *See, e.g., id.* at 4.

here. Second, *execution* immunity shields "property in the United States of a foreign state . . . from attachment[,] arrest[,] and execution," 28 U.S.C. § 1609, unless the property falls within a few enumerated exceptions codified in § 1610, *see Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816, 822 (2018). Execution immunity is a "default presumption that the judgment creditor must defeat at the outset." *Weinstein v. Islamic Republic of Iran*, 831 F.3d 470, 482 (D.C. Cir. 2016), *abrogated on other grounds by Rubin*, 138 S. Ct. 816. "When reviewing a plaintiff's unchallenged factual allegations to determine whether they are sufficient" to overcome immunity under the FSIA, courts "assume those allegations to be true." *Simon v. Republic of Hungary*, 812 F.3d 127, 135 (D.C. Cir. 2016) (citation omitted).

## III. ANALYSIS

To prevail on its motions, TIG must establish that the Argentinian property at issue falls within one of the narrow exceptions to execution immunity under the FSIA. The parties do not dispute that at least one of TIG's two judgments are arbitral awards that permit attachment under § 1610(a)(6).[2] Nor do they dispute that at the time TIG filed its motions, the property was "used for a commercial activity" within the meaning of § 1610(a). *See, e.g.*, Argentina's Opp'n at 11–12; TIG's Reply at 4. Both parties agree that the property was listed for sale when TIG first moved for relief and that Argentina withdrew the property from the market shortly after TIG filed its motions and before the matter was assigned to the undersigned.

The parties' sole dispute is the relevant time for assessing execution immunity. TIG contends that a foreign state's property may be attached as long as it was "used for a commercial

---

[2] The parties dispute whether the first judgment was rendered against Argentina and whether the Vienna Convention bars attachment. *See, e.g.*, Argentina's Opp'n at 8 n.2, 12–13, Dkt. 16; TIG's Reply at 3, 14–21, Dkt. 18. Because the Court concludes that the property is immune from attachment under the FSIA, it does not address either of these disputes.

3

activity" at the time a motion for a writ of attachment was *filed*. Argentina, on the other hand, argues that the commercial activities exception applies if the property is "used for a commercial activity" at the moment a writ of attachment *issues*. Text, structure, history, and precedent support Argentina's reading: a property is immune from attachment unless it is "used for a commercial activity" at the time a writ of attachment issues.

The Court begins with the text of the FSIA, mindful of its duty to narrowly construe exceptions to foreign immunity. *Liber. E. Timber Corp. v. Gov't of Republic of Liber.*, 659 F. Supp. 606, 610 (D.D.C. 2003) ("The concept of 'commercial activity' should be defined narrowly because sovereign immunity remains the rule rather than the exception and because courts should be cautious when addressing areas that affect the affairs of foreign governments." (internal citation omitted)); *see also Af-Cap, Inc. v. Chevron Overseas (Congo) Ltd.*, 475 F.3d 1080, 1087 (9th Cir. 2007) (similar). The FSIA provides that "the property in the United States of a foreign state shall be immune from attachment[,] arrest[,] and execution except as provided in section[] 1610 . . . ." 28 U.S.C. § 1609. The commercial activities exception provides that "[t]he property in the United States of a foreign state . . . used for a commercial activity in the United States, shall not be immune from attachment in aid of execution, or from execution, upon a judgment entered by a court of the United States," *id.* § 1610(a), if one of several enumerated provisions are satisfied, including if the movant holds a "judgment . . . based on an order confirming an arbitral award rendered against the foreign state," *id.* § 1610(a)(6).

In § 1610(a), the word "used" is a past participle phrased in the present tense. *Cf. Hamer v. City of Trinidad*, 924 F.3d 1093, 1104 (10th Cir. 2019) (statute providing that no individual "shall . . . be excluded" is "phrased in the present tense (albeit in the passive voice), which suggests that a qualified individual who *currently* experiences discrimination . . . suffers an

4

injury"). Implicit in the phrase "used for a commercial activity" is some form of the verb "to be." *See The American Heritage Book of English Usage* 46 (1996) (passive voice formed by coupling a "to be" verb with a past participle). And here, that form of the verb "to be" is "is" and not "was." As other courts have held, the § 1610(a) exception to executional immunity applies to property that *is* (as opposed to was) "used for a commercial activity." *Cf. FG Hemisphere Assocs. v. Congo*, 455 F.3d 575, 591 (5th Cir. 2006) ("To apply the § 1610(a) exception to executional immunity, there must be a finding that the property *is* located in the United States and used for commercial activity in the United States." (emphases omitted and added)). "The use of the present tense in a statute strongly suggests it does not extend to past actions." *Sherley v. Sebelius*, 644 F.3d 388, 394 (D.C. Cir. 2011). And the statute's use of the phrase "is or was used" in the adjacent provision, § 1610(a)(2), confirms this present tense interpretation. "Had Congress intended" the exception to apply based on both past and present uses of the property "it presumably would have [said] so expressly as it did in the . . . following subparagraph." *Sandoz Inc. v. Amgen Inc.*, 137 S. Ct. 1664, 1677 (2017) (internal quotation marks omitted).

This textual evidence explains why courts have consistently interpreted the relevant time for assessing execution immunity under § 1610(a) as the moment that a court makes the immunity determination. *See FG Hemisphere Assocs.*, 455 F.3d at 589. As noted, the Fifth Circuit held that § 1610(a) requires that property be "in the United States," 28 U.S.C. § 1610(a), "when the district court authorizes execution," *FG Hemisphere Assocs.*, 455 F.3d at 589. Likewise, when the Second Circuit held that the anticipated use of funds for commercial activity did not satisfy the exception, it explained that "the property that is subject to attachment and execution . . . must have been 'used for a commercial activity' *at the time* the writ of attachment

5

or execution is issued." *Aurelius Capital Partners, LP v. Republic of Argentina*, 584 F.3d 120, 130 (2d Cir. 2009). It also stressed that "[s]ection 1610(a) does not say that the property in the United States of a foreign state that '*will* be used' or '*could potentially* be used' for a commercial activity in the United States is not immune from attachment or execution." *Id.*

District courts have similarly held that courts "must rely on the [property]'s current usage" because "the statute only requires [courts] to consider what the property is 'used for.'" *NML Capital, Ltd. v. Republic of Argentina*, No. 04-cv-0197, 2005 WL 8161968, at *12 (D.D.C. Aug. 3, 2005). "Information pertaining to the [property]'s past uses . . . is extraneous." *Id.*; *see also id.* at *14 (refusing to issue a writ of attachment after the same R Street property was removed from the market in 2004 because there was "no evidence to support Argentina's present intent to sell the property"); *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 333 F. Supp. 3d 380, 418, 419 (D. Del. 2018) (explaining that "[t]he property subject to attachment . . . must . . . be 'used for a commercial activity' at the time the writ of attachment or execution is issued," and holding that the property there "continu[ed] to be 'used for a commercial activity'" (internal quotation marks omitted)).

TIG appears to concede that the statute is written in the present tense, but it argues that it is still entitled to relief because courts frequently interpret statutes written in the present tense to apply based on events at the time of filing rather than at the time any order issues. *See* TIG's Reply at 7–8. Significantly, TIG advanced this argument only after it became clear that Argentina had taken the property off the market. When TIG filed its motions, it too believed that attachment and execution were only possible if the property was still on the market at the time any writ issued. TIG's Br. at 2 (arguing that "the window for TIG to get any measure of satisfaction [wa]s fleeting" because Argentina "at any moment could pull the property off the

6

market, ostensibly to take it out of the realm of 'commercial activity' and to shield it from execution"). Nonetheless, TIG now relies on a misguided analogy between jurisdictional and execution immunity to justify its current position. As TIG itself explains, TIG's Reply at 12–14, the rule that "subject-matter jurisdiction turns on the facts upon filing" is "longstanding," *Keene Corp. v. United States*, 508 U.S. 200, 207 (1993) (collecting cases). That rule explains why courts evaluate jurisdictional immunity under the FSIA at the time a suit is filed. *See, e.g.*, *Dole Food Co. v. Patrickson*, 538 U.S. 468, 478 (2003) (construing § 1603(b) "consistent with the longstanding principle that the jurisdiction of the Court depends upon the state of things at the time of the action brought" (internal quotation marks omitted)); *Schubarth v. Fed. Republic of Germany*, 891 F.3d 392, 399 (D.C. Cir. 2018) (interpreting a jurisdictional provision); *Agudas Chasidei Chabad of U.S. v. Russian Fed'n*, 528 F.3d 934, 948 (D.C. Cir. 2008) (same); *see also Republic of Austria v. Altmann*, 541 U.S. 677, 708 (2004) (Breyer, J., concurring) ("[T]he legal concept of sovereign immunity, as traditionally applied, is about a defendant's status at the time of suit.") (emphasis omitted).

The problem for TIG is that § 1610(a) provides exceptions to execution immunity, not jurisdictional immunity. As the D.C. Circuit has explained, only the immunity addressed in §§ 1604–1607 implicates federal courts' subject matter jurisdiction. *See Weinstein*, 831 F.3d at 478–80. The execution immunity addressed in §§ 1609–1611 is not jurisdictional and therefore does not implicate the time-of-filing rule. As the Fifth Circuit explained when it distinguished between the timing of jurisdictional and execution-immunity determinations, *see FG Hemisphere Assocs.*, 455 F.3d at 588–89, "immunity from execution" is distinct from "jurisdictional immunity" and should be determined "when the district court authorizes execution," *id.* at 589 (internal quotation marks omitted). Any argument that the time-of-filing rule applies to

7

execution-immunity determinations "conflates the considerations and effects attendant to commencement and/or notice of a suit seeking to execute upon the foreign sovereign's property with those attendant to deciding whether to authorize execution upon that property." *Id.*

TIG next turns to the statutory definition of commercial activity in § 1603(d). TIG's Reply at 6. That provision defines a "commercial activity" to mean "either a regular course of commercial conduct or a particular commercial transaction or act." 28 U.S.C. § 1603(d). Returning to § 1610(a), TIG argues that interpreting the commercial activity exception to apply at the time any writ issues would render the individual transaction language superfluous because it is "difficult to imagine how anything other than *ongoing* and continuous activity could ever manage to be strictly current." TIG's Reply at 6 (internal quotation marks omitted). But even if a "particular commercial transaction" would not permit attachment, that language would not be wholly superfluous. After all, it could, for example, have meaning when interpreting the commercial activity exception to jurisdictional immunity in 28 U.S.C. § 1605(a)(2). And just as ordinary speakers of English do not intend to invoke every definition of a given word each time they use it, it is also reasonable to conclude that Congress did not intend to invoke both definitions each time it referenced the term "commercial activity" in the FSIA. *Cf. Return Mail, Inc. v. U.S. Postal Serv.*, 139 S. Ct. 1853, 1863 (2019) (explaining that a statutory term will not always "mean the same thing" each time it is used, "especially when [it] is used throughout a statute and takes on distinct characters in distinct statutory provisions" (internal quotation marks omitted)). Moreover, "[t]he canon against surplusage is not an absolute rule," *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013), and "cannot dictate" an interpretation contrary to the "plain meaning" of a statute, *Great Lakes Comnet, Inc. v. Fed. Commc'ns Comm'n*, 823 F.3d 998, 1003 (D.C. Cir. 2016).

Finally, TIG selectively quotes from out-of-circuit decisions to suggest that courts have held that the application of § 1610(a) turns on the time of filing. TIG's Reply at 8–9. A careful reading of those decisions, however, reveals that none are fairly interpreted as TIG argues. For example, TIG cites two Central District of California decisions stating that "property must be in active employment for commercial purposes at the time the writ of attachment or execution is sought." *Comm'ns Imp. Exp. S.A. v. Congo*, No. 16-00656, 2016 WL 9281947, at *6 (C.D. Cal. Apr. 21, 2016) (internal quotation marks omitted); *accord NML Capital v. Spaceport Sys. Int'l*, 788 F. Supp. 2d 1111, 1120 (C.D. Cal. 2011). But both passages are dicta in cases that did not turn on the timing question. And other parts of those same decisions make clear that the operative moment for the execution-immunity determination is when the writ issues, as opposed to when the writ is sought. *See Comm'ns Imp. Exp. S.A.*, 2016 WL 9281947, at *6 ("The property that is subject to attachment and execution . . . must have been 'used for a commercial activity' at the time the writ of attachment or execution is *issued*." (emphases omitted and added, alterations adopted, and internal quotation marks omitted)); *accord Spaceport Sys. Int'l*, 788 F. Supp. 2d at 1120. The cited passages also rely on the same Ninth Circuit decision, *Af-Cap, Inc. v. Chevron Overseas (Congo) Ltd.*, 475 F.3d 1080, 1088–89 (9th Cir. 2007), that does not support a time-of-filing interpretation. Thus, TIG has not "defeat[ed]" the "default presumption" of execution immunity, *Weinstein*, 831 F.3d at 482, and the Court is without authority to grant its requested relief.

## CONCLUSION

For these reasons, the Court denies TIG's Motions for Emergency Relief, Attachment-Related Relief, and a Writ of Execution, Dkt. 2. An order consistent with this decision accompanies this memorandum opinion.

*[signature]*
DABNEY L. FRIEDRICH
United States District Judge

July 10, 2019