# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---------------------------------------------------------------------- x

TIG INSURANCE COMPANY, as successor by merger
to International Insurance Company and International
Surplus Lines Insurance Company;

      Plaintiff-Judgment Creditor,        :   Case No.: 1:18-mc-00129-DLF

v.

REPUBLIC OF ARGENTINA as successor to Caja
Nacional de Ahorro y Seguro; and CAJA NACIONAL
DE AHORRO Y SEGURO;

      Defendant-Judgment Debtors.

---------------------------------------------------------------------- x

## NOTICE OF MOTION TO DISMISS

PLEASE TAKE NOTICE that, upon the accompanying Memorandum of Law of the
Republic of Argentina (the "Republic") dated December 18, 2020; the Declaration of Carmine
D. Boccuzzi, Jr. dated December 18, 2020, and all attached exhibits; the Declaration of Gabriel
Bottini dated December 18, 2020, and all attached exhibits; the Declaration of Jorge Argüello
dated December 18, 2020, and all attached exhibits; and the prior record in the above-captioned
action, the Republic will move this Court pursuant to Federal Rule of Civil Procedure 12(b)(1),
the Foreign Sovereign Immunities Act, 28 U.S.C. § 1610, and the Vienna Convention on
Diplomatic Relations, 23 U.S.T. 3227, for an order dismissing with prejudice the above-
captioned action filed by plaintiff TIG Insurance Company and granting such other and further
relief as the Court deems just and proper.

NOTICE IS FURTHER GIVEN that pursuant to the parties' agreed briefing schedule, so-Ordered by the Court on November 10, 2020, plaintiff's response to the Motion, if any, shall be filed on or before January 22, 2021, and the Republic's reply shall be due on February 9, 2021.

Dated: December 18, 2020
       New York, New York

Carmine D. Boccuzzi, Jr.
    cboccuzzi@cgsh.com
Rathna J. Ramamurthi
    rramamurthi@cgsh.com
CLEARY GOTTLIEB STEEN
& HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Tel. (212) 225-2508
Fax (212) 225-3999

Charles M. Asmar (D.C. Bar No. 434984)
    CAsmar@asm-law.com
Christopher A. Taggi (D.C. Bar No. 473065)
    CTaggi@asm-law.com
David A. Edelstein (D.C. Bar No. 983160)
    DEdelstein@asm-law.com
ASMAR, SCHOR & MCKENNA, PLLC
5335 Wisconsin Ave., NW, Suite 400
Washington, D.C. 20015
Tel. (202) 244-4264
Fax (202) 686-3567

*Attorneys for the Republic of Argentina*

TO:     Mark N. Bravin
        Theresa B. Bowman
        Mitchell Silberberg & Knupp LLP
        1818 N Street NW, 7th Floor
        Washington, D.C. 20036

        *Attorneys for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---------------------------------------------------------------------- x
                                                                       :
TIG INSURANCE COMPANY, as successor by merger                          :
to International Insurance Company and International                    :
Surplus Lines Insurance Company;                                       :
                                                                       :
       Plaintiff-Judgment Creditor,                               :   Case No.: 1:18-mc-00129-DLF
                                                                       :
v.                                                                     :
                                                                       :
REPUBLIC OF ARGENTINA as successor to Caja                             :
Nacional de Ahorro y Seguro; and CAJA NACIONAL                         :
DE AHORRO Y SEGURO;                                                    :
                                                                       :
       Defendant-Judgment Debtors.                                :
---------------------------------------------------------------------- x


**MEMORANDUM OF LAW OF THE REPUBLIC OF ARGENTINA IN SUPPORT OF
ITS MOTION TO DISMISS**

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ........................................................................ iii

TABLE OF ABBREVIATIONS ................................................................... vii

PRELIMINARY STATEMENT ................................................................... 1

FACTUAL BACKGROUND ........................................................................ 2

I.    THE REPUBLIC DID NOT ENTER INTO ANY ARBITRATION
      AGREEMENT RELEVANT TO THIS CASE. .................................. 2

      A.    Caja And Other Private Entities Enter Reinsurance Contracts ................. 2

      B.    IIC Brings Arbitration Against Caja And Seeks Enforcement
            Of Its Default Arbitral Award .................................................... 4

      C.    TIG Commences Legal Proceedings Against The Republic. ................... 6

II.   IN THIS ACTION, TIG SEEKS TO SEIZE THE CHANCERY
      ANNEX. .......................................................................................... 7

      A.    The Chancery Annex Is Part Of The Argentine Mission, Used
            To Store Diplomatic Files .......................................................... 7

      B.    TIG's Execution Attempt Was Denied By This Court, And
            The D.C. Circuit Remanded For Consideration Of The
            "Totality Of The Circumstances." ................................................ 9

ARGUMENT ............................................................................................. 10

POINT I  THE REPUBLIC DID NOT MAKE AN AGREEMENT TO ARBITRATE WITH
TIG, SO THE CONTRACTS AND JUDGMENTS PROVIDE NO BASIS FOR
JURISDICTION OVER THE REPUBLIC OR ITS PROPERTY. ............................ 10

      A.    The 2018 Judgment Against The Republic Should Be Vacated
            Since The Republic Did Not Make An Agreement To
            Arbitrate. ............................................................................. 11

      B.    Neither Of The Judgments Can Be Enforced Against The
            Republic Or Its Property. .......................................................... 14

      C.    To The Extent TIG Argues That The Republic Is Bound By
            The Arbitration Clauses As A Successor-In-Interest, That
            Contention Is Unavailing. ......................................................... 16

POINT II  EVEN IF THE JUDGMENTS WERE ENFORCEABLE AGAINST THE
REPUBLIC, THEY COULD NOT BE ENFORCED AGAINST THE CHANCERY ANNEX.
............................................................................................................. 20

      A.    The Chancery Annex Is Not Used For Commercial Activity .................. 20

            1.    Considering The Totality Of The Circumstances, The
                  Property Is Best Characterized As Predominantly
                  Unused Or Used Diplomatically ........................................ 21

2.  The Brief Listing Of The Chancery Annex For Sale
Did Not Convert It To Property Being Used For A
Commercial Activity. ..................................................................................24

B.  The Chancery Annex Is Also Immune Under The Vienna
Convention.............................................................................................................28

CONCLUSION...............................................................................................................................32

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*767 Third Ave. Assocs. v. Permanent Mission of Republic of Zaire to United Nations*,
988 F.2d 295 (2d Cir. 1993)................................................................................... 30, 31

*Af-Cap, Inc. v. Chevron Overseas (Congo) Ltd.*,
475 F.3d 1080 (9th Cir. 2007) .............................................................. 15, 21, 24, 26

*Af-Cap, Inc. v. Republic of Congo*,
326 F. Supp. 2d 128 (D.D.C. 2004)........................................................... 10-11, 23, 30

*Allstate Ins. Co. v. Banco Do Estado Do Rio Grande Do Sul, S.A.*,
No. 04 Civ. 1550 (DLC), 2004 WL 1398437 (S.D.N.Y. June 23, 2004) .......................... 16

*Argentine Republic v. Amerada Hess Shipping Corp.*,
488 U.S. 428 (1989)................................................................................................ 10-11

*Aurum Asset Managers, LLC v. Banco Do Estado Do Rio Grande Do Sul*,
No. 08 Misc. 102, 2010 WL 4027382 (E.D. Pa. Oct. 13, 2010)................................ 13, 16, 18-19

*Aurum Asset Managers, LLC v. Bradesco Companhia de Seguros*,
441 F. App'x 822 (3d Cir. 2011) .............................................................. 12, 13, 16

*Avelar v. J. Cotoia Const., Inc.*,
No. 11 Civ. 2172, 2011 WL 5245206 (E.D.N.Y. Nov. 2, 2011) ........................................ 29

*Bell Helicopter Textron, Inc. v. Islamic Republic of Iran*,
734 F.3d 1175 (D.C. Cir. 2013) ........................................................................... 12

*Bennett v. Islamic Republic of Iran*,
618 F.3d 19 (D.C. Cir. 2010) ............................................................................... 22

*City of Englewood v. Socialist People's Libyan Arab Jamahiriya*,
773 F.2d 31 (3d Cir. 1985).................................................................................. 22, 25

*Comm'ns Imp. Exp. S.A. v. Republic of the Congo*,
No. 16 Civ. 00656 (GHK), 2016 WL 9281947 (C.D.C.A. Apr. 21, 2016) ...................... 21

*Cortez Byrd v. Corporacion Forestal y Indus. de Olancho, S.A.*,
974 F. Supp. 2d 264 (S.D.N.Y. 2013).................................................................. 16-17

*Devi v. Silva*,
   861 F. Supp. 2d 135 (S.D.N.Y. 2012)................................................................. 28

*DRC, Inc. v. Republic of Honduras*,
   71 F. Supp. 3d 201 (D.D.C. 2014)..................................................................... 17

*EM Ltd. v. Republic of Argentina*,
   473 F.3d 463 (2d Cir. 2007)............................................................................... 21

*Farhang v. Indian Inst. of Tech., Kharagpur*,
   529 F. App'x 812 (9th Cir. 2013) ...................................................................... 14

*First Fidelity Bank, N.A., v. Gov't of Antigua & Barbuda–Permanent Mission*,
   877 F.2d 189 (2d Cir. 1989)............................................................................... 19

*Flatow v. Islamic Republic of Iran*,
   76 F. Supp. 2d 16 (D.D.C.1999) ................................................................... 22, 23

*GSS Group Ltd. v. Nat'l Port Auth. of Liberia*,
   822 F.3d 598 (D.C. Cir. 2016) ...................................................................... 17, 18

*Int'l Ins. Co. v. Caja Nacional de Ahorro y Seguro*,
   293 F.3d 392 (7th Cir. 2002) ................................................................... 5, 14, 17

*Int'l Ins. Co. v. Caja Nacional de Ahorro y Seguro*,
   No. 00 Civ. 6703, 2001 WL 322005 (N.D. Ill. Apr. 2, 2001) ............................ 5

*Jerez v. Republic of Cuba*,
   775 F.3d 419 (D.C. Cir. 2014)........................................................................... 11

*Liberian E. Timber Corp. v. Gov't of Republic of Liberia*,
   659 F. Supp. 606 (D.D.C. 1987)........................................................................ 30

*Mihaylov v. United States*,
   70 F. Supp. 2d 4 (D.D.C. 1999)......................................................................... 28

*NML Capital Ltd. v. Republic of Argentina*,
   No. 02 Civ. 2507, 2005 WL 743086 (S.D.N.Y. Mar. 31, 2005) ....................... 27

*NML Capital, Ltd. v. Republic of Argentina*,
   No. 04 Civ. 197 (CKK), 2005 WL 8161968 (D.D.C. Aug. 3, 2005)................ *passim*

*NML Capital, Ltd. v. Space Expl. Techs. Corp.*,
   No. 14 Civ. 02262 (SVW), 2015 WL 1334291 (C.D. Cal. Mar. 6, 2015)......... 21

*NML Capital, Ltd. v. Spaceport Sys. Int'l, L.P.*,
788 F. Supp. 2d 1111 (C.D. Cal. 2011) ............................................................ 27

*Prac. Concepts, Inc. v. Republic of Bolivia*,
811 F.2d 1543 (D.C. Cir. 1987) ..................................................................... 12

*Rafii v. Islamic Republic of Iran*,
No. 01 Civ. 850 (CKK), 2005 WL 8167693 (D.D.C. Oct. 25, 2005) ................................ 22

*Republic of Argentina v. NML Capital, Ltd.*,
573 U.S. 134 (2014) ........................................................................... 15, 25

*Republic of Sudan v. Harrison*,
139 S. Ct. 1048 (2019) ......................................................................... 11

*Rubin v. The Islamic Republic of Iran*,
637 F.3d 783 (7th Cir. 2011) .................................................................... 14

*S & S Mach. Co. v. Masinexportimport*,
802 F. Supp. 1109 (S.D.N.Y. 1992) ............................................................... 28

*SACE S.p.A. v. Republic of Paraguay*,
243 F. Supp. 3d 21 (D.D.C. 2017) ................................................................ 13

*Schubarth v. Fed. Republic of Germany*,
891 F.3d 392 (D.C. Cir. 2018) ................................................................... 25

*Semtek Int'l Inc. v. Info. Satellite Sys.*,
No. 09 Civ. 10183 (RWZ), 2012 WL 831475 (D. Mass. Mar. 9, 2012) ............................... 12

*Shelbourne N. Water St. Corp. v. Nat'l Asset Mgmt. Agency*,
374 F. Supp. 3d 712 (N.D. Ill. 2019) ............................................................ 13

*TIG Ins. Co. v. Republic of Argentina*,
967 F.3d 778 (D.C. Cir. 2020) .............................................................. *passim*

*TIG Ins. Co. v. Republic of Argentina*,
No. 18 Misc. 0129 (DLF), 2019 WL 3017618 (D.D.C. July 10, 2019) .............................. 10, 21

*United States v. Arlington Cnty., Va.*,
669 F.2d 925 (4th Cir. 1982) .................................................................... 25

*Vera v. Banco Bilbao Vizcaya Argentaria, S.A.*,
946 F.3d 120 (2d Cir. 2019) ..................................................................... 12

*Verizon New England Inc. v. Transcom Enhanced Servs., Inc.*,
21 N.Y.3d 66 (2013) ............................................................................................ 31

*Weinstein v. Islamic Republic of Iran*,
831 F.3d 470 (D.C. Cir. 2016) ........................................................................... 14

*World Wide Minerals, Ltd. v. Republic of Kazakhstan*,
296 F.3d 1154 (D.C. Cir. 2002) ......................................................................... 19

*Wyatt v. Syrian Arab Republic*,
83 F. Supp. 3d 192 (D.D.C. 2015) ............................................................... 28, 30

**Rules and Statutes**

28 U.S.C. § 1605 ................................................................................................. 13

**Other Authorities**

Jean d'Aspremont, *Premises of Diplomatic Missions* ...................................... 29

# TABLE OF ABBREVIATIONS[1]

| | |
|---|---|
| Argüello Decl. | Decl. of Jorge Argüello, dated December 18, 2020 |
| Boccuzzi Decl. | Decl. of Carmine D. Boccuzzi, Jr., dated December 18, 2020 |
| Bordon Decl. | Decl. of Jose Octavio Bordon, *NML Capital, Ltd. v. Republic of Argentina*, No. 04 Civ. 197 (D.D.C. Feb. 17, 2004), ECF No. 2 (Boccuzzi Decl. Ex. G) |
| Bottini Decl. | Decl. of Gabriel Bottini, dated December 18, 2020 |
| Fortune Aff. | Aff. of Kelly Fortune (Jan. 2, 2019), ECF No. 17-1 |
| Levit Aff. | Aff. of Luis Levit (Dec. 28, 2018), ECF No. 16-1 |
| Aldort Decl. | Decl. of Julie Rodriguez Aldort (Sept. 25, 2018), ECF No. 2-3 |
| Bravin Decl. | Decl. of Mark N. Bravin (Sept. 25, 2018), ECF No. 2-4 |
| Custo Decl. | Decl. of Bernardo Gustavo Custo (Sept. 25, 2018), ECF No. 2-5 |
| LeGros Decl. | Decl. of Christopher LeGros (Sept. 25, 2018), ECF No. 2-6 |
| TIG 2018 Br. | TIG Insurance Company's Omnibus Mem. in Supp. of Mot. for Emergency Relief, Attachment, and Execution (Sept. 25, 2018), ECF No. 2-1 |
| TIG 2018 Supp. Br. | TIG Insurance Company's Supp. Br. in Response to the Court's Oct. 5 Order (Oct. 12, 2018), ECF No. 9 |
| TIG 2018 Reply Br. | TIG Insurance Company's Reply in Support of its Omnibus Mot. (Feb. 1, 2019), ECF No. 18 |

---

[1] The Declarations of Jorge Argüello, Carmine D. Boccuzzi, Jr., and Gabriel Bottini are being filed today together with this Motion to Dismiss.

The U.S. Court of Appeals for the D.C. Circuit directed this Court "to determine whether, at the time of filing, the totality of the circumstances supported characterizing the R Street Property as one 'used for a commercial activity' and, if so, whether any of Argentina's other defenses bar attachment of its property." *TIG Ins. Co. v. Republic of Argentina*, 967 F.3d 778, 788 (D.C. Cir. 2020). Pursuant to that Order, and this Court's Order dated November 10, 2020, authorizing the Republic of Argentina (the "Republic") to file a motion to dismiss this action, the Republic submits this Memorandum of Law in Support of its Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(1), the Foreign Sovereign Immunities Act, 28 U.S.C. § 1610 ("FSIA"), and the Vienna Convention on Diplomatic Relations, April 18, 1961, 23 U.S.T. 3227 (the "Vienna Convention" or "VCDR").

## PRELIMINARY STATEMENT

Plaintiff TIG Insurance Company ("TIG")'s requests to attach and seize property belonging to the Republic, located at 2136 R Street, NW, Washington, D.C. (the "Chancery Annex") should be denied, and the 2018 judgment entered against the Republic vacated for lack of jurisdiction.

*First*, this action must be dismissed since the judgments cannot be enforced against the Republic or its property under the FSIA, which provides the sole basis for jurisdiction in U.S. courts over foreign states and their property. TIG cites the FSIA's so-called arbitration exceptions to immunity, 28 U.S.C. § 1605(a)(6) and 28 U.S.C. § 1610(a)(6), but they are inapplicable because the Republic never made any agreement to arbitrate with plaintiff or any other entity relevant to this action. The contracts and arbitration agreements on which the underlying judgments are based are between other parties—not the Republic. To the extent TIG argues that the Republic is liable as a successor-in-interest to a party to the contracts, that argument fails because the Republic did not assume any obligations under these contracts—and

certainly did not sign onto the contracts' arbitration agreements. Accordingly, the underlying judgment entered directly against the Republic must be vacated and neither of the underlying judgments can be enforced against the Republic or any of its property.

*Second,* the Chancery Annex is immune from attachment under the FSIA for the additional reason that TIG cannot demonstrate that it is "used for a commercial activity" under the "totality of the circumstances" test articulated by the D.C. Circuit. As TIG has itself repeatedly stated, the Chancery Annex is largely unused. Its sole use (which is ongoing) is as storage for diplomatic files of the Republic. The brief, "aberrational" listing of the Chancery Annex for sale does not change this, to the extent it constitutes commercial activity at all.

*Third*, TIG's attempt to seize the Chancery Annex fails under the Vienna Convention. Under that Convention, the Chancery Annex is inviolable as part of the premises of the Argentine diplomatic mission, and contains archives and documents of the mission, which are themselves inviolable. The FSIA explicitly incorporates international treaties like the Vienna Convention, which provides additional and independent grounds for dismissing this action.

## FACTUAL BACKGROUND

### I. THE REPUBLIC DID NOT ENTER INTO ANY ARBITRATION AGREEMENT RELEVANT TO THIS CASE.

#### A. Caja And Other Private Entities Enter Reinsurance Contracts.

This matter stems from two reinsurance contracts entered over 40 years ago. The Republic was party to neither.

The parties to the First Casualty Reinsurance Agreement were private insurance companies including International Surplus Lines Insurance Company ("ISLIC") and International Insurance Company ("IIC")—TIG's alleged predecessor entities—and as counterparty reinsurer, Caja Nacional de Ahorro y Seguro ("Caja"), an autonomous Argentine

entity that conducted insurance, reinsurance, and other related business.  *See* Arts. III, XXIV, Casualty Reinsurance Agreement (Aldort Decl. Ex. 1 at 3, 15); Charter of Caja Nacional de Ahorro y Seguro (Boccuzzi Decl. Ex. A); Bottini Decl. ¶ 8.  The First Casualty Reinsurance Agreement came into force as of January 1, 1979.  Art. XXIV, Casualty Reinsurance Agreement (Aldort Decl. Ex. 1 at 15).  It was terminated effective as of January 1, 1984.  *See* Termination Endorsement (Aldort Decl. Ex. 1 at 20).  The Republic was not a party to the First Casualty Reinsurance Agreement.

The Second Casualty Reinsurance Agreement was also entered by ISLIC and on behalf of IIC, among other private insurance companies.  Arts. III, XXIV, Casualty Excess Reinsurance Agreement (Aldort Decl. Ex. 1 at 21, 38).  The signatory for the counterparty reinsurer was David M. Pierson, purportedly as an agent for Caja.  Art. XXIV, Casualty Excess Reinsurance Agreement (Aldort Decl. Ex. 1 at 38).  Mr. Pierson signed the Second Casualty Reinsurance Agreement on December 22, 1979, and the agreement commenced retroactively as of March 15, 1979.  *Id*.  But on February 13, 1979—some ten months before Pierson signed the Second Casualty Reinsurance Agreement and more than a month prior to its retroactive effective date— Caja confirmed to Pierson via telex that their relationship was terminated, effective June 30, 1979.  *See* Memorandum of Agreement dated January 20, 1977 between Caja Nacional de Ahorro y Seguro and Interemco, Inc. (Boccuzzi Decl. Ex. B); Telex (Boccuzzi Decl. Ex. C). Pierson responded, "Thanks, Noted."  Telex (Boccuzzi Decl. Ex. C); *see also* Sec. 1, Resolution No. 1308, dated August 8, 1979 (providing for "immediate cancellation" of business with Interemco Inc. among other entities) (Boccuzzi Decl. Ex. D).  Accordingly, Pierson did not, because he could not, enter the Second Casualty Reinsurance Agreement on behalf of Caja.

The First Casualty Reinsurance Agreement and the Second Casualty Reinsurance Agreement (together, the "Contracts"), had identical substantive terms. *See* Casualty Reinsurance Agreement, Casualty Excess Reinsurance Agreement (Aldort Decl. Ex. 1). They also contained identical arbitration provisions (the "Arbitration Clauses"), providing for the arbitration of any dispute between "the Company and the Reinsurer," defined as the parties to the respective contracts, *i.e.*, ISLIC and IIC among other companies on the one hand, and Caja or Pierson on the other. Arts. III, XXI, XXIV, Casualty Reinsurance Agreement (Aldort Dec. Ex. 1 at 3, 14-15); Arts. III, XXI, XXIV, Casualty Excess Reinsurance Agreement (Aldort Decl. Ex. 1 at 21, 33, 38).

### B. IIC Brings Arbitration Against Caja And Seeks Enforcement Of Its Default Arbitral Award.

According to TIG, in April 2000, IIC served a notice of its intent to arbitrate against Caja, purportedly in connection with defaults on both Contracts. Aldort Decl. ¶¶ 2-3; Letter dated Apr. 10, 2000 (Aldort Decl. Ex. 2). IIC sought $2,173,405.47 under the Contracts: $220,975.16 under the First Casualty Reinsurance Agreement and $1,952,430.31 under the Second Casualty Reinsurance Agreement. Schedule (Aldort Decl. Ex. 2 at 45). A default arbitral award for $2,009,061.72, plus interest, fees, and costs, was entered against Caja on October 17, 2000. Aldort Decl. ¶ 4; Final Award (Aldort Decl. Ex. 3 at 53-54).

IIC then filed a petition for confirmation of the arbitral award in the U.S. District Court for the Northern District of Illinois, and Caja appeared in that action to defend against the recognition. Pet. for Confirmation of Arbitration Panel's Award, No. 00 Civ. 6703 (JWD) (N.D. Ill. Oct. 27, 2000) ("2001 Judgment Proceedings"), ECF No. 1 (Aldort Decl. Ex. 4). Among other defenses, Caja asserted that it was an instrumentality of a foreign sovereign and accordingly should be exempted under the FSIA from the general Illinois law requirement that

defendants in such cases must post pre-judgment security. *See* Def. Mem. in Opp. to Pl.'s Mot. to Strike Answer and for Posting of Pre-Judgment Security ¶¶ 7-10, 2001 Judgment Proceedings (Jan. 31, 2001), ECF No. 8 (Aldort Decl. Ex. 7). In raising its defenses, Caja noted that the Second Casualty Reinsurance Agreement was not signed on its behalf, in light of the termination of Caja's relationship with Pierson described above. *Id.* ¶ 4(a). The district court rejected Caja's arguments with respect to the pre-judgment security and entered a default judgment against Caja confirming the arbitral award, based on Caja's failure to post the security (the "2001 Judgment"). *See Int'l Ins. Co. v. Caja Nacional de Ahorro y Seguro*, No. 00 Civ. 6703, 2001 WL 322005, at *2 (N.D. Ill. Apr. 2, 2001); Order, 2001 Judgment Proceedings (July 5, 2001), ECF No. 28 (Aldort Decl. Ex. 13). In entering the 2001 Judgment, the court did not make any findings concerning subject matter jurisdiction. *See id.*

Caja appealed. Notice of Appeal, 2001 Judgment Proceedings (Aug. 3, 2001), ECF No. 32 (Aldort Decl. Ex. 14). The Seventh Circuit affirmed the pre-judgment security ruling and the entry of the 2001 Judgment against Caja. *Int'l Ins. Co. v. Caja Nacional de Ahorro y Seguro*, 293 F.3d 392, 401 (7th Cir. 2002). Considering *sua sponte* subject matter jurisdiction for entry of the 2001 Judgment, the Seventh Circuit ruled that Caja was not a foreign sovereign entity, holding that there was subject matter jurisdiction pursuant to the Panama Convention, or else 28 U.S.C. § 1332. *Id.* at 395-400. The Court rejected Caja's argument that it was an *instrumentality* of the Republic (*i.e.*, a "separate legal person, which is an organ of a foreign state"). *Id.* at 397-98. Caja at no point argued that it was the Republic itself.

While the appeal was pending, IIC sought in the district court discovery in aid of the enforcement of the 2001 Judgment. *See Int'l Ins. Co*, 2001 WL 1516730, at *1. When Caja failed to comply with discovery requests and related court orders, the district court awarded

sanctions against Caja in the amount of $2,000 per day.  Order, 2001 Judgment Proceedings (Dec. 4, 2002), ECF No. 64 (Aldort Decl. Ex. 44 at 408).  The amount was later increased to $4,000 per day.  Order, 2001 Judgment Proceedings (Mar. 17, 2005), ECF No. 114 (Aldort Decl. Ex. 46 at 417).  According to TIG, these daily sanctions account for over $21.5 million of the approximately $33.7 million combined total judgment amount it currently seeks to enforce.  *See* LeGros Decl. ¶¶ 16-18.

As part of the privatization policy launched in the 1990s in the Republic, Caja was liquidated pursuant to three Argentine resolutions issued in 1994, 1998, and 2005 (the "Resolutions").  Resolutions Nos. 470/94, 893/98, 563/2005 (Custo Decl. Exs. A-C); Bottini Decl. ¶¶ 10-11.

### C.    TIG Commences Legal Proceedings Against The Republic.

In July 2016, TIG Insurance Company ("TIG"), purportedly as a successor to ISLIC and IIC, instituted a second arbitration under the Contracts against Caja.  *See* Letters dated July 1, 2016, No. 17 Civ. 2835 (GF) (N.D. Ill. Apr. 14, 2017) (the "2018 Judgment Proceedings"), ECF No. 3-3 (Aldort Decl. Ex. 18).  The arbitral tribunal entered a default award in favor of TIG against the Republic, purportedly as successor to Caja.  *See* Final Order and Award dated March 9, 2017, 2018 Judgment Proceedings (Apr. 14, 2017), ECF No. 3-4 (Aldort Decl. Ex. 49).

TIG petitioned the U.S. District Court for the Northern District of Illinois for recognition of this award, which was granted in January 2018, and a default judgment was entered against the Republic (the "2018 Judgment" and together with the 2001 Judgment, the "Judgments").  The district court made no subject matter jurisdiction findings beyond referring to TIG's papers,

in which TIG cited the arbitration exception as the purported basis for jurisdiction.  *See*

Judgment, 2018 Judgment Proceedings (Jan. 8, 2018), ECF No. 29 (Aldort Decl. Ex. 41).[2]

The present action followed, in which TIG makes various requests for enforcement of its

Judgments against the Chancery Annex.

## II.    IN THIS ACTION, TIG SEEKS TO SEIZE THE CHANCERY ANNEX.

### A.    The Chancery Annex Is Part Of The Argentine Mission, Used To Store Diplomatic Files.

TIG's stated goal from the inception of this action has been to attach and execute on the

Chancery Annex in aid of the Judgments.  The Chancery Annex is part of the Argentine

diplomatic mission in Washington, D.C.  Argüello Decl. ¶ 3.  In the past, it was used to house the

Republic's representative to the Inter-American Defense Board.  *See NML Capital, Ltd. v.*

*Republic of Argentina*, No. 04 Civ. 197 (CKK), 2005 WL 8161968, at *14 (D.D.C. Aug. 3,

2005).  Following a brief listing of the Chancery Annex for sale in 2003, a creditor brought a

motion in this Court seeking to attach the Chancery Annex.  *NML Capital, Ltd.*, 2005 WL

8161968, at **3-4.  The Court denied the motion, on the grounds that the Chancery Annex was

immune from attachment under the FSIA among other reasons because it was not used for a

commercial activity.  *Id.* at *14.  The Chancery Annex was recognized on the diplomatic rolls by

the U.S. State Department throughout the 2003 sale listing, until at least February 2004.  *See* All

---

[2] Hr'g Tr. at 3:6-8, 2018 Judgment Proceedings (Jan. 8, 2018) ("The papers submitted by the petitioner, by TIG Insurance Company, establish the right to the relief requested") (Boccuzzi Decl. Ex. F); Pet. for Confirmation of Final Arbitral Award ¶ 5, 2018 Judgment Proceedings (Apr. 14, 2017), ECF No. 2 ("The Republic, as successor to Caja . . . waived immunity pursuant to 28 U.S.C. § 1605(a)(6)(A).") (Aldort Decl. Ex. 24); *see also* Final Order and Award at 1, 2018 Judgment Proceedings (Apr. 14, 2017), ECF No. 3-4 (arbitral panel finding jurisdiction based on Arbitration Clauses) (Aldort Decl. Ex. 49).

Active Office and Residence Report [Fax Transmittal from U.S. Department of State Office of Foreign Missions] (Bordon Decl. Ex. B at 3) (Boccuzzi Decl. Ex. G).

Currently, the Chancery Annex has been allocated to the Argentine Ministry of Foreign Affairs, International Trade & Worship for its use, with access permitted only to members of that Ministry or the Argentine Ministry of Defense. Argüello Decl. ¶ 8. The Chancery Annex flies the Argentine flag and displays the Argentine seal. *Id.* ¶ 3; Photographs from Sept. 2018 (Levit Aff. Ex. 10); Levit Aff. ¶ 24. It is used as storage for the diplomatic files of the Argentine Embassy and of the Argentine Defense and Military Attaché's Office. Argüello Decl. ¶ 4; Levit Aff. ¶ 23. Other than for the storage of diplomatic files, the Chancery Annex is largely unusable, and has been unusable and dilapidated since at least 1997. *See NML Capital, Ltd.*, 2005 WL 8161968, at **4, 14 ("[S]ince 1997, the building has been uninhabited and in a state of disrepair with heavy restoration cost estimates" and is "currently vacant and only used to store diplomatic files"); Argüello Decl.¶ 5 ("Other than for the storage of these [diplomatic] files, the Chancery Annex is essentially unusable, since it is in a state of disrepair."); Diplomatic Note No. 10-188 (Aug. 16, 2010) (noting the Chancery Annex's dilapidated exterior) (Boccuzzi Decl. Ex. H); Diplomatic Note No. 12-227 (July 18, 2012) (describing "improper disposal of trash and the presence of rodents" at the Chancery Annex and its "poor condition over the past several years") (Boccuzzi Decl. Ex. I); Resolution No. 2018-7-APN-AABE#JGM at 2 (June 11, 2018) (The Chancery Annex "has not been used or occupied since 1997" and "is in a terminal condition, not suitable for use.") (Boccuzzi Decl. Ex. K).

In July 2018, the Republic listed the Chancery Annex for sale, retaining Washington Fine Properties, LLC as a broker. Levit Aff. ¶¶ 4-5; Fortune Aff. ¶ 3. The Terms and Conditions for the potential sale reflected that the Chancery Annex was unused. *See* Venta de Propiedad de la

Republica Argentina – Bases y Condiciones [Sale of Property of the Republic of Argentina –
Terms and Conditions] at Annex I ("Occupancy Condition: Unoccupied") (Bravin Decl. Ex. D at
11); *id.* at Art. 5.6 (the Republic "makes no representations concerning . . . the adequacy of the
Property for its current or any future use") (Bravin Decl. Ex. D at 4).  After TIG filed this action
on September 25, 2018, the Chancery Annex was de-listed from sale on September 28, 2018.
Levit Aff. ¶¶ 7, 11-16; Fortune Aff. ¶¶ 7, 9-12, 14.  Accordingly, there was no actual sale, and
there were various steps left to be taken before any sale transaction could occur, *i.e.*, solicitation
and receipt of final bids from finalists selected among the initial bidders, notification of the
awarded bidder, and then completion of the sale.  Arts. 10-11, Venta de Propiedad de la
Republica Argentina – Bases y Condiciones [Sale of Property of the Republic of Argentina –
Terms and Conditions] (Bravin Decl. Ex. D at 5-6); Levit Aff. ¶ 6; Fortune Aff. ¶ 4.  The
Republic has not tried to sell the Chancery Annex since it was de-listed, nor does it have any
intention to do so.  Argüello Decl. ¶ 7; Levit Aff. ¶¶ 19, 21-22; Fortune Aff. ¶ 15.

**B.    TIG's Execution Attempt Was Denied By This Court, And The D.C. Circuit
Remanded For Consideration Of The "Totality Of The Circumstances."**

In 2018, TIG filed a motion to enforce the Judgments against the Chancery Annex,
seeking *inter alia* a writ of attachment.  Mot. for Emergency Relief, Attachment, and Execution
(Sept. 25, 2018), ECF No. 2.  The Republic initially moved to dismiss for lack of jurisdiction
based on insufficient service of process.  Mot. to Dismiss (Nov. 16, 2018), ECF No. 13.  After
service was completed, the Republic filed its opposition to TIG's motion, arguing that the
Chancery Annex was immune from attachment and execution under the FSIA and the Vienna
Convention.  Opp. to Mot. for Emergency Relief, Attachment, and Execution (Dec. 28, 2018),
ECF No. 16.  This Court denied TIG's motion, agreeing with the Republic that none of the
FSIA's exceptions to execution immunity applied since the Chancery Annex had been de-listed

9

from sale, so would not be used for a commercial activity at the time that a writ of attachment would issue. *TIG Ins. Co.*, 2019 WL 3017618, at \*4. The Court did not reach the Republic's remaining defenses. *Id.* at 3 n.2.

TIG filed an appeal, and on July 28, 2020, the D.C. Circuit held that whether a property is "'used for commercial activity'" under the FSIA should be determined based on the "totality of the circumstances" at the time of filing of a motion for a writ of attachment. *TIG Ins. Co.*, 967 F.3d at 780. The D.C. Circuit took note of the listing for sale of the Chancery Annex and remanded for this Court to consider the remaining facts and circumstances to determine whether the totality "supported characterizing the R Street Property as one 'used for a commercial activity' and, if so, whether any of Argentina's other defenses bar attachment of its property." *Id.* at 788. The D.C. Circuit cautioned that in conducting its "totality of the circumstances" analysis, this Court should "avoid finding speculative or aberrational commercial uses, or uses in the distant past, sufficient to satisfy the 'used for a commercial activity' requirement." *Id.*

Following issuance of the mandate, this Court so-ordered a schedule for further proceedings proposed by the parties, Min. Order (Nov. 10, 2020), pursuant to which the Republic files this Motion to Dismiss.

## ARGUMENT

## POINT I

## THE REPUBLIC DID NOT MAKE AN AGREEMENT TO ARBITRATE WITH TIG, SO THE CONTRACTS AND JUDGMENTS PROVIDE NO BASIS FOR JURISDICTION OVER THE REPUBLIC OR ITS PROPERTY.

Before reaching the question of whether the Judgments can be enforced against the Chancery Annex specifically, the Court must ask whether they can be enforced against the Republic or its property at all pursuant to the FSIA, which "provides the sole basis for obtaining jurisdiction over a foreign state in federal court," *e.g.*, *Argentine Republic v. Amerada Hess*

*Shipping Corp.*, 488 U.S. 428, 439 (1989), and "'must be applied by the district courts in every action against a foreign sovereign, since subject-matter jurisdiction in any such action depends on the existence of one of the specified exceptions to foreign sovereign immunity,'" *Af-Cap, Inc. v. Republic of Congo*, 326 F. Supp. 2d 128, 129 (D.D.C. 2004) (Congo did not "waive[] its right to assert sovereign immunity under the FSIA" by failing to assert such right in previous Texas court proceedings).

The FSIA does not permit such enforcement here.  That is because the 2001 Judgment was not even nominally entered against the Republic and was not based on any arbitral agreement entered into by the Republic or any arbitral award against the Republic.  As for the 2018 Judgment, which was entered against the Republic, that is void since it was not entered based on any arbitral agreement entered into by the Republic.

### A.    The 2018 Judgment Against The Republic Should Be Vacated Since The Republic Did Not Make An Agreement To Arbitrate.

"When enforcement of [a] default judgment is attempted," the defendant "may assert [a] jurisdictional objection" to the default judgment.  *Jerez v. Republic of Cuba*, 775 F.3d 419, 422 (D.C. Cir. 2014) (affirming vacatur of D.D.C. writ of attachment because underlying Florida judgments were void, since "no statutory exception to sovereign immunity under the FSIA applie[d]," and "[a]s a result there is no legal basis for the [D.D.C.] writ of attachment").  If the "court asked to enforce a default judgment . . . finds that the issuing court lacked jurisdiction, it must vacate the judgment" and reject the attempt to enforce it.  *Id.* at 422; *Republic of Sudan v. Harrison*, 139 S. Ct. 1048, 1051 (2019) (upholding Sudan's challenge to S.D.N.Y. turnover orders on the basis that D.D.C. default judgment against it "was invalid for lack of personal jurisdiction").  Findings by the issuing court regarding jurisdiction do not "relieve [the enforcing court] of its obligation to assure itself of its *own* jurisdiction."  *Vera v. Banco Bilbao Vizcaya*

*Argentaria, S.A.*, 946 F.3d 120, 135 (2d Cir. 2019) (S.D.N.Y. turnover orders void where Florida

court lacked FSIA subject matter jurisdiction to enter underlying default judgment); *Prac.*

*Concepts, Inc. v. Republic of Bolivia*, 811 F.2d 1543, 1551-52 (D.C. Cir. 1987) ("When a

defendant foreign state has appeared and asserts legal defenses, albeit after a default judgment

has been entered, it is important that those defenses be considered carefully and, if possible, that

the dispute be resolved on the basis of [sic] all relevant legal arguments."); *Semtek Int'l Inc. v.*

*Info. Satellite Sys.*, No. 09 Civ. 10183 (RWZ), 2012 WL 831475, at *6 (D. Mass. Mar. 9, 2012)

(finding "cause for liberality in reopening a case that has never been considered on the merits . . .

[especially] in cases involving foreign sovereigns and their instrumentalities") (internal quotation

marks and citation omitted).

A judgment is void, and unenforceable, if it was issued "in excess of subject-matter

jurisdiction." *Bell Helicopter Textron, Inc. v. Islamic Republic of Iran*, 734 F.3d 1175, 1180

(D.C. Cir. 2013) (affirming grant of Rule 60(b)(4) motion vacating default judgment for lack of

jurisdiction under the FSIA); *Aurum Asset Managers, LLC v. Bradesco Companhia de Seguros*,

441 F. App'x 822, 825 (3d Cir. 2011) (vacatur of judgment confirming arbitral award).  "[I]f the

judgment is void, relief is mandatory." *Bell Helicopter Textron*, 734 F.3d at 1179 (internal

quotation marks omitted).  Where a challenge to jurisdiction is "insufficient to void the judgment

under Rule 60(b)(4), the strength of such challenge may, nevertheless, favor Rule 60(b)(6)

vacature." *Semtek*, 2012 WL 831475, at *7 (denying Rule 60(b)(4) relief based on question of

fact as to alter ego status, but granting Rule 60(b)(6) relief where default judgment did not

include findings on FSIA immunity and was for an "extremely high" monetary amount).

Plaintiff's asserted basis for jurisdiction over the Republic for the 2018 Judgment was the

FSIA's arbitration exception to jurisdictional immunity, which applies where an "action is

brought, either to enforce an agreement *made by the foreign state* with or for the benefit of a private party to submit to arbitration . . . or to confirm an award made pursuant to such an agreement to arbitrate."  28 U.S.C. § 1605(a)(6) (emphasis added).  For this basis for jurisdiction to be available, a plaintiff must demonstrate that the foreign state entered into an agreement to arbitrate.  *See Aurum Asset Managers, LLC v. Banco Do Estado Do Rio Grande Do Sul*, No. 08 Misc. 102, 2010 WL 4027382, at *5 (E.D. Pa. Oct. 13, 2010) (FSIA arbitration exception did not apply where foreign sovereign entity "was never a party to any contract with [plaintiff] or any of [plaintiff's] predecessors-in-interest and  . . . did not agree to arbitrate anything related to this case."), *aff'd sub nom. Aurum Asset Managers, LLC v. Bradesco Companhia de Seguros*, 441 F. App'x 822 (3d Cir. 2011).  Such a contract must have been signed by an agent of the foreign state with actual authority "to effect a waiver of a foreign state's sovereign immunity."  *SACE S.p.A. v. Republic of Paraguay*, 243 F. Supp. 3d 21, 24 (D.D.C. 2017) (dismissing judgment recognition action for lack of FSIA jurisdiction because official who effected purported explicit waiver of immunity lacked actual authority, so did not fall within definition of "foreign state" as the term is used in the FSIA).  And the foreign state must have expressly consented to the contractual provision forming the basis for jurisdiction.  *See Shelbourne N. Water St. Corp. v. Nat'l Asset Mgmt. Agency*, 374 F. Supp. 3d 712, 721 (N.D. Ill. 2019) (no waiver by Irish state entity that acquired "pre-existing assets" from Irish banks and "had no role in agreeing" to contractual provisions of those assets that would otherwise create waiver).

There was no such arbitration agreement "made by" the Republic here.  The Republic was a party to neither the First Casualty Reinsurance Agreement nor the Second Casualty Reinsurance Agreement.  The First Casualty Reinsurance Agreement was signed by Caja.  The Second Casualty Reinsurance Agreement was signed by a terminated agent for Caja, who lacked

the authority to sign.  Neither contract was signed by even a putative agent of the Republic, let alone by an agent with actual authority to waive the Republic's sovereign immunity, and the Republic *a fortiori* did not consent to be bound by the arbitration clauses (or any of the other contractual provisions).  *See Farhang v. Indian Inst. of Tech., Kharagpur*, 529 F. App'x 812, 813-14 (9th Cir. 2013) (affirming that foreign sovereign entity cannot be bound "to an agreement it did not sign").  In earlier Court proceedings, Caja claimed to be an *instrumentality* of Argentina, but (1) that argument was rejected and (2) even if Caja were an "instrumentality" of Argentina, this is a "separate legal person" from Argentina, and its alleged agreement to arbitrate could not be imputed to the Republic.  *See Int'l Ins. Co.*, 293 F.3d at 397-98.  Accordingly, there was no jurisdictional basis for entry of the 2018 Judgment against the Republic, and that judgment should be vacated.

## B.    Neither Of The Judgments Can Be Enforced Against The Republic Or Its Property.

Section 1609 of the FSIA "protects foreign sovereigns by ensuring that, . . . [their] property in the United States shall be immune from attachment, arrest, and execution, except as provided in sections 1610 and 1611."  *TIG Ins. Co. v. Republic of Argentina*, 967 F.3d 778, 781 (D.C. Cir. 2020) (internal quotation marks omitted).  Execution immunity begins with the "'presumption that a foreign state is immune and then the plaintiff must prove that an exception to immunity applies.'"  *Weinstein v. Islamic Republic of Iran*, 831 F.3d 470, 482 (D.C. Cir. 2016), *abrogated on other grounds by Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816 (2018); *see also Rubin v. The Islamic Republic of Iran*, 637 F.3d 783, 796 (7th Cir. 2011) ("[T]he FSIA codifies the common-law rule that property of a foreign state in the United States is *presumed* immune from attachment and execution.  To overcome the presumption of immunity, the

plaintiff must identify the particular foreign-state property he seeks to attach and then establish that it falls within a statutory exception.").

The "exception invoked in this case" is 28 U.S.C. § 1610(a)(6), which applies where the judgment to be enforced against the foreign state's property "is based on an order confirming an arbitral award rendered against the foreign state, provided that attachment in aid of execution, or execution, would not be inconsistent with any provision in the arbitral agreement." *TIG Ins. Co.*, 967 F.3d at 781. Those requirements are not satisfied here.

TIG cannot show that the Judgments did and/or could "confirm[] an arbitral award rendered against the foreign state," *i.e.*, the Republic. *See* 28 U.S.C. § 1610(a)(6). Only the 2018 Judgment even nominally falls within the ambit of the arbitration exception, as the 2001 Judgment confirmed an arbitral award "rendered against" Caja, not the Republic. Regardless of whether there was jurisdiction for entry of the 2001 Judgment *against Caja*, there is no jurisdictional basis to recognize or enforce that judgment against the Republic. And as described above, the Republic never agreed to arbitrate with TIG or its predecessors, so any "arbitral award rendered against" it—as well as any judgment confirming such an award—is void for lack of jurisdiction. Indeed, given the "pivotal purpose of the FSIA… to 'limit execution against property directly belonging to a foreign state,'" *Af-Cap, Inc. v. Chevron Overseas (Congo) Ltd.*, 475 F.3d 1080, 1089 (9th Cir. 2007), and established law that exceptions to execution immunity are "narrower" than the exceptions to jurisdictional immunity, *Republic of Argentina v. NML Capital, Ltd.*, 573 U.S. 134, 142 (2014), it would defy the statutory scheme to hold that Section 1610(a)(6) subjects a foreign state's property to attachment and execution irrespective of whether the underlying "order confirming an arbitral award" was properly entered against it.

Moreover, enforcement of either of the Judgments against the Republic would "be inconsistent with [the] provision in the arbitral agreement[s]" respectively referring to Caja and Pierson—not the Republic—as the contractual counterparties. *See* 28 U.S.C. § 1610(a)(6); Art. XXI, Casualty Reinsurance Agreement (referring to disputes between "the Company and the Reinsurer," neither of which is defined as the Republic, and stating that an arbitral decision "shall be final and binding" on those parties) (Aldort Dec. Ex. 1 at 14); Art. XXI, Casualty Excess Reinsurance Agreement (same) (Aldort Decl. Ex. 1 at 33). This action should therefore be dismissed because neither of the Judgments is enforceable against the Republic.

### C.    To The Extent TIG Argues That The Republic Is Bound By The Arbitration Clauses As A Successor-In-Interest, That Contention Is Unavailing.

In prior briefing, TIG has asserted that the Republic is liable as a successor-in-interest of Caja. TIG 2018 Br. at 31-33. But that argument fails at every step. As courts in multiple circuits have recognized, even where a foreign sovereign defendant is responsible for another entity's contractual liabilities, that does not abrogate the foreign sovereign defendant's immunity, through a contract that it did not enter. *See Aurum Asset Managers, LLC*, 2010 WL 4027382, at *6 (arbitration clause in contract entered by subsidiary did not create jurisdiction over Brazilian sovereign entity that assumed subsidiary's liabilities under that contract), *aff'd sub nom. Aurum Asset Managers, LLC v. Bradesco Companhia de Seguros*, 441 F. App'x 822 (3d Cir. 2011); *Allstate Ins. Co. v. Banco Do Estado Do Rio Grande Do Sul, S.A.*, No. 04 Civ. 1550 (DLC), 2004 WL 1398437, at *6 (S.D.N.Y. June 23, 2004) (dismissing for lack of subject matter jurisdiction because foreign sovereign defendant responsible for subsidiary's contractual liabilities was not "liable for contracts to which it was not a party, or for the payment of an award obtained in arbitration proceedings in which it did not participate" and the fact that it "is a sovereign state immune to lawsuits in the United States is a final barrier that [plaintiff] cannot

surmount"); *see also Cortez Byrd v. Corporacion Forestal y Indus. de Olancho, S.A.*, 974 F. Supp. 2d 264, 269 (S.D.N.Y. 2013) (judgment against Honduran instrumentality should not be enforced against Honduras's property even though the allegations "would suffice to establish successor liability in the mine-run case" because "a more rigorous showing is required under the FSIA"). Similarly, this Court held that it could not exercise jurisdiction over the Republic of Honduras based on an arbitration agreement signed by its sub-entity even where the plaintiff asserted that "in actuality, [the sub-entity]'s liabilities become liabilities of the Republic." *DRC, Inc. v. Republic of Honduras*, 71 F. Supp. 3d 201, 218 (D.D.C. 2014) ("[A] sovereign's payment of its instrumentality's debts is not a sufficient basis for disregarding the instrumentality's separate legal identity.").

So too here—even if the Republic became responsible for the contractual liabilities (which, as described below, is not the case), it did not enter into the Contracts and did not bind itself to the Arbitration Clauses, meaning plaintiff's invocation of the FSIA's arbitration exceptions fails. *See* Bottini Decl. ¶ 17 ("None of the Resolutions contains any provision whereby the Republic may be said to have entered into an arbitration agreement or otherwise accepted such an agreement made by Caja.").[3] Indeed, to base jurisdiction or execution on

---

[3] In its prior briefing, TIG asserted in a footnote that the Republic "should also be liable for Caja Nacional's judgment debt on an 'alter ego' theory." TIG 2018 Br. at 32 n.7. But TIG has not pleaded any facts to support the existence of an alter ego relationship between the Republic and Caja —nor could it—or that Caja (or Pierson) was acting as an agent of the Republic in entering the Contracts. *See, e.g., GSS Group Ltd. v. Nat'l Port Auth. of Liberia*, 822 F.3d 598, 605 (D.C. Cir. 2016) (arbitration agreement signed by Liberian port authority did not bind Republic of Liberia where plaintiff had not shown that the port authority was acting agent of the Republic in entering the agreement). In considering these very contracts the Seventh Circuit held that Caja was not even "a foreign instrumentality under the FSIA." *Int'l Ins. Co. v. Caja Nacional de Ahorro y Seguro*, 293 F.3d 392, 399 (7th Cir. 2002). Even as an instrumentality of the Republic, Caja would be "presumed to be separate from . . . the foreign state," *GSS Group Ltd.*, 822 F.3d at 605, and TIG has offered no basis for disregarding this presumption. *See* Sec. 1, Charter of Caja Nacional de Ahorro y Seguro ("*Caja Nacional de Ahorro y Seguro* is a State-owned autonomous entity, with budgetary and administrative autonomy.") (Boccuzzi Decl. Ex. A); Bottini Decl. ¶ 9 ("As an autonomous entity (*entidad autárquica*), Caja had a legal personality separate from that of the Republic. As explained by the Argentine Supreme Court, the reason for autonomous entities to have their

arbitration clauses not entered into by the Republic and pre-dating the Republic's supposed

"succession" to the underlying liability by decades would ignore the rule that the relevant time

period for analysis of jurisdiction on a contractual basis is the time of the entry into the contract.

*See GSS Group Ltd. v. Nat'l Port Auth. of Liberia*, 822 F.3d 598, 608 (D.C. Cir. 2016) (limiting

analysis to facts that "shed[] . . . light on the degree to which Liberia controlled the Port

Authority *when the Port Authority entered into and then cancelled the GSS contract in 2005–06*"

and disregarding later events) (emphasis added).  The Resolutions liquidating Caja—which are

the sole alleged connection between the Republic and the Contracts—were issued from 1994 to

2005, many years after Contracts were entered and terminated between 1979 and 1985.

> In any event, the Republic is *not* a successor to the liabilities at issue, and it certainly did
>
> not clearly and unambiguously waive its immunity from suit with respect to them.  TIG has
>
> acknowledged that "as a general matter . . . a successor is not liable for its predecessor's
>
> liabilities."  TIG 2018 Br. at 31.  It therefore asserts only that the Republic is liable as a
>
> successor purportedly based on "an express or implied agreement to assume [Caja's] liabilities."
>
> *Id.*[4]  Not so.  The Resolutions were adopted in order "to transfer *active (i.e., ongoing)*
>
> reinsurance businesses in the international private market."  Bottini Decl. ¶ 13 (emphasis added).
>
> But the Contracts were entered and terminated a decade before the first of the Resolutions was
>
> issued in 1994.  *See* Art. XXIV, Casualty Reinsurance Agreement (Aldort Dec. Ex. 1 at 15);

---

own legal personality is precisely to allow them to perform certain functions autonomously, without the intervention of the Republic.  In this capacity, Caja entered into contracts in its own name.").  Accordingly, as TIG itself observed, any alter ego contention "is neither helpful nor relevant here."  TIG 2018 Br. at 32 n.7.

[4] TIG claims that the Annex of Resolution 893/98 "specified Caja Nacional's contingent liabilities to TIG in the amount of $1,600,000.00 USD."  Custo Decl. ¶ 9 (citing Appendix at 1, Resolution No. 893/98 (Custo Decl. Ex. B)).  That amount corresponds to a judgment issued by an Ohio court on other contracts.  Judgment, *Int'l Surp Lines Inc v. Certain Underwriters, et al*, No. 92 Civ. 829 (S.D. Ohio July 31, 1996), ECF No. 201 (Boccuzzi Decl. Ex. E).  It is not related to any claims in this case.  *Aurum*, 2010 WL

Termination Endorsement (Aldort Decl. Ex. 1 at 20); Art. XXIV, Casualty Excess Reinsurance Agreement (Aldort Decl. Ex. 1 at 38).  Accordingly, the Contracts would not have been considered "active" assets or liabilities of the type that would be transferred in the liquidation. The circumstances surrounding the Resolutions therefore do not support a finding that the Republic assumed Caja's obligations under the Contracts, let alone a finding that the Republic "clearly and unambiguously" waived its immunity from suit in the Courts of the United States. *See World Wide Minerals, Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154, 1162 (D.C. Cir. 2002); Bottini Decl. ¶¶ 15-20.

Dismissal of this enforcement action is further supported by the fact that the Republic is not a successor to the largest components of the Judgment amounts, for additional independent reasons.  *See First Fidelity Bank, N.A., v. Gov't of Antigua & Barbuda–Permanent Mission*, 877 F.2d 189, 196 (2d Cir. 1989) (vacating default judgment under Rule 60(b)(6) since "the fusion of substantive and jurisdictional issues [under the FSIA] militates in favor of setting aside the default judgment").  *First*, the vast majority of the underlying judgment debt is connected to the Second Casualty Reinsurance Agreement (*e.g.*, approximately $1.95 million of the $2.17 million sought in the first arbitration).  *See* Schedule (Aldort Decl. Ex. 2 at 45).  But the Second Casualty Reinsurance Agreement was not even signed by Caja, as Caja stated in 2001 Judgment proceedings.  *See* Def. Mem. in Opp. to Pl.'s Mot. to Strike Answer and for Posting of Pre-Judgment Security at ¶ 4(a), 2001 Judgment Proceedings (Jan. 31, 2001), ECF No. 8 (Aldort Decl. Ex. 7).  Those obligations were not even recognized as belonging to Caja, so certainly would not have been transferred to the Republic.

---

4027382, at *6 ("[T]he fact that the articles addressing [sovereign successor's] obligations . . . are silent with regard to . . . [predecessor's] general contractual obligations is compelling.").

*Second*, according to TIG's calculations, over $21.5 million of the $33.7 million combined total amount of the Judgments corresponds with daily sanctions of $2,000 to $4,000 imposed on Caja by the Illinois district court for non-compliance with post-judgment discovery requests and related court orders.  *See* LeGros Decl. ¶¶ 16-18.  TIG has not shown that the Republic assumed such liabilities.

## POINT II

### EVEN IF THE JUDGMENTS WERE ENFORCEABLE AGAINST THE REPUBLIC, THEY COULD NOT BE ENFORCED AGAINST THE CHANCERY ANNEX.

### A.    The Chancery Annex Is Not Used For Commercial Activity.

All of the exceptions to immunity in Section 1610(a) have a prerequisite that the property must be "used for a commercial activity."  28 U.S.C. § 1610(a).  That requirement is not satisfied here, requiring dismissal of this action.  "Courts must narrowly construe the concept of 'commercial activity' because sovereign immunity remains the rule rather than the exception and because courts must proceed cautiously when addressing areas that affect the affairs of foreign governments."  *NML Capital, Ltd. v. Republic of Argentina*, No. 04 Civ. 197 (CKK), 2005 WL 8161968, at *11 (D.D.C. Aug. 3, 2005).  In considering use for a commercial activity, the D.C. Circuit directed this Court to "look to the totality of the circumstances," "tak[ing] into account all uses of the Property, including recent past uses, as well as whether the foreign state has manipulated the Property's use or status to evade attachment and execution, and whether the Property remains available for commercial use."  *TIG Ins. Co.*, 967 F.3d at 785.  The D.C. Circuit cautioned this Court to "avoid finding speculative or aberrational commercial uses, or uses in the distant past, sufficient to satisfy the 'used for a commercial activity' requirement."  *Id.* at 788.  Applying this test to the undisputed facts, TIG cannot show that at the time it filed its motion, the commercial activity requirement was satisfied.

20

1.  *Considering The Totality Of The Circumstances, The Property Is Best Characterized As Predominantly Unused Or Used Diplomatically.*

TIG cannot demonstrate that the Chancery Annex is *used* for a commercial activity, since the Chancery Annex is largely unused and unusable.  Where property is "merely maintained," it cannot be considered to be used for a commercial activity.  *See NML Capital, Ltd. v. Space Expl. Techs. Corp.*, No. 14 Civ. 02262 (SVW), 2015 WL 1334291, at *7 (C.D. Cal. Mar. 6, 2015) (denying attachment of contractual satellite launch rights) (citing *Af-Cap, Inc. v. Chevron Overseas (Congo) Ltd.*, 475 F.3d 1080, 1091 (9th Cir. 2007)); *EM Ltd. v. Republic of Argentina*, 473 F.3d 463, 484-85 (2d Cir. 2007) (holding funds in an account was not "use" of the funds).  Here, the Chancery Annex is not even maintained in usable condition; to the contrary, it "has fallen into disrepair and has become uninhabitable."  *See TIG Ins. Co. v. Republic of Argentina*, No. 18 Misc. 0129 (DLF), 2019 WL 3017618, at *1 (D.D.C. July 10, 2019); *accord TIG Ins. Co.*, 967 F.3d at 780; *see Comm'ns Imp. Exp. S.A. v. Republic of the Congo*, No. 16 Civ. 00656 (GHK), 2016 WL 9281947, at *7 (C.D.C.A. Apr. 21, 2016) (Aircraft not used for commercial activity where it was "simply being stored" and there was no evidence of "anyone working on the aircraft, preparing it for flight, or moving the aircraft since they began monitoring it").

The Chancery Annex's dilapidation and lack of fitness for use over many years is well-documented in U.S. State Department Communications.  *See, e.g.*, Diplomatic Note No. 10-188 (Aug. 16, 2010) (expressing concern about the Chancery Annex's dilapidated exterior) (Boccuzzi Decl. Ex. H); Diplomatic Note No. 12-227 (July 18, 2012) (describing "improper disposal of trash and the presence of rodents" at the Chancery Annex and its "poor condition over the past several years") (Boccuzzi Decl. Ex. I).  It is confirmed by an Argentine resolution enacted a few months before TIG's motion was filed, which states that the Chancery Annex "has not been used or occupied since 1997" and "is in a terminal condition, not suitable for use."

21

Resolution No. 2018-7-APN-AABE#JGM at 2 (June 11, 2018) (Boccuzzi Decl. Ex. K).  And it

has previously been discussed by this Court.  *See NML Capital, Ltd.*, 2005 WL 8161968, at *4

("[S]ince 1997, the building has been uninhabited and in a state of disrepair with heavy

restoration cost estimates.").  Indeed, TIG itself has repeatedly characterized the Chancery

Annex as unused.  *See, e.g.*, TIG 2018 Br. at 14 (describing the Chancery Annex as "uninhabited

and long-unused"); Bravin Decl. ¶ 4 (The Chancery Annex "was used for the last time in 1997");

TIG 2018 Supp. Br. at 9 (describing the Chancery Annex as "uninhabitable and unoccupied for

decades, since at least the 1990s").[5]

TIG also cannot show that the Chancery Annex was used *for a commercial activity*.  *See*

Argüello Decl. ¶ 6.  To the extent the Chancery Annex has been used over the last two decades,

it has been used diplomatically.  *See Bennett v. Islamic Republic of Iran*, 618 F.3d 19, 21 (D.C.

Cir. 2010) ("Diplomatic properties are generally immune from attachment.").[6]  In the past, the

Chancery Annex was used as a diplomatic residence.  *See NML Capital, Ltd.*, 2005 WL

8161968, at *14; *City of Englewood v. Socialist People's Libyan Arab Jamahiriya*, 773 F.2d 31,

36-37 (3d Cir. 1985) (Use as a diplomatic residence "as a matter of law . . . is not commercial

---

[5] *See also id.* at 10-11 (describing the Chancery Annex's "dilapidated" and "long-dormant state"); *id.* at
10 n.8-9 (citing news reports noting the Chancery Annex "will require significant restoration work" and
describing the Chancery Annex as rat-infested, "vacant," and "deteriorate[d]"); TIG 2018 Reply Br. at 17
(noting prospective buyers and agents had to sign liability waivers given the dilapidated, unsafe building
conditions and neighbor's testimony about the "decay[]"); *id.* at 18 (Congress member describing the
Chancery Annex as "long abandoned" and in a "dangerous state of disrepair.").

[6] Property can be considered diplomatic even while largely dormant.  *See Rafii v. Islamic Republic of
Iran*, No. 01 Civ. 850 (CKK), 2005 WL 8167693, at *7 (D.D.C. Oct. 25, 2005) (holding that bank
accounts "even though dormant . . . are still being used exclusively for diplomatic and consular
purposes") (internal quotations omitted).  In several cases involving abandoned property that formerly
pertained to the Iranian diplomatic mission, this Court held that such properties were not being used for a
commercial activity even as the U.S. government rented them in order to generate revenue to comply with
its obligations under international agreements.  *See, e.g.*, *Flatow v. Islamic Republic of Iran*, 76 F. Supp.
2d 16, 22 (D.D.C.1999).  That conclusion would be no different in the absence of renting of those
properties, where former diplomatic property simply remains dilapidated or vacant.

activity"). As of at least February 2004, the Chancery Annex was recognized on the diplomatic

rolls by the U.S. State Department. *See* All Active Office and Residence Report [Fax

Transmittal from U.S. Department of State Office of Foreign Missions] (Bordon Decl. Ex. B at

3) (Boccuzzi Decl. Ex. G). The Chancery Annex continues to display the Argentine flag and

seal and has been allocated to the Argentine Ministry of Foreign Affairs, International Trade &

Worship, which is charged with sovereign functions. Argüello Decl. ¶¶ 3, 8; Levit Aff. ¶ 24;

*Flatow v. Islamic Republic of Iran*, 76 F. Supp. 2d 16, 22 (D.D.C. 1999) (use of Iranian embassy

property to support Iran's diplomatic activities "was sovereign in nature, not commercial").

Only members of the Argentine Ministry of Foreign Affairs, International Trade & Worship and

the Argentine Ministry of Defense have access to the Chancery Annex. Argüello Decl. ¶ 8. And

its sole ongoing use is "to store diplomatic files of the Argentine Mission and of the Republic's

Defense and Military Attache's Office." Argüello Decl. ¶ 4; *see TIG Ins. Co.*, 967 F.3d at 780

("Argentina says that it still stores some diplomatic files" in the Chancery Annex); Diplomatic

Note No. 110/2018 (Oct. 19, 2018) (Chancery Annex "is used for the storage of archives and

documents of the Argentine Defense Attaché and the Argentine Embassy to the United States.")

(Argüello Decl. Ex. 1) (Boccuzzi Decl. Ex. L); Letter to Deputy Assistant Secretary, Bureau of

Western Hemisphere Affairs, U.S. Department of State, dated Oct. 26, 2020 (Chancery Annex

"is currently storing diplomatic archives") (Argüello Decl. Ex. 2) (Boccuzzi Decl. Ex. M); Levit

Aff. ¶ 23; *NML Capital, Ltd.*, 2005 WL 8161968, at *4; *Af-Cap, Inc. v. Republic of Congo*, 326

F. Supp. 2d 128, 130-31 (D.D.C. 2004) ("The proposition [that embassy property is not subject

to attachment] was nearly self-evident to the drafters of the FSIA.").

    2. *The Brief Listing Of The Chancery Annex For Sale Did Not Convert It To Property Being Used For A Commercial Activity.*

Considered in context, the fact that the Chancery Annex was briefly listed for sale does not alter the prevailing characterization of it as unused and unusable, or diplomatically used.

*First*, any commercial activity connected to the listing of the Chancery Annex for sale was aberrational. The D.C. Circuit noted that the Republic "actively employed its property for a commercial activity (namely, putting it up for sale)," but nevertheless remanded for consideration of Section 1610(a)'s commercial activity requirement. *TIG Ins. Co.*, 967 F.3d at 784. This demonstrates that the listing for sale alone does not suffice under Section 1610(a)— and there is no other purported commercial activity here to consider. The Chancery Annex was recognized by the U.S. State Department on the diplomatic rolls at least as of February 5, 2004. All Active Office and Residence Report [Fax Transmittal from U.S. Department of State Office of Foreign Missions] (Bordon Decl. Ex. B at 3) (Boccuzzi Decl. Ex. G). In the nearly 17 years since that time, the only purported commercial activity is the single listing of the Chancery Annex for sale for just over two months, which is at most a "rare occasion[]" of commercial use when "considered holistically and in context." *TIG Ins. Co. v. Republic of Argentina*, 967 F.3d 778, 784 (D.C. Cir. 2020); *Af-Cap, Inc. v. Chevron Overseas (Congo) Ltd.*, 475 F.3d at 1088 ("The United States Supreme Court has similarly defined 'use' as . . . not merely a passive, passing, or past connection to commerce." (quoting *Jones v. United States*, 529 U.S. 848, 855 (2000)). The fact that TIG filed its motion during that brief moment "should not be dispositive." *TIG Ins. Co.*, 967 F.3d at 786 (disfavoring "confine[ment of] the district court's examination to the property's use at the exact moment when the suit was filed" as "an artificially narrow lens" that "allow[s] one-time or aberrational uses to dictate the fate of the property").

Consistent with the principle that isolated commercial transactions should not transform the overall characterization of a property's use, courts have recognized that acquisition of property in a commercial sale does not render that property used for commercial activity.  *See United States v. Arlington Cnty., Va.*, 669 F.2d 925, 934 (4th Cir. 1982) ("We cannot accept the suggestion that the commercial acquisition of the property indelibly stamps the use of the property as a commercial activity."); *City of Englewood*, 773 F.2d at 37 (same conclusion).  The same should be true for disposition of property, which is all that was contemplated here.  *See* Resolution No. 2018-7-APN-AABE#JGM at 2 (June 11, 2018) (authorization granted "to dispose of a series of properties of the [Republic], including the [Chancery Annex]") (Boccuzzi Decl. Ex. K).

*Second*, the unconsummated listing of the Chancery Annex for sale does not in and of itself constitute commercial activity.  At the time TIG filed its motion, the Chancery Annex had been listed with a Broker but no actual sale contract had been entered, much less fulfilled.  *See* Art. 3, Venta de Propiedad de la Republica Argentina – Bases y Condiciones [Sale of Property of the Republic of Argentina – Terms and Conditions] (Broker agrees to "assist the Argentine Republic in the process of sale of the Property by performing advertising and other marketing activities") (Bravin Decl. Ex. D at 3).  The Chancery Annex was then de-listed, and no sale took place.  Considering recently whether marketing for sale alone constitutes commercial activity under the FSIA, the D.C. Circuit was "inclined to agree" that it does not, except when viewed together with a course of *completed* sales for billions of dollars.  *Schubarth v. Fed. Republic of Germany*, 891 F.3d 392, 400–01 (D.C. Cir. 2018).[7]  Of course, there is not even one completed

---

[7] *Schubarth* considered commercial activity in the context of jurisdictional immunity under Section 1605(a)(2) rather than execution immunity under Section 1610(a).  Since the exceptions to execution immunity are narrower than the exceptions to jurisdictional immunity, *see Republic of Argentina v. NML Capital, Ltd.*, 573 U.S. 134, 142 (2014), *Schubarth*'s conclusions apply with even greater force here.

sale here.  *See also* TIG 2018 Br. at 22 (acknowledging necessity of a completed sale in stating

that it "waited to see if the auction . . . would proceed substantially towards its conclusion"

before bringing its action).  A completed sale transaction was several steps away, and would

have required the Republic to solicit and receive final bids from finalists selected among the

initial bidders, notify the awarded bidder, and complete the sale.  *See* Arts. 10-11, Venta de

Propiedad de la Republica Argentina – Bases y Condiciones [Sale of Property of the Republic of

Argentina – Terms and Conditions] (Bravin Decl. Ex. D at 5-6); Levit Aff. ¶ 6; Fortune Aff. ¶ 4;

*Af-Cap, Inc.*, 475 F.3d at 1091 ("[T]he further removed the property is from the referenced

commercial transaction, the less likely it is that the property was used *for* that transaction.").

And it was possible there would never be a completed sale, since—as in fact occurred—the

listing could be withdrawn "at any time and at [the Republic's] sole discretion."  Art. 1, Venta de

Propiedad de la Republica Argentina – Bases y Condiciones [Sale of Property of the Republic of

Argentina – Terms and Conditions] (Bravin Decl. Ex. D at 2).[8]

   Accordingly, the sale listing at most contributed to creating the potential for use of the

Chancery Annex for commercial activity—and that is not enough.  *See TIG Ins. Co.*, 967 F.3d at

787 ("Section 1610(a) does not say that the property in the United States of a foreign state that

'*will* be used' or '*could potentially* be used' for a commercial activity in the United States is not

immune from attachment or execution,") (quoting *Aurelius Capital Partners, LP v. Republic of

Argentina*, 584 F.3d 120, 130 (2d Cir. 2009)); *Af-Cap, Inc.*, 475 F.3d at 1091 ("[P]roperty is

'used for a commercial activity in the United States' when the property in question is put into

---

[8] Consistent with the fact that a listing for sale does not guarantee an actual commercial sale, the
Chancery Annex was not removed from the diplomatic rolls while it was listed for sale in 2003.  *See also*
TIG 2018 Br. at 8 ("Critically, however, the window for TIG to get any measure of satisfaction is fleeting.
The Republic at any moment could pull the property off the market, ostensibly to take it out of the realm
of 'commercial activity' and to shield it from execution."); *id.* at 10 (It would "frustrate enforcement
efforts" for the Republic to "remov[e] the property from the market.").

action, put into service, availed or employed *for* a commercial activity, not *in connection* with a commercial activity or *in relation* to a commercial activity."); *NML Capital, Ltd. v. Spaceport Sys. Int'l, L.P.*, 788 F. Supp. 2d 1111, 1122 (C.D. Cal. 2011) ("[P]reparation of the . . . Satellite for its intended commercial activity in space constitute[s] a passing connection to commerce.").

*Finally*, this is not a case of "manipulat[ion of] the Property's use or status to evade attachment and execution." *TIG Ins. Co.*, 967 F.3d at 785. Since the listing of the Chancery Annex for sale did not alter its prevailing use, the de-listing of the Chancery Annex similarly does not change, let alone constitute manipulation of, such use. Moreover, the Chancery Annex was de-listed from sale, has remained de-listed, and there has been no authorization for any re-listing. *See* Argüello Decl. ¶ 7; Levit Aff. ¶¶ 7, 11; Fortune Aff. ¶ 7 (Republic emailing broker and all bidders that "it is a final position that the Republic of Argentina has decided to withdraw the 2136 R Street property from the market, effective immediately" and submitting withdrawal form); Fortune Aff. ¶ 14 (broker stating that she received "inquiries regarding whether [the Chancery Annex] might be re-listed in the future" and "consistently informed any inquirers that the property has been permanently removed from the market and will not be re-listed.").

In addition to notifying the broker and bidders, the Republic also notified the U.S. State Department and issued a resolution nullifying the sale listing. Levit Aff. ¶¶ 15-16. And notwithstanding TIG's accusations, there is no evidence that the Republic has tried to surreptitiously sell the Chancery Annex or otherwise avoid the Court's authority, nor has it. Under these circumstances, the Republic's revocation of the sale listing was permissible, and not manipulative. *See NML Capital Ltd. v. Republic of Argentina*, No. 02 Civ. 2507, 2005 WL 743086, at *3 (S.D.N.Y. Mar. 31, 2005) (describing as "quite understandable" the Republic's position "that if [certain] attachments are in effect, it will not go forward with the [2005]

exchange offer"), *aff'd sub nom EM Ltd. v. Republic of Argentina,* 131 F. App'x 745 (2d Cir.

2005); Art. 1, Venta de Propiedad de la Republica Argentina – Bases y Condiciones [Sale of

Property of the Republic of Argentina – Terms and Conditions] (The "Republic may withdraw

the Property from sale at any time and at its sole discretion.") (Bravin Decl. Ex. D at 2).

**B.    The Chancery Annex Is Also Immune Under The Vienna Convention.**

The exceptions to immunity set forth in the FSIA are "[s]ubject to existing international

agreements," such as the Vienna Convention.  *Wyatt v. Syrian Arab Republic*, 83 F. Supp. 3d

192, 195 (D.D.C. 2015) (citation omitted).  Accordingly, the Vienna Convention provides an

independent basis for immunity of the Chancery Annex from attachment.  *Id.* ("Property is

immune from attachment under section 1610 of the FSIA if it is subject to the Vienna

Convention on Diplomatic Relations . . . regardless of how it would [otherwise] be treated under

sections 1610 and 1611.")*; see also Devi v. Silva*, 861 F. Supp. 2d 135, 142 (S.D.N.Y. 2012)

("[D]eviation from the international consensus on the broad scope of diplomatic immunity . . .

'would create an acute risk of reciprocation by other States.'").

The Vienna Convention provides that "[t]he premises of [a diplomatic] mission shall be

inviolable" and "[t]he premises of the mission, their furnishings and other property thereon and

the means of transport of the mission shall be immune from search, requisition, attachment or

execution."  Arts. 22(1), 22(3), VCDR; *see Mihaylov v. United States*, 70 F. Supp. 2d 4, 6-7

(D.D.C. 1999) ("Under Article 22, the United States agrees that the 'premises of the mission

shall be inviolable.'"); *S & S Mach. Co. v. Masinexportimport*, 802 F. Supp. 1109, 1110-11

(S.D.N.Y. 1992) ("[I]f [a] building is part of the 'premises of the mission,' it is immune from

attachment"; ancillary property is "physically inviolable to the same extent as the mission's

primary premises.").  The Vienna Convention defines the "premises of the mission" to include

"the buildings or parts of buildings and the land ancillary thereto, irrespective of ownership, used

for the purposes of the mission including the residence of the head of the mission." Art. 1(i),

VCDR.[9]  The Vienna Convention also provides that "[t]he archives and documents of the

mission shall be inviolable at any time and wherever they may be."  Art. 24, VCDR.

Here, the Chancery Annex is immune from attachment and execution under the Vienna

Convention because it is part of the premises of the Argentine diplomatic mission and houses

archives and documents of the mission.  Argüello Decl. ¶¶ 3-4; Bordon Decl. ¶ 4 (Boccuzzi

Decl. Ex. G).  Such statements from the current and former Argentine Ambassadors are all that

are required to establish the Chancery Annex's use and purpose.  *See Avelar v. J. Cotoia Const.,

Inc.*, No. 11 Civ. 2172, 2011 WL 5245206, at *4 (E.D.N.Y. Nov. 2, 2011) ("A sworn statement

from the head of mission is sufficient to establish that a bank account is used for diplomatic

purposes."); Jean d'Aspremont, *Premises of Diplomatic Missions*, Oxford Public International

Law (Mar. 2009) ("The receiving State cannot verify the actual use of the building without

bearing a risk of infringing said inviolability.").  But in addition, the U.S. State Department has

specifically recognized that the Vienna Convention's protections apply to the Chancery Annex.

*See* Diplomatic Note No. 17-556 at 1-2 (Apr. 17, 2017) (noting that "[o]n the basis of . . . the

Vienna Convention" the Republic would be exempt from all taxes associated with sales of the

Chancery Annex and two other properties) (Boccuzzi Decl. Ex. J).

Indeed, the only use of the Chancery Annex has been, and continues to be, for the

purposes of the mission.  The Chancery Annex previously served to house the Republic's

representative to the Inter-American Defense Board.  *NML Capital, Ltd.*, 2005 WL 8161968, at

*14.  Currently, it has been allocated to the Ministry of Foreign Affairs, International Trade &

---

[9] *Accord* Art. 21, UN Convention on Jurisdictional Immunities (Property "used or intended for use in the performance of the functions of the diplomatic mission of the State" is considered governmental, non-commercial property immune from attachment and execution).

Worship for its use.  Argüello Decl. ¶ 8.   The Chancery Annex's use and purpose "continues to be to store diplomatic files of the Argentine Mission and the Argentine Defense and Military Attaché's Office."  Argüello Decl.¶ 4; Levit Aff. ¶¶ 20, 23-24.  The Vienna Convention specifically bestows the highest protection on such "archives and documents of the mission," Art. 24, VCDR, demonstrating that storage of them should be considered a diplomatic purpose. *See Af-Cap, Inc.*, 326 F. Supp. 2d at 131 ("[I]nviolable," which characterizes the premises of the mission and its archives and documents, is an "advisedly categorical, strong word"). Accordingly, whether or not it is considered part of the premises of the mission as a formalistic matter, the Chancery Annex is protected under the Vienna Convention because diplomatic files are stored within it.  *See Liberian E. Timber Corp. v. Gov't of Republic of Liberia*, 659 F. Supp. 606, 608 (D.D.C. 1987) ("Article 22(3) does not provide the exclusive authority in the Vienna Convention to determine which property enjoys diplomatic immunity from attachment . . . . Article 24 states that the archives and documents of the mission are inviolable wherever they may be."); *see also Wyatt v. Syrian Arab Republic*, 83 F. Supp. 3d 192, 196 (D.D.C. 2015) (Vienna Convention "obligates the United States to respect and protect not only the premises of the mission, but its 'property' as well.").

TIG's demand to seize the Chancery Annex accordingly flies in the face of the protections afforded by the Vienna Convention to that property—it would be a plain affront to the inviolability of the Chancery Annex for TIG to obtain access, or to seize it (thereby commanding the removal of the filed kept there).  *See 767 Third Ave. Assocs. v. Permanent Mission of Republic of Zaire to United Nations*, 988 F.2d 295, 302 (2d Cir. 1993) (emphasizing the absolute nature of inviolability under the Vienna Convention and reversing district court order that awarded private plaintiff "possession of the [mission] premises and direct[ed] U.S.

Marshals to remove the mission, its effects, and its personnel physically"); Art. 24, VCDR ("The archives and documents of the mission shall be inviolable *at any time and wherever they may be*.") (emphasis added).[10]

Finally, TIG's remaining requests for relief are moot or foreclosed.  *First*, TIG's request for an emergency order preventing withdrawal of the Chancery Annex from the auction market is moot, since that withdrawal has already occurred.  *See TIG Ins. Co.*, 967 F.3d at 780 ("Argentina took the Property off the market" on September 28, 2018).  *Second*, TIG's requests for an emergency order directing payment of sale proceeds to CRIS and for writs of attachment and execution of the Republic's interests in sale proceeds are moot, since there has been no sale, nor is any sale contemplated.  *See Verizon New England Inc. v. Transcom Enhanced Servs., Inc.*, 21 N.Y.3d 66, 71 (2013) (no attachable property interest where "agreement was terminable at will, at any time, without prior notice," so party could "unilaterally eliminate any possibility of future revenue").  *Third*, TIG's purported reservations of rights to request turnover of the Chancery Annex to TIG or a forced sale of the Chancery Annex with proceeds to be turned over to TIG are foreclosed, since these remedies would require impermissible forcible ejectment of the Republic from the Chancery Annex.  *See 767 Third Ave. Assocs.*, 988 F.2d at 296 (denying eviction of a sovereign because local remedies should not "override []established rule[s] of international law").  And TIG's request for leave to file and record the Judgments in order to attach the Chancery Annex fails for the same reasons as its request for a writ of attachment.

Accordingly, the action should be dismissed in full.

---

[10] The only individuals who are permitted access to the Chancery Annex are members of the Argentine Ministry of Defense and Ministry of Foreign Affairs, Argüello Decl. ¶ 8, who are not subject to the jurisdiction of this Court.  Art. 31(1), VCDR.

## CONCLUSION

For the foregoing reasons, the Republic respectfully requests that the Court grant its

Motion to Dismiss.

Dated: December 18, 2020

Carmine D. Boccuzzi, Jr.
    cboccuzzi@cgsh.com
Rathna J. Ramamurthi
    rramamurthi@cgsh.com
CLEARY GOTTLIEB STEEN
& HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Tel. (212) 225-2508
Fax (212) 225-3999

Charles M. Asmar (D.C. Bar No. 434984)
    CAsmar@asm-law.com
Christopher A. Taggi (D.C. Bar No. 473065)
    CTaggi@asm-law.com
David A. Edelstein (D.C. Bar No. 983160)
    DEdelstein@asm-law.com
ASMAR, SCHOR & MCKENNA, PLLC
5335 Wisconsin Ave., NW, Suite 400
Washington, D.C. 20015
Tel. (202) 244-4264
Fax (202) 686-3567

*Attorneys for the Republic of Argentina*