**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| TIG INSURANCE COMPANY, | |
| *Judgment Creditor*, | |
| v. | No. 18-mc-00129 (DLF) |
| REPUBLIC OF ARGENTINA *et al.*, | |
| *Judgment Debtor.* | |

**<u>MEMORANDUM OPINION</u>**

In this miscellaneous action, TIG Insurance Company moves for a writ of attachment and writ of execution on a building owned by the Republic of Argentina based on two foreign judgments it obtained in another jurisdiction. *See* Registration of Foreign Js., Dkt. 1; Mot. for Emergency Relief at 2, Dkt. 2. Before the Court is Argentina's motion to dismiss under Federal Rule of Civil Procedure 12(b)(1). *See* Mot. to Dismiss at 1, Dkt. 30. For the reasons that follow, the Court will treat the motion as a motion for relief from judgment under Federal Rule of Civil Procedure 60(b)(4) and will grant it in part.

## I.    BACKGROUND

### A.  Factual Background[1]

TIG is the successor in interest to two private insurance companies—the International Surplus Lines Insurance Company and the International Insurance Company—which entered

---

[1] Although Argentina's motion appears to challenge both the legal and factual sufficiency of TIG's jurisdictional allegations, *see* Mot. to Dismiss at 1, Dkt. 30, the Court need not address the parties' factual disputes because it resolves the legal challenges addressed in this opinion in Argentina's favor. Therefore, the Court "take[s] [TIG's] factual allegations as true and determine[s] whether [it] bring[s] the case within any of the [FSIA] exceptions to immunity invoked by" TIG. *Peterson v. Islamic Republic of Iran*, 563 F. Supp. 2d 268, 272 (D.D.C. 2008)

into two casualty reinsurance contracts with Caja Nacional de Ahorro y Segurro in 1979.  First

LeGros Decl. ¶¶ 2–4, Dkt. 2-6.[2]  Caja was a state-owned corporation created by Argentina in

1915.  Custo Decl. ¶ 5, Dkt. 2-5.  Under these contracts, the insurance companies paid Caja

insurance premiums for tail coverage of various losses during the contract period that could arise

after the contracts' termination.  Second LeGros Decl. ¶¶ 3, 11, Dkt. 32-4.  These contracts

included arbitration provisions that survived the termination of the agreements.  Second LeGros

Decl. ¶ 13; Aldort Decl. ¶ 2, Dkt. 2-3; Aldort Decl. Ex. 1 (Casualty Reinsurance Contracts) at 14,

33.

      In the 1990s, Argentina's then-Ministry of Economy and Works and Public Services

issued two resolutions that placed Caja into liquidation.  Custo Decl. ¶¶ 6–11.  The first

resolution began the liquidation in 1994 and directed the Ministry to manage the process.  Custo

Decl. ¶ 7.  In 1998, the second resolution transferred "ascertained liabilities and contingent assets

and liabilities of Caja Nacional, derived from active reinsurance transactions in private markets

outside . . . Argentina in which [Caja] was involved . . . to the National Treasury."  Custo Decl.

¶ 8.  This resolution specifically identified a $1.6 million contingent liability to TIG.  Custo

Decl. ¶ 9.  In 2005, Argentina's Ministry of Economy and Production issued a final resolution

concluding the Caja liquidation and dissolving the entity.  Custo Decl. ¶ 10; *see also* Aldort

Decl. Ex. 24, at 319.  This resolution provided for Argentina to absorb all of Caja's liquidated

and contingent assets and liabilities.  Custo Decl. ¶ 11.  It also directed the Ministry "to make

payments that may rise from the liquidation process" and "manage any and all legal cases that

---

(sixth alteration in original) (quoting *Mwani v. bin Laden*, 417 F.3d 1, 15 (D.C. Cir. 2005)).
Because there is no complaint in this miscellaneous case, the facts are drawn solely from TIG's
affidavits and declarations.

[2] For simplicity, the Court will henceforth refer to TIG and its predecessors as "TIG."

C[aja] . . . may be a party to and the ones that may be filed in the future." Custo Decl. ¶ 11 (internal quotation marks omitted).

Although TIG paid Caja the reinsurance premiums it owed, Caja "has repeatedly failed to pay TIG for its portion of the losses under" the reinsurance contracts. First LeGros Decl. ¶ 5; Second LeGros Decl. ¶¶ 3–6. In response, TIG brought arbitral proceedings, first against Caja and then, after its dissolution, against Argentina. Aldort Decl. ¶ 2; First LeGros Decl. ¶ 5. TIG sought the insurance payouts for the portion of the risk that Caja assumed in the reinsurance contracts that TIG was paying out. Second LeGros Decl. ¶ 3. The first arbitration against Caja culminated in a default award for TIG in 2000. Aldort Decl. ¶ 4. In 2017, TIG initiated a second arbitration against Argentina for a different set of losses. Aldort Decl. ¶ 19. The arbitral panel determined that Argentina was the successor-in-interest to Caja and thus liable under the reinsurance contracts. Aldort Decl. Ex. 49 (Mar. 9, 2017, Final Order and Award) ¶¶ 1–4. This arbitration also concluded in a default award in TIG's favor. Aldort Decl. ¶ 20; Mar. 9, 2017, Final Order and Award ¶ 4.

### B. Procedural History

#### 1. *Judgment against Caja*

On October 27, 2000, TIG petitioned the U.S. District Court for the Northern District of Illinois to confirm an approximately $4.7 million default arbitration award against Caja. *Int'l Ins. Co. v. Caja Nacional de Ahorro y Seguro*, 293 F.3d 392, 393–94 (7th Cir. 2002). Illinois law requires certain foreign companies, before filing any pleadings, to post "a bond . . . sufficient to secure the payment of any final judgment" that could be entered against them. *Id.* at 394 (quoting 215 ILCS 5/123(5)). Although Caja did not challenge the Illinois court's subject matter jurisdiction, it did argue that the FSIA exempted it from the above requirement to post security.

3

*Id.* at 394 & n.2.  The district court rejected Caja's argument, struck its pleadings, and, after Caja refused to post security, entered default judgment against it.  *Id.* at 394–95.

On appeal of that default judgment, the Seventh Circuit specifically addressed subject matter jurisdiction.  *Id.* at 395–97.  The court concluded that federal question jurisdiction was present "pursuant to the Inter-American Convention on International Commercial Arbitration (known popularly as the 'Panama Convention'), codified at 9 U.S.C. §301 *et seq.*"  *Id.* at 395–96.  In the alternative, the court also determined that diversity jurisdiction was available under 28 U.S.C. § 1332(a)(2) because "it [wa]s undisputed that [TIG] [wa]s an American corporation and that Caja [wa]s an Argentinian Business entity."  *Id.* at 396 n.10.  As another alternative basis for jurisdiction, the court said that "even if [Caja] [wa]s a foreign instrumentality, [it] waived its immunity in a proceeding to confirm the arbitral award" and thus jurisdiction was available under the arbitration exception to the FSIA.  *Id.* at 397 (citing 28 U.S.C. § 1605(a)(6)(A)).  However, the Court went on to hold that "Caja ha[d] not presented sufficient prima facie evidence to establish that it [wa]s a foreign instrumentality under the FSIA such that it would be entitled to immunity from posting pre-judgment security."  *Id.* at 399.  Accordingly, the Seventh Circuit affirmed the default judgment against Caja.  *Id.* at 393.

While the appeal was pending, TIG sought discovery to aid enforcement of the default judgment.  *Int'l Ins. Co. v. Caja Nacional de Ahorro y Seguro*, No. 00-C-6703, 2001 WL 1516730, at *1 (N.D. Ill. Nov. 28, 2001).  The district court originally quashed the plaintiff's citation to discover assets, *id.* at *3, but later entered an agreed order to govern discovery, Agreed Order, No. 00-CV-06703 (Mar. 19, 2002), Dkt. 52.  On December 4, 2002, the district court found that Caja failed to comply with its discovery obligations and sanctioned the company at the rate of $2,000 per day.  Minute Order, No. 00-CV-06703 (Dec. 4, 2002), Dkt. 64; *see also*

*Int'l Ins. Co. v. Caja Nacional de Ahorro y Seguro*, No. 00-CV-06703, 2004 WL 555618, at *1 (N.D. Ill. Mar. 18, 2004) (documenting discovery history).  After further discovery disputes and Caja's failure to comply with court orders, the court increased the sanctions against the company to $4,000 per day.  Mem. Op. & Order at 3, 5, No. 00-CV-06703 (Mar. 17, 2005), Dkt. 115. When the Northern District of Illinois revived the judgment in 2014, the total judgment against Caja—the arbitral award, post-judgment interest, sanctions granted, and attorneys' fees granted—amounted to $23,898,354.  Reg. of Foreign J. Ex. 1 (Clerk's Certification of Judgment), at 6, Dkt. 1-1.

### 2.    *Judgment against Argentina*

On April 14, 2017, TIG filed a second petition to confirm a default arbitral award in the Northern District of Illinois.  Pet. for Confirmation of Final Arbitration Award, No. 17-cv-2835 (N.D. Ill. Apr. 14, 2017), Dkt. 2.  This petition named the Republic of Argentina as the respondent and sought confirmation of a 2017 arbitral award against Argentina in the amount of $3,459,489.31, inclusive of interest and costs.  *Id.* ¶¶ 1, 3, 17–18.  TIG brought the arbitration against Argentina as the successor-in-interest to Caja to recover on TIG's reinsurance contracts with Caja.  *Id.* ¶¶ 3, 7–10.  In September, Argentina contested service of process.  Letter from Consulate General of the Argentine Republic, No. 17-cv-2835 (N.D. Ill. Sep. 20, 2017), Dkt. 15. On December 6, the court overruled Argentina's objection to service of process.  Minute Entry, No. 17-cv-2835 (N.D. Ill. Dec. 6, 2017), Dkt. 27.  On January 8, 2018, the court granted TIG's motion for default judgment, which the clerk entered in the amount of $3,459,489.31.  J. in Civil Case, No. 17-cv-2835 (N.D. Ill. Jan. 8, 2018), Dkt. 27.  The case docket does not reflect an appearance by Argentina or any adjudication of the court's subject matter jurisdiction.

###### 3.      *Enforcement of judgments*

On September 24, 2018, TIG began this proceeding against Argentina and Caja by registering the two Northern District of Illinois judgments pursuant to 28 U.S.C. § 1963. Registration of Foreign Js.  The next day, TIG moved for emergency relief related to the real property at 2136 R Street, N.W., Washington, D.C., a writ of attachment on the property and any future proceeds therefrom, and a writ of execution on any future proceeds therefrom.  Mots. For Emergency Relief, Attachment-Related Relief, and Writ of Execution on Judgments at 1–3, Dkt. 2.  On October 5, the Court requested additional briefing on service of process and the uses of the property.  Order at 1, Dkt. 6.  On October 24, Argentina entered a special appearance for the limited purpose of contesting service of process and this Court's jurisdiction.  Notice of Special Appearance, Dkt. 10.  On November 16, Argentina moved to dismiss this case for lack of personal jurisdiction under Rule 12(b)(2) of the Federal Rules of Civil Procedure and insufficient service of process under Rule 12(b)(5), Argentina's Mot. to Dismiss at 1, Dkt. 13, but the second argument was rendered moot by the perfection of service, *see* Notice Regarding Mot. to Dismiss, Dkt. 14, and Argentina ceased contesting personal jurisdiction.

Thereafter, Argentina opposed TIG's motions on the grounds that the R Street property was off the market and covered by the FSIA's attachment immunity as a property not "used for a commercial activity."  Argentina's Opp'n to TIG's Mot. for Emergency Relief, Attachment, and Execution at 1, Dkt. 16.  This Court resolved that question in Argentina's favor.  *TIG Ins. Co. v. Republic of Argentina*, No. 18-mc-0129, 2019 WL 3017618, at *1 (D.D.C. July 10, 2019).  The Court held that the appropriate time period in which to analyze commercial use is at the time the writ of attachment would issue.  *Id.* at *2–3.  Because there was no commercial use at the would-

be time of attachment, the Court concluded that the property was immune under the FSIA.  *Id.* at *4–5.

On appeal, the D.C. Circuit disagreed.  *TIG Ins. Co. v. Republic of Argentina*, 967 F.3d 778, 780 (D.C. Cir. 2020).  That court concluded that the text and purpose of the FSIA's attachment immunity provision require examining the record at the time of filing, not at the time of issuance of the writ.  *Id.* at 782.  The D.C. Circuit went on to explain that, in analyzing a property's use, courts must consider the totality of the circumstances of the property's past and present use.  *Id.* at 785–86.  Thus, the court of appeals vacated this Court's order and remanded "to determine whether, at the time of filing, the totality of the circumstances supported characterizing the R Street property as one 'used for commercial activity' and, if so, whether any of Argentina's other defenses bar[red] attachment of its property."  *Id.* at 788.

On remand, Argentina moved to dismiss this action under Rule 12(b)(1) of the Federal Rules of Civil Procedure for lack of subject matter jurisdiction.  Mot. to Dismiss at 1, Dkt. 30.  In addition to arguing that the totality of the circumstances militated against a commercial use of the property, Argentina also raised jurisdictional immunity under the FSIA and the Vienna Convention in support of dismissal.  *See* Argentina's Mem. in Supp. of Mot. to Dismiss at 1–2, Dkt. 30.  Fully briefed, this motion is now ripe for resolution.

## II.  LEGAL STANDARD[3]

Rule 60(b) of the Federal Rules of Civil Procedure allows a party to seek relief from a final judgment for one of six reasons.  Fed. R. Civ. P. 60(b).  "Rule 60(b)(4) authorizes relief

---

[3] Although Argentina brings its motion to dismiss for lack of jurisdiction under Rule 12(b)(1), this miscellaneous action is not an independent case—there is no complaint or any other pleading as defined by Federal Rule of Civil Procedure 7(a); rather, TIG seeks to enforce judgments already entered by the U.S. District Court for the Northern District of Illinois.  Accordingly, the proper vehicle for Argentina to challenge the jurisdiction underlying those judgments is Rule

from a final order if 'the judgment is void.'"  *United States v. Philip Morris USA Inc.*, 840 F.3d

844, 849 (D.C. Cir. 2016) (quoting Fed. R. Civ. P. 60(b)(4)).  "A void judgment is a legal

nullity."  *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 270 (2010) (citing Black's

Law Dictionary 1822 (3d ed. 1933)).  Under this rule, "relief is available 'only in the rare

instance where a judgment is premised either on a certain type of jurisdictional error or on a

violation of due process that deprives a party of notice or the opportunity to be heard.'"  *Niskey*

*v. Wolf*, Nos. 13-cv-1269-JDB, 18-cv-3044-JDB, 2020 WL 8366838, at *2 (D.D.C. Dec. 10,

2020) (quoting *Philip Morris USA*, 840 F.3d at 850).  Relief under Rule 60(b)(4) is appropriate

when the judgment issuing court lacked subject matter jurisdiction.  *See Bell Helicopter Textron,*

*Inc. v. Islamic Republic of Iran*, 734 F.3d 1175, 1180 (D.C. Cir. 2013).

## III.   ANALYSIS

The Court will resolve Argentina's motion in two stages.  In this opinion, the Court will

address first whether Argentina can challenge in this proceeding the jurisdiction of the district

court that issued the 2018 default judgment against Argentina.  The Court will then turn to

whether that court had jurisdiction under the FSIA to issue a default judgment against Argentina.

In resolving that question, this Court will address two of three possible exceptions to Argentina's

jurisdictional immunity under the FSIA: the arbitration and commercial activity exceptions.

Finally, the Court will address jurisdictional discovery.  The Court will also order supplemental

briefing and address in a forthcoming opinion two remaining issues: whether the waiver

---

60(b)(4).  *See, e.g.*, *Bell Helicopter Textron, Inc v. Islamic Republic of Iran*, 734 F.3d 1175,
1179–82 (D.C. Cir. 2013) (analyzing a non-appearing party's challenge to the jurisdiction
underlying the judgment under Rule 60(b)(4)); *Practical Concepts, Inc. v. Republic of Bolivia*,
811 F.2d 1543, 1545–48 (D.C. Cir. 1987) (R.B. Ginsburg, J.) (same).

exception to Argentina's jurisdictional immunity under the FSIA applies and, if necessary, whether the 2001 default judgment against Caja can be enforced against Argentina.

### A.  Argentina May Challenge Subject Matter Jurisdiction in This Proceeding

In this proceeding, TIG attempts to enforce the 2018 default judgment against Argentina entered by the U.S. District Court for the Northern District of Illinois.  *See* Registration of Foreign Js.  Thus, the existence of jurisdiction in this case depends on whether that court had jurisdiction to enter the judgment.[4]  *See, e.g.*, *Stansell v. Revolutionary Armed Forces of Columbia*, No. 10-mc-471, 2019 WL 4040680, at *2 (D.D.C. Aug. 26, 2019) (characterizing subject-matter jurisdiction in enforcement proceeding as dependent on underlying judgment).  As the Second Circuit has explained in this context, "subject matter jurisdiction, once established through the applicability of an exception to jurisdictional immunity . . . continues through post-judgment enforcement proceedings."  *Walters v. Indus. & Comm. Bank of China, Ltd.*, 651 F.3d 280, 295 (2d Cir. 2011); *see also First City, Texas Houston, N.A. v. Rafidain Bank*, 281 F.3d 48, 53–54 (2d Cir. 2002) (holding that "where subject matter jurisdiction under the FSIA exists to decide a case, jurisdiction continues long enough to allow proceedings in aid of any money judgment that is rendered in the case," *id.* at 54).  This Court must therefore "prob[e] further back in the jurisdictional chain to examine the authority of a prior court, the judgment of which this Court is called upon to authorize execution."  *Jerez v. Republic of Cuba*, 777 F. Supp. 2d 6, 16 (D.D.C. 2011) (quoting *Weininger v. Castro*, 462 F. Supp. 2d 457, 468 (S.D.N.Y. 2006).

This kind of collateral attack on the jurisdiction of a judgment-issuing court is well-established.  *See, e.g.*, *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S.

---

[4] TIG also seeks to enforce in this proceeding the 2001 default judgment entered against Caja, *see* Registration of Foreign Js., but as noted above, *see supra* Part III, this Court will defer ruling on that judgment until after it reviews supplemental briefing.

694, 706 (1982) ("A defendant is always free to ignore the judicial proceedings, risk a default judgment, and then challenge that judgment on jurisdictional grounds in a collateral proceeding." (citing *Baldwin v. Traveling Men's Ass'n*, 283 U.S. 522, 525 (1931))).  This is allowed because a judgment issued by a court that lacks jurisdiction is null and void.  *See, e.g.*, *Jerez v. Republic of Cuba*, 775 F.3d 419, 422 (D.C. Cir. 2014); *see also Burnham v. Superior Court of Cal., Cnty. of Marin*, 495 U.S. 604, 608 (1990) (plurality opinion) ("The proposition that the judgment of a court lacking jurisdiction is void traces back to the English Year Books.").  In explaining this procedural posture, the D.C. Circuit wrote that a foreign defendant may "refrain from appearing" in merits proceedings, thereby exposing itself to "the risk of default judgment."  *Practical Concepts, Inc. v. Republic of Bolivia*, 811 F.2d 1543, 1547 (D.C. Cir. 1987) (R.B. Ginsburg, J.).  "When enforcement of the default judgment is attempted, however, [it] may assert [its] jurisdictional objection.  If [it] prevails on the objection, the default judgment will be vacated.  If [its] loses on the jurisdictional issue, on the other hand, [its] day in court is normally over" and it cannot "defend on the merits."  *Id.*

In this proceeding, Argentina may collaterally attack the jurisdiction of the district court that entered the 2018 judgment against Argentina because Argentina never contested the jurisdiction of that court; the court entered the judgment after Argentina failed to appear.  *See* Judgment in a Civil Case, No. 17-cv-2835 (N.D. Ill. Jan. 8, 2018), Dkt. 29; Minute Entry, No. 17-cv-2835 (N.D. Ill. Dec. 6, 2017), Dkt. 27.  And even though the parties did not dispute subject matter jurisdiction in the initial briefing in this proceeding, *see* Mem. Op. at 2–3, Dkt. 23, Argentina's jurisdictional arguments remain ripe for review.  Federal courts have an "ongoing obligation to ensure that '[they are] acting within the scope of [their] jurisdictional authority.'" *Hardy v. N. Leasing Systems, Inc.*, 953 F. Supp. 2d 150, 155 (D.D.C. 2013) (quoting *Ha v. U.S.*

*Dep't of Educ.,* 680 F. Supp. 2d 45, 46 (D.D.C. 2010)); *see also Kontrick v. Ryan*, 540 U.S. 443,

455 (2004) ("A litigant generally may raise a court's lack of subject-matter jurisdiction at any

time in the same civil action, even initially at the highest appellate instance." (citation omitted)).

Thus, a party may raise subject matter jurisdiction "at any stage in the litigation, even after trial

and the entry of judgment," *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506 (2006), or on appeal, *see*

*Athens Community Hosp., Inc. v. Schweiker*, 686 F.2d 989, 992 (D.C. Cir. 1982).  It can even be

raised "by a party that once conceded the tribunal's subject-matter jurisdiction."  *Sebelius v.*

*Auburn Regional Medical Ctr.*, 568 U.S. 145, 153 (2013).

    Argentina's jurisdictional argument is also not untimely, as TIG contends, *see* TIG's

Opp'n at 8 n.5.  The D.C. Circuit has long held that "Rule 60(b)(4) motions are not governed by

a reasonable time restriction," *Bell Helicopter Textron*, 734 F.3d at 1179 (citing *Austin v. Smith*,

312 F.2d 337, 343 (D.C. Cir. 1962)), because a void judgment is "a legal nullity," *Combs v. Nick*

*Garin Trucking*, 825 F.2d 437, 442 (D.C. Cir. 1987) (quoting 7 J. Moore & J. Lucas, Moore's

Federal Practice, ¶ 60.25[2], at 60–224 (1985)).  A void judgment cannot "acquire validity

because of laches on the part of him who applies for relief from it."  *Austin*, 312 F.2d at 343.

    For these reasons, Argentina can contest the jurisdiction of the judgment-issuing court in

this collateral enforcement proceeding.

## B.  Jurisdiction Under the FSIA Is Unavailable

    The FSIA "provides the sole basis for obtaining jurisdiction over a foreign state in the

courts of this country."  *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993) (quoting *Argentine*

*Republic v. Amerada Hess Shipping Corp.,* 488 U.S. 428, 443 (1989)); *see* 28 U.S.C. § 1330

(granting original jurisdiction to district courts over actions against foreign states); *id.* § 1604

(establishing immunity).  The general rule is that the "foreign sovereign is immune from the

jurisdiction of 'the courts of the United States and of the States,' except insofar as a particular case comes within one of the several statutory exceptions to the rule of immunity." *Princz v. Fed. Republic of Germany*, 26 F.3d 1166, 1171 (D.C. Cir. 1994) (quoting 28 U.S.C. § 1605 (establishing exceptions)). Accordingly, "the FSIA begins with a presumption of immunity, which the plaintiff bears the initial burden to overcome by producing evidence that an exception applies." *Bell Helicopter Textron*, 734 F.3d at 1183. The foreign sovereign then bears "the burden of persuasion" of "establish[ing] the absence of the factual basis by a preponderance of the evidence." *Agudas Chasidei Chabad of U.S. v. Russian Federation*, 528 F.3d 934, 940 (D.C. Cir. 2008).

In this case, TIG argues that three exceptions to sovereign immunity apply. First, it contends that the U.S. District Court for the Northern District of Illinois had jurisdiction to enter the 2018 default judgment against Argentina under the FSIA's arbitration exception to sovereign immunity. *See* TIG's Opp'n at 9 (citing 28 U.S.C. § 1605(a)(6)). In the alternative, TIG maintains that jurisdiction was available under the waiver exception to sovereign immunity. *See id.* at 22–23 (citing 28 U.S.C. § 1605(a)(1)). Finally, it asserts that the commercial activity exception applied. *See id.* at 23 n.19. The Court will address each in turn.

### 1. Arbitration exception

The arbitration exception provides that immunity is not available in any case "in which the action is brought, either to enforce an agreement made by a foreign state with or for the benefit of a private party to submit to arbitration all or any differences which have arisen or may arise between the parties . . . or to confirm an award made pursuant to such an agreement to arbitrate." 28 U.S.C § 1605(a)(6). It is undisputed that the reinsurance contracts that form the basis of the arbitral award are agreements that call for the arbitration of differences. *See*

Argentina's Mem. at 4; TIG's Opp'n at 3–4. And the parties agree that Caja—not Argentina—was the contracting party to those agreements. First LeGros Decl. ¶¶ 2–4; *see also* First LeGros Decl. Exs. B, C, Dkt. 2-6 (executed contracts). They disagree, however, on whether those agreements were "made by a foreign state"—that is, Argentina—as required by the FSIA. This Court concludes that they were not.

The scope of the FSIA's exception for agreements "made by a foreign state" is a question of statutory interpretation. *See Asociacion de Reclamantes v. United Mexican States*, 735 F.2d 1517, 1521 (D.C. Cir. 1984) (explaining that interpreting FSIA exceptions required "determin[ing] what Congress meant by the language in this particular statute"). "Make," in the context of "make a contract," means "[t]o agree upon, and conclude or adopt, a contract[;] [i]n case of a written contract, to reduce it to writing, execute it in due form, and deliver it as binding." *Make a contract*, Black's Law Dictionary (5th ed. 1979). On its face, the past participial phrase "made by" refers to the parties who reduced the arbitration agreement to writing, executed, and delivered it at the time of formation—*i.e.*, the point at which that agreement was "made." *See* 28 U.S.C § 1605(a)(6). In that respect, the FSIA's exception can apply only to the parties that formed or "made" the agreement, *see Gater Assets Ltd. v. AO Moldovagaz*, 2 F.4th 42, 68 (2d Cir. 2021) (noting that "[a] contract can be said to be 'made by' only the parties to it"), and therefore cannot apply to parties that merely obtained liability under it.

This interpretation is consistent with the purpose of the arbitration exemption. As the Second Circuit explained, Congress enacted the exemption "to implement the Inter-American Convention on International Commercial Arbitration." *Gater Assets*, 2 F.4th at 68 n.28 (quoting An Act to Implement the Inter–American Convention on International Commercial Arbitration,

Pub. L. No. 100-669, 102 Stat. 3969 (1988)).  That convention, in turn, applies to "parties" who have "undertake[n] to submit to arbitral decision any differences that may arise or have arisen between them" in either a formal or informal "agreement."  *Id.* (quoting Inter-American Convention on International Commercial Arbitration, art. 1, done Jan. 30, 1975, T.I.A.S. 90-1027, 1438 U.N.T.S. 245).  There is no reason to suppose that Congress, in authorizing suits against foreign states that agreed to arbitration, also authorized suits against states who later incurred liability under contracts that provide for arbitration.  Because Argentina did not make the contracts at issue here, the arbitration exception does not authorize suit against Argentina.  *See* First LeGros Decl. Exs. B, C (showing that Caja executed the reinsurance contracts decades before Argentina assumed its assets and liabilities).

TIG resists this conclusion, arguing that the arbitration exemption incorporates general principles of contract law, under which Argentina is liable for Caja's debts.  *See* TIG's Opp'n at 11–20.  But whether "a statute withdraws sovereign immunity is 'analytically distinct' from" the question of liability.  *Owens v. Republic of Sudan*, 864 F.3d 751, 807 (D.C. Cir. 2017), *vacated and remanded on other grounds by Opati v. Republic of Sudan*, 140 S. Ct. 1601 (2020).  *Cf. United States v. Mitchell*, 463 U.S. 206, 218 (1983) (explaining that United States' waiver of immunity under the Tucker Act was analytically distinct from whether "statutes or regulations . . . can be interpreted as requiring compensation").  Here, if Congress had intended the arbitration exception to turn on liability, it could have tied that exception to agreements that "bound" or "governed" foreign states, as opposed to agreements that those states "made."  *See* 28 U.S.C § 1605(a)(6).  For those reasons, the Second Circuit called into question whether "direct benefits estoppel can apply not only to bind a private party to an arbitration agreement but also to abrogate a state's immunity under the FSIA's arbitration immunity exception."  *Gater Assets*, 2

F.4th at 67.  For the same reasons, and squarely confronted with the question, this Court concludes that direct benefit estoppel does not waive immunity under § 1605(a)(6).[5]

The same logic applies to TIG's arguments that the arbitration exception applies because Argentina is Caja's successor-in-interest and assumed Caja's assets and liabilities.  *See* TIG's Opp'n at 11–18.  Those—along with equitable estoppel, *see id.* at 19–20—are theories of substantive contract law liability that apply to arbitration agreements as they do to normal contracts.  *See, e.g.*, *Fisser v. Int'l Bank*, 282 F.2d 231, 233 (2d Cir. 1960) (explaining that the "generally operative principles of contract law" apply to determine to whom the obligation to arbitrate attaches).  And when those theories do not intersect with the statutory framework of jurisdictional sovereign immunity, it is the end of the inquiry.  *See, e.g.*, *Invista N. Am., S.À.R.L. v. Rhodia Polyamide Intermediates S.A.S.*, 503 F. Supp. 2d 195, 201–02 (D.D.C. 2007) (applying contract-law assumption principles to arbitration agreement).  Accordingly, even if Argentina is Caja's successor-in-interest, assumed Caja's contractual liabilities, or is equitably estopped from denying those liabilities, the arbitration agreements were nonetheless not "made by" Argentina so as to waive sovereign immunity.[6]

Finally, TIG advances an alter ego theory to establish jurisdiction under the FSIA's arbitration exception.  *See* TIG's Opp'n at 20–21.  Under this theory, "an incorporated entity . . .

---

[5] In *Gater Assets*, the Second Circuit both provided a more considered analysis than its past "suggest[ions] in dicta," 2 F.4th at 67 (citing *Monesgasque de Reassurances S.A.M. v. Nak Naftogaz of Ukraine*, 311 F.3d 488, 501 (2d Cir. 2002)), and questioned the reasoning of the district court in that case, *see id.* at 67–68 (discussing *Gater Assets Ltd. v. AO Gazsnabtranzit*, 413 F Supp. 3d 304, 325–27 (S.D.N.Y. 2019)).  TIG's reliance on *Monesgasque* and the district court's opinion in *Gater Assets*, *see* TIG's Opp'n at 10–11, is thus misplaced.

[6] The natural consequence of this—that Argentina might be liable under the contract but unable to be sued over it—is within the very nature of immunity because it renders a potentially liable party incapable of being sued.  *See, e.g.*, *Mitchell v. Forsyth*, 472 U.S. 511, 525 (1985) (noting that "the essence of absolute immunity is its possessor's entitlement not to have to answer for his conduct in a civil damages action").

is not be regarded as legally separate from its owners," *First Nat'l Bank v. Banco Para El Comercio Exterior de Cuba* (*Bancec*), 462 U.S. 611, 629 (1983), where the foreign state so extensively controls the entity such "that a relationship of principal and agent is created," *id.*, or where "adher[ing] blindly to the corporate form . . . would cause . . . injustice," *id.* at 632. Applying this theory here, if Caja were an alter ego of Argentina when the reinsurance contracts were made, then the contracts would have been "made by" Argentina to the same extent as they were made by Caja.

*Bancec* provides the framework for determining whether a foreign corporate entity is an alter ego of a foreign sovereign. *See, e.g.*, *DRC, Inc. v. Republic of Honduras*, 71 F. Supp. 3d 201, 208–14 (D.D.C. 2014) (applying *Bancec*). First, there is "a baseline rule 'that government instrumentalities established as juridical entities distinct and independent from their sovereign should normally be treated as such.'" *GSS Grp. Ltd. v. Nat'l Port Auth.*, 680 F.3d 805, 814 (D.C. Cir. 2012) (quoting *Bancec*, 462 U.S. at 626–27). This "presumption of the juridical separateness of entities also applies to jurisdictional issues." *Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 446 (D.C. Cir. 1990). But the presumption can "be overcome where the foreign state so extensively controlled the instrumentality 'that a relationship of principal and agent is created,' or where . . . 'adhering blindly to the corporate form would cause injustice.'" *TMR Energy Ltd. v. State Prop. Fund of Ukraine*, 411 F.3d 296, 301 (D.C. Cir. 2005) (cleaned up) (quoting *Bancec*, 462 U.S. at 629, 632).

As the proponent of the alter ego theory, "the burden of proof on this issue [is] squarely on" TIG. *Estate of Heiser v. Islamic Republic of Iran*, 885 F. Supp. 2d 429, 435 (D.D.C. 2012). This presents an uphill battle for TIG because it "bears the burden of asserting facts sufficient to" establish either an agency relationship or fraud or injustice. *Foremost-McKesson*, 905 F.2d at

447; *see De Letelier v. Republic of Chile*, 748 F.2d 790, 795 (2d Cir. 1984) (placing burden on plaintiff to establish that separate entity "was not entitled to separate recognition"). There is such a high bar because a sovereign's decision "to create an instrumentality with a separate legal personality . . . normally should be respected by our courts." *DRC*, 71 F. Supp. 3d at 210 (citing *Bancec*, 462 U.S. at 626–27).

 TIG does not appear to challenge that the presumption of separateness applies. *See* TIG's Opp'n at 20–21. And TIG has not proffered any evidence that suggests the absence of some of the key characteristics of independence that courts consider in this context: "creation by an enabling law that prescribes the instrumentality's powers and duties; establishment as a separate juridical entity with the capacity to hold property and to sue and be sued; management by a government-selected board; primary responsibility for its own finances; and operation as a distinct economic enterprise that often is not subject to the same administrative requirements that apply to government agencies." *DRC*, 71 F. Supp. 3d at 209 (citing *Bancec*, 462 U.S. at 624). In fact, TIG's own filings show the presence of a number of them. *See, e.g.*, Aldort Decl. Ex. 24, Dkt. 32-5, at 2 (noting belief that "Caja is a corporation organized and previously existing under the laws of Argentina"); *id.* (noting that "Caja ceased being a separate juridical entity" *after* the liquidation process was completed in 2005). Thus, Caja's "establishment as a juridically independent entity entitles it to a presumption of separateness from the Republic for purposes of determining whether the" judgment-issuing "[c]ourt ha[d] subject matter jurisdiction." *DRC*, 71 F. Supp. 3d at 214.

 To overcome the presumption of separateness under the agency theory, TIG must show that Argentina exercised such control over Caja that "it significantly exceed[ed] the normal supervisory control exercised by any corporate parent over its subsidiary and, indeed,

amount[ed] to complete domination of the subsidiary." *Transamerica Leasing, Inc. v. La Republica de Venezuela*, 200 F.3d 843, 848 (D.C. Cir. 2000). Alternatively, Argentina must have "exercise[d] its control in such a way as to make the [Caja] its agent." *Id.* at 849. In this context, mere ownership of "a majority of a corporation's stock or . . . appointing its Board of Directors" is insufficient. *Id.* "[T]he relationship of principal and agent does not obtain unless the parent has manifested its desire for the subsidiary to act upon the parent's behalf, the subsidiary has consented so to act, the parent has the right to exercise control over the subsidiary with respect to matters entrusted to the subsidiary, and the parent exercises its control in a manner more direct than by voting a majority of the stock in the subsidiary or making appointments to the subsidiary's Board of Directors." *Id.* (citing Restatement (Second) of Agency § 1).

Although TIG says the record is "replete with support" of Argentina's control over Caja, *see* TIG's Opp'n at 20, that is not the case. TIG points to Argentina's liquidation resolutions as evidence "that Caja existed under Argentina's complete control" and "in some stage of significant undercapitalization," *id.* (citation omitted). But Argentina passed these resolutions in the 1990s and 2000s, in the process of liquidating Caja. *See* Custo Decl. ¶¶ 5–12. Thus, they tell us little about whether Caja was Argentina's alter ego at the relevant time—when the contracts "were made." In any event, these resolutions actually cut against TIG. The need for legal resolutions to wind up Caja suggests that Argentina did *not* regularly exert such great control over Caja on a day-to-day basis so as to make Caja its agent. And even if Argentina "ha[d] the right to control [Caja], it must actually [have] exercise[d] that control." *In re Kaiser Grp. Int'l, Inc.*, 730 F. Supp. 2d 247, 252 (D.D.C. 2010). TIG has offered no evidence that Argentina exercised control over Caja when these contracts were formed. Accordingly, the Court

concludes that TIG has not made a showing sufficient to overcome the high bar to establishing

an agency relationship and rebut the "presumption of juridical separateness," *Foremost-*

*McKesson*, 905 F.2d at 446.

The presumption of separateness also can be overcome under the fraud or injustice theory

(1) "where a foreign sovereign intentionally seeks to gain a benefit while using the legally

separate status of its instrumentality as a shield to guard against concomitant costs or risks,"

*DRC*, 71 F. Supp. 3d at 218 (citing *Bancec*, 462 U.S. at 630–33); (2) "where a sovereign

otherwise unjustly enriches itself through the instrumentality," *id.* (citing *Transamerica Leasing*,

200 F.3d at 854); (3) "where a sovereign uses its instrumentality to defeat a statutory policy," *id.*

(citing *Transamerica Leasing*, 200 F.3d at 854); or (4) "where an instrumentality has been

cloaked with the apparent authority of the sovereign, and the complaining party reasonably relies

upon that manifestation of authority," *id.* (citing *Transamerica Leasing*, 200 F.3d at 850).  None

of these circumstances are present here.

In *Bancec*, the Supreme Court addressed the first circumstance and explained that

"Bancec was not entitled to its presumption of independent status where it was clear that 'the

Cuban Government [itself] could not bring suit in a United States court without also subjecting

itself to its adversary's counterclaim,' and where, due to the fact that 'Bancec was dissolved

before Citibank filed its answer,' 'the Cuban Government and [its central bank] . . . would be the

only beneficiaries of any recovery.'" *GSS Grp. Ltd. v. Republic of Liberia*, 31 F. Supp. 3d 50, 63

(D.D.C. 2014) (quoting *Bancec*, 462 U.S. at 630–32) (alterations in original).  A foreign

sovereign cannot use its instrumentality as a sword in U.S. courts while retaining its own shield

of sovereign immunity from relevant counterclaims.  *See Bancec*, 462 U.S. at 633–34

("[I]nternationally recognized equitable principles" prevented "the injustice that would result

from permitting a foreign state to reap the benefits of our courts while avoiding the obligations of international law.").  Here, there is no evidence that Argentina is trying to reap the benefits of American courts while avoiding potential downside, so this kind of fraud or injustice is not present.

TIG has not shown that Argentina "unjustly enriche[d] itself through" Caja.  *DRC*, 71 F. Supp. 3d at 218.  This occurs where the sovereign "manipulate[s] [the subsidiary] in order to obtain a financial benefit from the" counterparty "for which it had no intention of paying." *Transamerica Leasing*, 200 F.3d at 854.  TIG has proffered no evidence that Argentina manipulated Caja when the insurance contracts were signed so that Argentina could benefit from them without risk.  In fact, TIG has proffered no evidence that, at the time of contracting, Caja operated under any substantial influence by Argentina or in any way different from an insurance company's standard counterparties.  Accordingly, the Court concludes that this circumstance is also not present.

Nor has TIG show that Argentina acted with either a statutory policy or cloak of apparent authority with reasonable reliance.  *See DRC*, 71 F. Supp. 3d at 218.  There is no evidence that Argentina used Caja "to defeat any statutory policy of either [Argentina] or the United States." *Transamerica Leasing*, 200 F.3d at 854.  And there is no evidence from TIG's filings that Caja appeared to act with the authority of Argentina and TIG so relied on that appearance.

In sum, the Court concludes that there is not a wrong "constitute[ing] either 'fraud' or 'misuse of the corporate form to promote injustice,'" but rather "simply a run of the mill alleged contractual breach."  *GSS Grp. Ltd. v. Nat'l Port Auth. of Liberia*, 822 F.3d 598, 608 (D.C. Cir. 2016) (quoting *Bridas S.A.P.I.C. v. Gov't of Turkm.¸* 447 F.3d 411, 416–17 (5th Cir. 2006)).  Thus, the arbitration exception does provide an exception to Argentina's immunity.

###### 2.   *Waiver exception*

The FSIA's waiver exception provides that sovereign immunity is unavailable when "the foreign state has waived its immunity either explicitly or by implication."  28 U.S.C. § 1605(a)(1).  At issue here is implied waiver.  *See* TIG's Opp'n at 22–24.  The D.C. Circuit has explained that the implied waiver provision must be construed narrowly.  *Creighton Ltd. v. Gov't of Qatar*, 181 F.3d 118, 122 (D.C. Cir. 1999).  Implied waiver of sovereign immunity occurs in three situations:  "'where a foreign state has filed a responsive pleading without raising the defense of sovereign immunity'; where a foreign state agrees to participate in arbitration in another country; and where a foreign state agrees in a contract that the laws of another country will govern that contract."  *Inversora Murten, S.A. v. Energoprojekt Holding Co.*, 671 F. Supp. 2d 152, 155 (D.D.C. 2009) (quoting *World Wide Minerals, Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154, 1161 n.11 (D.C. Cir. 2002)).  None is applicable here.

Argentina did not file a responsive pleading in the cases underlying the judgments TIG seeks to enforce here, nor has it filed a responsive pleading in this enforcement action.  "[T]he only filings that are considered pleadings are a complaint, an answer to a complaint, an answer to a counterclaim designated as a counterclaim, an answer to a crossclaim, a third-party complaint, an answer to a third-party complaint, and a reply to an answer."  *Id.* (citing Fed. R. Civ. P. 7(a)); *see also Adkins v. Safeway, Inc.*, 985 F.2d 1101, 1102 (D.C. Cir. 1993)).  In the cases underlying the judgment, Argentina did not make an appearance, much less file a pleading.  *See supra* section III.A.  And in this enforcement action, no pleadings have been filed.  Therefore, filing a responsive pleading without raising sovereign immunity cannot serve as a basis for an implied waiver of sovereign immunity.

But it is unclear from the parties' briefs whether the second or third bases for implied waiver could be applicable here.  It is clear that Caja agreed to participate in arbitration in another country by selecting Chicago, Illinois, as the seat of arbitration, and Caja agreed that laws of another country (the United States) would govern the reinsurance contracts.  *See* Aldort Decl. Ex. 1, at 13–14, 32–33 (Reinsurance Contracts).  What is not clear is whether the Argentinian resolutions that liquidated Caja and transferred its assets and liabilities to Argentina effected a legal change such that Argentina agreed to the reinsurance contracts.  The Court will therefore order the parties to file supplemental briefs addressing the legal effect of the resolutions.

### 3.  *Commercial activity exception*

The FSIA also provides an exception from immunity for cases "in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States."  28 U.S.C. § 1605(a)(2).  TIG suggests that Argentina does not challenge this exception. *See* TIG's Opp'n at 23 n.19.  But this exception is inapplicable for the same reason that the arbitration exception does not apply—there was no commercial activity "by" or "of" Argentina. *See, e.g.*, *Wye Oak Tech., Inc. v. Republic of Iraq*, 24 F.4th 686, 700–01 (D.C. Cir. 2022) (explaining that "it is the foreign state that has to have engaged in activity" being analyzed under the commercial exception).  Rather, there was commercial activity "by" or "of" Caja, which is not the same. *See supra* section III.B.1.  Accordingly, this exception also cannot abrogate Argentina's sovereign immunity.

### C.  Jurisdictional Discovery Is Not Available

Finally, the Court turns to TIG's one sentence request for jurisdictional discovery on the question of whether Caja is Argentina's alter ego.  *See* TIG's Opp'n at 21.  To obtain jurisdictional discovery, a party "must have at least a good faith belief that such discovery will enable it to show that the court has . . . jurisdiction over the defendant."  *Caribbean Broad. Sys., Ltd. v. Cable & Wireless P.L.C.*, 148 F.3d 1080, 1090 (D.C. Cir. 1998).  The party must also make a "detailed showing of what discovery it wishes to conduct or what results it thinks such discovery would produce."  *NBC-USA Hous., Inc., Twenty-Six v. Donovan*, 774 F. Supp. 2d 277, 295 (D.D.C. 2011) (quoting *Atlantigas Corp. v. Nisource, Inc.*, 290 F. Supp. 2d 34, 53 (D.D.C. 2003)).  "Where there is no showing of how jurisdictional discovery would help [the party] discover anything new, 'it [is] inappropriate to subject [the opposing party] to the burden and expense of discovery."  *Id.* (quoting *Atlantigas*, 290 F. Supp. 2d at 53) (second alteration in original).  Likewise, a party "may not use jurisdictional discovery to 'conduct a fishing expedition in the hopes of discovering some basis of jurisdiction.'"  *Nuevos Destinos, LLC v. Peck*, No. 15-cv-1846, 2019 WL 78780, at *13 (D.D.C. Jan. 2, 2019) (quoting *In re Papst Licensing GMBH & Co. KG Litig.*, 590 F. Supp. 2d 94, 101 (D.D.C. 2008)).

In the FSIA context, there is a heightened requirement to obtain jurisdictional discovery.  "[J]urisdictional discovery should not be ordered when to do so would frustrate the significance and benefit of entitlement to immunity from suit."  *Peterson v. Islamic Republic of Iran*, 563 F. Supp. 2d 268, 274 (D.D.C. 2008) (citation and internal quotation marks omitted).  It "should be carefully controlled and limited" so as not to "burden[] a sovereign that proves to be immune from suit."  *Phoenix Consulting Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000) (citing *Foremost-McKesson*, 905 F.2d at 449).  Here, TIG has provided no evidence that Caja

was Argentina's alter ego at the relevant point in time—when the reinsurance contracts were formed.  Nor has it indicated what discovery it would conduct to support its theory, let alone filed an appropriate motion to that effect, *see, e.g.*, *GSS Grp. Ltd. v. Nat'l Port Auth.*, 680 F.3d at 812 (explaining that reservation of "the right to conduct appropriate discovery" in the footnote of an opposition memorandum was not a sufficient request for jurisdictional discovery). Accordingly, the Court will deny TIG's request for jurisdictional discovery.

## CONCLUSION

For the foregoing reasons, the Court concludes that the FSIA's arbitration and commercial activity exceptions to sovereign immunity do not apply to the 2018 judgment against Argentina.  Thus, the Court grants Argentina's motion in part.  But the Court defers ruling on (1) the waiver exception's applicability to the 2018 judgment and (2) whether the 2001 judgment against Caja can be enforced against Argentina, until after the parties file supplemental briefs.  A separate order consistent with this decision accompanies this memorandum opinion.

DABNEY L. FRIEDRICH
United States District Judge

April 18, 2022