UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

TIG INSURANCE COMPANY,

    *Judgment Creditor*,

v.

REPUBLIC OF ARGENTINA *et al.*,

    *Judgment Debtors.*

No. 18-mc-00129 (DLF)

**MEMORANDUM OPINION**

In this miscellaneous action, TIG Insurance Company moves for a writ of attachment and writ of execution on a building owned by the Republic of Argentina based on two foreign judgments it obtained in another jurisdiction. *See* Registration of Foreign Js., Dkt. 1; Mot. for Emergency Relief at 2, Dkt. 2. Before the Court for the second time is Argentina's motion to dismiss under Federal Rule of Civil Procedure 12(b)(1). Dkt. 30. For the reasons stated in the Court's second Memorandum Opinion, Dkt. 39, and those that follow, the Court will treat the motion as a motion for relief from judgment under Federal Rule of Civil Procedure 60(b)(4) and will grant the motion as to the 2018 judgment.

**I.   BACKGROUND**

    **A.  Factual Background**[1]

TIG is the successor-in-interest to two private insurance companies—the International Surplus Lines Insurance Company and the International Insurance Company—which entered into

---

[1] Although Argentina's motion appears to challenge both the legal and factual sufficiency of TIG's jurisdictional allegations, *see* Mot. to Dismiss at 1, Dkt. 30, the Court need not address the parties' factual disputes because it resolves the legal challenges addressed in this opinion in Argentina's favor. Therefore, the Court "take[s] [TIG's] factual allegations as true and determine[s] whether

two casualty reinsurance contracts with Caja Nacional de Ahorro y Segurro in 1979. First LeGros Decl. ¶¶ 2–4, Dkt. 2-6.[2] Caja was a state-owned corporation created by Argentina in 1915. First Custo Decl. ¶ 5, Dkt. 2-5. Under these contracts, the insurance companies paid Caja insurance premiums for tail coverage of various losses during the contract period that could arise after the contracts' termination. Second LeGros Decl. ¶¶ 3, 11, Dkt. 32-4. These contracts included arbitration provisions that survived the termination of the agreements. Second LeGros Decl. ¶ 13; Aldort Decl. ¶ 2, Dkt. 2-3; Aldort Decl. Ex. 1 (Casualty Reinsurance Contracts) at 14, 33.

In the 1990s, Argentina's then-Ministry of Economy and Works and Public Services issued two resolutions that placed Caja into liquidation. First Custo Decl. ¶¶ 6–11. The first resolution began the liquidation process in 1994 and directed the Ministry to manage the process. First Custo Decl. ¶ 7. In 1998, the second resolution transferred "ascertained liabilities and contingent assets and liabilities of Caja Nacional, derived from active reinsurance transactions in private markets outside . . . Argentina in which [Caja] was involved . . . to the National Treasury." First Custo Decl. ¶ 8. This resolution specifically identified a $1.6 million contingent liability to TIG. First Custo Decl. ¶ 9. In 2005, Argentina's Ministry of Economy and Production issued a final resolution concluding the Caja liquidation and dissolving the entity. First Custo Decl. ¶ 10; *see also* Aldort Decl. Ex. 24, at 319. This resolution provided for Argentina to absorb all of Caja's liquidated and contingent assets and liabilities. First Custo Decl. ¶ 11. It also directed the Ministry "to make payments that may rise from the liquidation process" and "manage any and all legal cases

---

[it] bring[s] the case within any of the [FSIA] exceptions to immunity invoked by" TIG. *Peterson v. Islamic Republic of Iran*, 563 F. Supp. 2d 268, 272 (D.D.C. 2008) (sixth alteration in original) (quoting *Mwani v. bin Laden*, 417 F.3d 1, 15 (D.C. Cir. 2005)). Because there is no complaint in this miscellaneous case, the facts are drawn solely from TIG's affidavits and declarations.

[2] For simplicity, the Court will henceforth refer to TIG and its predecessors as "TIG."

that C[aja] . . . may be a party to and the ones that may be filed in the future." First Custo Decl. ¶ 11 (internal quotation marks omitted).

Although TIG paid Caja the reinsurance premiums it owed, Caja "has repeatedly failed to pay TIG for its portion of the losses under" the reinsurance contracts. First LeGros Decl. ¶ 5; *see* Second LeGros Decl. ¶¶ 3–6. In response, TIG brought arbitral proceedings, first against Caja and then, after its dissolution, against Argentina. Aldort Decl. ¶ 2; First LeGros Decl. ¶ 5. TIG sought the insurance payouts for the portion of the risk that Caja assumed in the reinsurance contracts that TIG was paying out. Second LeGros Decl. ¶ 3. The first arbitration against Caja culminated in a default award for TIG in 2000. Aldort Decl. ¶ 4. In 2017, TIG initiated a second arbitration against Argentina for a different set of losses. Aldort Decl. ¶ 19. The arbitral panel determined that Argentina was the successor-in-interest to Caja and thus liable under the reinsurance contracts. Aldort Decl. Ex. 49 (Mar. 9, 2017, Final Order and Award) ¶¶ 1–4. This arbitration also concluded in a default award in TIG's favor. Aldort Decl. ¶ 20; Mar. 9, 2017, Final Order and Award ¶ 4.

### B. Procedural History

#### 1. *Judgment against Caja*

On October 27, 2000, TIG petitioned the U.S. District Court for the Northern District of Illinois to confirm an approximately $4.7 million default arbitration award against Caja. *Int'l Ins. Co. v. Caja Nacional de Ahorro y Seguro*, 293 F.3d 392, 393–94 (7th Cir. 2002). Illinois law requires certain foreign companies, before filing any pleadings, to post "a bond . . . sufficient to secure the payment of any final judgment" that could be entered against them. *Id.* at 394 (quoting 215 ILCS 5/123(5)). Although Caja did not challenge the district court's subject matter jurisdiction, it did argue that the FSIA exempted it from the above requirement to post security.

*Id.* at 394 & n.2. The district court rejected Caja's argument, struck its pleadings, and, after Caja refused to post security, entered default judgment against it. *Id.* at 394–95.

On appeal of that default judgment, the Seventh Circuit specifically addressed subject matter jurisdiction. *Id.* at 395–97. The court concluded that federal question jurisdiction was present "pursuant to the Inter-American Convention on International Commercial Arbitration (known popularly as the 'Panama Convention'), codified at 9 U.S.C. § 301 *et seq.*" *Id.* at 395–96. In the alternative, the court also determined that diversity jurisdiction was available under 28 U.S.C. § 1332(a)(2) because "it [wa]s undisputed that [TIG] [wa]s an American corporation and that Caja [wa]s an Argentinian Business entity." *Id.* at 396 n.10. As another alternative basis for jurisdiction, the court said that "even if [Caja] [wa]s a foreign instrumentality, [it] waived its immunity in a proceeding to confirm the arbitral award" and thus jurisdiction was available under the arbitration exception to the FSIA. *Id.* at 397 (citing 28 U.S.C. § 1605(a)(6)(A)). However, the Court went on to hold that "Caja ha[d] not presented sufficient prima facie evidence to establish that it [wa]s a foreign instrumentality under the FSIA such that it would be entitled to immunity from posting pre-judgment security." *Id.* at 399. Accordingly, the Seventh Circuit affirmed the default judgment against Caja. *Id.* at 393.

While the appeal was pending, TIG sought discovery to aid enforcement of the default judgment. *Int'l Ins. Co. v. Caja Nacional de Ahorro y Seguro*, No. 00-C-6703, 2001 WL 1516730, at *1 (N.D. Ill. Nov. 28, 2001). The district court originally quashed the plaintiff's citation to discover assets, *id.* at *3, but later entered an agreed order to govern discovery, Agreed Order, No. 00-cv-6703 (Mar. 19, 2002), Dkt. 52. On December 4, 2002, the district court found that Caja failed to comply with its discovery obligations and sanctioned the company at the rate of $2,000 per day. Minute Order, No. 00-cv-6703 (Dec. 4, 2002), Dkt. 64; *see also Int'l Ins. Co. v. Caja*

4

*Nacional de Ahorro y Seguro*, No. 00-C-6703, 2004 WL 555618, at *1 (N.D. Ill. Mar. 18, 2004) (documenting discovery history).  After further discovery disputes and Caja's failure to comply with court orders, the court increased the sanctions against the company to $4,000 per day.  Mem. Op. & Order at 3, 5, No. 00-cv-6703 (Mar. 17, 2005), Dkt. 115.  When the Northern District of Illinois revived the judgment in 2014, the total judgment against Caja—the arbitral award, post-judgment interest, sanctions granted, and attorneys' fees granted—amounted to $23,898,354.  Reg. of Foreign J. Ex. 1 (Clerk's Certification of Judgment) at 6, Dkt. 1-1.

     2.  *Judgment against Argentina*

  On April 14, 2017, TIG filed a second petition to confirm a default arbitral award in the Northern District of Illinois.  Pet. for Confirmation of Final Arbitration Award, No. 17-cv-2835 (N.D. Ill. Apr. 14, 2017), Dkt. 2.  This petition named the Republic of Argentina as the respondent and sought confirmation of a 2017 arbitral award against Argentina in the amount of $3,459,489.31, inclusive of interest and costs.  *Id.* ¶¶ 1, 3, 17–18.  TIG brought the arbitration against Argentina as the successor-in-interest to Caja to recover on TIG's reinsurance contracts with Caja.  *Id.* ¶¶ 3, 7–10.  In September, Argentina contested service of process.  Letter from Consulate General of the Argentine Republic, No. 17-cv-2835 (N.D. Ill. Sept. 20, 2017), Dkt. 15.  On December 6, the court overruled Argentina's objection to service of process.  Minute Entry, No. 17-cv-2835 (N.D. Ill. Dec. 6, 2017), Dkt. 27.  On January 8, 2018, the court granted TIG's motion for default judgment, which the clerk entered in the amount of $3,459,489.31.  J. in Civil Case, No. 17-cv-2835 (N.D. Ill. Jan. 8, 2018), Dkt. 29.  The case docket does not reflect an appearance by Argentina or any adjudication of the court's subject matter jurisdiction.

### *3.     Enforcement of judgments*

On September 24, 2018, TIG began this proceeding against Argentina and Caja by registering the two Northern District of Illinois judgments pursuant to 28 U.S.C. § 1963. Registration of Foreign Js.  The next day, TIG moved for emergency relief related to the real property at 2136 R Street N.W., Washington, D.C., a writ of attachment on the property and any future proceeds therefrom, and a writ of execution on any future proceeds therefrom. Dkt. 2.  On October 5, the Court requested additional briefing on service of process and the uses of the property.  Order at 1, Dkt. 6.  On October 24, Argentina entered a special appearance for the limited purpose of contesting service of process and this Court's jurisdiction.  Notice of Special Appearance, Dkt. 10.  On November 16, Argentina moved to dismiss this case for lack of personal jurisdiction under Rule 12(b)(2) of the Federal Rules of Civil Procedure and insufficient service of process under Rule 12(b)(5), Argentina's Mot. to Dismiss at 1, Dkt. 13, but the second argument was rendered moot by the perfection of service, *see* Notice Regarding Mot. to Dismiss, Dkt. 14, and Argentina ceased contesting personal jurisdiction.

Thereafter, Argentina opposed TIG's motions on the grounds that the R Street property was off the market and covered by the FSIA's attachment immunity as a property not "used for a commercial activity."  Argentina's Opp'n to TIG's Mot. for Emergency Relief, Attachment, and Execution at 1, Dkt. 16.  This Court resolved that question in Argentina's favor.  *TIG Ins. Co. v. Republic of Argentina*, No. 18-mc-0129, 2019 WL 3017618, at *1 (D.D.C. July 10, 2019).  The Court held that the appropriate time period in which to analyze commercial use is at the time the writ of attachment would issue.  *Id.* at *2–3.  Because there was no commercial use at the would-be time of attachment, the Court concluded that the property was immune under the FSIA.  *Id.* at *4–5.

6

On appeal, the D.C. Circuit disagreed. *TIG Ins. Co. v. Republic of Argentina*, 967 F.3d 778, 780 (D.C. Cir. 2020). That court concluded that the text and purpose of the FSIA's attachment immunity provision require examining the record at the time of filing, not at the time of issuance of the writ. *Id.* at 782. The D.C. Circuit went on to explain that, in analyzing a property's use, courts must consider the totality of the circumstances of the property's past and present use. *Id.* at 785–86. Thus, the court of appeals vacated this Court's order and remanded "to determine whether, at the time of filing, the totality of the circumstances supported characterizing the R Street property as one 'used for commercial activity' and, if so, whether any of Argentina's other defenses bar[red] attachment of its property." *Id.* at 788.

On remand, Argentina argued for the first time that the judgment-issuing court lacked subject matter jurisdiction under the FSIA and moved to dismiss this action under Rule 12(b)(1) of the Federal Rules of Civil Procedure.[3] Mot. to Dismiss at 1, Dkt. 30; Argentina's Mem. in Supp. of Mot. to Dismiss at 1–2, Dkt. 30. In its April 18 opinion, the Court first concluded that Argentina could challenge the subject matter jurisdiction of the judgment-issuing court in this attachment proceeding. Second Mem. Op. at 9–11. Then, the Court reviewed three possible exceptions in the FSIA that, if applicable, would establish jurisdiction over Argentina: the arbitration exception, the waiver exception, and the commercial activity exception. *Id.* at 11–12. The Court concluded that the arbitration exception was not applicable because reinsurance contracts were not "made by" Argentina. *Id.* at 12–20. In doing so, the Court also rejected TIG's theory that Caja was an alter ego of Argentina. *Id.* at 15–20. Turning to the waiver exception, the Court concluded that there

---

[3] Argentina also argued that the totality of the circumstances militated against finding a commercial use of the property, *see* Argentina's Mem. at 1–2, but the Court need not address attachment immunity because it is resolving the motion on jurisdictional immunity in Argentina's favor.

7

was no implied waiver by responsive pleading but that there might be implied waiver by agreement to arbitrate or agreement to be governed by US law. *Id.* at 21–22. The Court reserved the implied waiver exception to await further briefing by the parties on "whether the Argentinian resolutions that liquidated Caja and transferred its assets and liabilities to Argentina effected a legal change such that Argentina agreed to the reinsurance contracts," including the arbitration and choice-of-law provisions. *Id.* at 22. On the commercial activity exception, the Court concluded that it was inapplicable for the same reason that the arbitration exception did not apply. *Id.* Finally, the Court denied TIG's request for jurisdictional discovery. *Id.* at 23–24.

## II.    LEGAL STANDARD[4]

Rule 60(b) of the Federal Rules of Civil Procedure allows a party to seek relief from a final judgment for one of six reasons. Fed. R. Civ. P. 60(b). "Rule 60(b)(4) authorizes relief from a final order if 'the judgment is void.'" *United States v. Philip Morris USA Inc.*, 840 F.3d 844, 849 (D.C. Cir. 2016) (quoting Fed. R. Civ. P. 60(b)(4)). "A void judgment is a legal nullity." *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 270 (2010) (citing Black's Law Dictionary 1822 (3d ed. 1933)). Under this rule, "relief is available 'only in the rare instance where a judgment is premised either on a certain type of jurisdictional error or on a violation of due process that deprives a party of notice or the opportunity to be heard.'" *Niskey v. Wolf*, Nos. 13-cv-1269-JDB, 18-cv-3044-JDB, 2020 WL 8366838, at *2 (D.D.C. Dec. 10, 2020) (quoting *Philip Morris USA*,

---

[4] Although Argentina brings its motion to dismiss for lack of jurisdiction under Rule 12(b)(1), this miscellaneous action is not an independent case—there is no complaint or any other pleading as defined by Federal Rule of Civil Procedure 7(a); rather, TIG seeks to enforce judgments already entered by the U.S. District Court for the Northern District of Illinois. Accordingly, the proper vehicle for Argentina to challenge the jurisdiction underlying those judgments is Rule 60(b)(4). *See, e.g.*, *Bell Helicopter Textron, Inc v. Islamic Republic of Iran*, 734 F.3d 1175, 1179–82 (D.C. Cir. 2013) (analyzing a non-appearing party's challenge to the jurisdiction underlying the judgment under Rule 60(b)(4)); *Practical Concepts, Inc. v. Republic of Bolivia*, 811 F.2d 1543, 1545–48 (D.C. Cir. 1987) (R.B. Ginsburg, J.) (same).

840 F.3d at 850). Relief under Rule 60(b)(4) is appropriate when the judgment-issuing court lacked subject matter jurisdiction. *See Bell Helicopter Textron, Inc. v. Islamic Republic of Iran*, 734 F.3d 1175, 1180 (D.C. Cir. 2013).

## III.   ANALYSIS

The Court will first address whether Argentina impliedly waived its sovereign immunity such that the Northern District of Illinois had subject matter jurisdiction to enter the 2018 judgment against it. The Court will then address whether TIG can use the 2001 judgment against Caja to attach property owned by Argentina.[5]

### A. The 2018 Judgment

As the Court explained in its second opinion, the FSIA withdraws sovereign immunity when "the foreign state has waived its immunity either explicitly or by implication." 28 U.S.C. § 1605(a)(1). Implied waiver of sovereign immunity generally occurs in three situations: "'where a foreign state has filed a responsive pleading without raising the defense of sovereign immunity'; where a foreign state agrees to participate in arbitration in another country; and where a foreign state agrees in a contract that the laws of another country will govern that contract." *Inversora Murten, S.A. v. Energoprojekt Holding Co.*, 671 F. Supp. 2d 152, 155 (D.D.C. 2009) (quoting *World Wide Minerals, Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154, 1161 n.11 (D.C. Cir. 2002)). Relevant here are the second and third bases, which the Court will analyze together because the same reinsurance contracts provide for both the application of the laws of another (the United

---

[5] TIG also attempts to relitigate the issue of whether Caja is an alter ego of Argentina. *See* TIG's Suppl. Opp'n at 12–15, 17–19, Dkt. 44. The Court already resolved that question in the negative. *See* Second Mem. Op. at 15–20. The Court declines to reconsider its earlier ruling outside the context of a properly filed motion pursuant to Federal Rule of Civil Procedure 54(b). *See, e.g.*, *Singh v. George Wash. Univ.*, 383 F. Supp. 2d 99, 101 (D.D.C. 2005) (noting that Rule "54(b) governs reconsideration of orders that do not constitute final judgments in a case").

States) and the arbitration in another country (the United States). *See* Aldort Decl. Ex. 1, at 13–14, 32–33 (Reinsurance Contracts). Accordingly, the issue is whether Argentina "agreed to" those contractual provisions, such that it impliedly waived sovereign immunity under both the arbitration and choice-of-law prongs.

For the implied waiver of sovereign immunity under either prong to apply here, TIG must meet the high bar ascribed to the FSIA's implied waiver exception. First, there is "substantial precedent construing the implied waiver provision narrowly." *Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 444 (D.C. Cir. 1990); *see also Wye Oak Tech., Inc. v. Republic of Iraq*, 24 F.4th 686, 691 (D.C. Cir. 2022) (K.B. Jackson, J.) (noting "the 'virtually unanimous' precedents construing the implied waiver provision narrowly" (quoting *Creighton Ltd. v. Gov't of the State of Qatar*, 181 F.3d 118, 122 (D.C. Cir. 1999))); *Khochinsky v. Republic of Poland*, 1 F.4th 1, 8 (D.C. Cir. 2021); *World Wide Minerals*, 296 F.3d at 1161 n.11. Accordingly, the waiver must be "clear and unambiguous." *Ivanenko v. Yanukovich*, 995 F.3d 232, 240 (D.C. Cir. 2021). Second, for a sovereign to have impliedly waived its sovereign immunity, it must have not only "indicated its amenability to suit," *Princz v. Fed. Republic of Germany*, 26 F.3d 1166, 1174 (D.C. Cir. 1994); it must also "have subjectively intended to do so," *Doe I v. State of Israel*, 400 F. Supp. 2d 86, 105 (D.D.C. 2005); *see also Inversora Murten*, 671 F. Supp. 2d at 156 (attempting to discern Japanese instrumentality's "subjective intent to waive sovereign immunity and participate in th[e] litigation"); *Cabiri v. Gov't of the Republic of Ghana*, 165 F.3d 193, 201 (2d Cir. 1999) (suggesting that implied waiver "requires that the plaintiff demonstrate proof of subjective intent to waive

10

immunity"). There must be "strong evidence that" waiver "is what the foreign state intended." *Foremost-McKesson*, 905 F.2d at 444 (quoting *Frolova*, 761 F.2d at 377).

It is through this lens that the Court considers the actions that Argentina took in liquidating and dissolving Caja to determine if it subjectively intended to agree to Caja's arbitration and choice-of-law contract provisions. In 1991, Argentina "declared C[aja] subject to dissolution and liquidation." Second Custo Decl. ¶¶ 22, 25, Dkt. 44-1. Some of Caja's assets were spun off into private companies, but others, including Caja's reinsurance business, remained. *Id.* ¶¶ 22, 27. In 1998, Argentina "declare[d] transferred to the N[ational] T[reasury] the determined liabilities and the assets and contingent liabilities of . . . C[aja] . . . derived from the active reinsurance business of the private market abroad in which said entity participates." Second Custo Decl. Ex. BC-14, at 5. In the same decree, Argentina charged a subdivision of the Ministry of Economy "with the handling of the businesses . . . until their conclusion, as well as the claims that may arise in the future derived from active reinsurance operations of the foreign private market made [by Caja], currently in liquidation, exercising all the powers that the Liquidator of the latter entity has in this regard." *Id.* at 6. In 2003, Argentina transferred the responsibility for handling Caja's legal matters from one subdivision of the Ministry of Economy to another. Second Custo Decl. ¶ 37. Specifically, Argentina "entrusted" the Legal Undersecretary "with adopting all necessary measures to handle, through its final conclusion, the litig[ation] portfolio corresponding to the active and passive reinsurance businesses entered into with foreign parties by" Caja "as well as the claims and litigation matters that may arise in the future in connection with the active and passive reinsurance operations of the aforementioned residual entities." Second Custo Decl. Ex. BC-15, at 7. Finally, in 2005, Argentina declared that Caja's liquidation would be concluded within ninety days, that Caja's "determined assets and liabilities, and the contingent assets and

11

liabilities of [Caja] . . . are declared transferred . . . to the National State," and that the Legal Undersecretariat of the Legal and Administrative Secretariat would be responsible for "all measures necessary to handle all judicial matters [Caja] . . . is a party to, as well as those that may be instituted in the future." Second Custo Decl. Ex. BC-16, at 8. Then, Caja ceased to exist. Second Custo Decl. ¶ 41.

For these actions to imply waiver of sovereign immunity as to the reinsurance contracts, they must show that Argentina indicated its amenability to arbitration abroad or to application of the laws of the United States, and that Argentina subjectively intended to do so. They do not. Although Argentina transferred the assets and liabilities of Caja and provided for the government to handle claims and litigation, neither of these actions evinces a "clear and unambiguous" subjective intent to waive sovereign immunity. *Ivanenko*, 995 F.3d at 240. First, a sovereign nation's adoption of another entity's liabilities does not, by itself, evince such a subjective intent. Courts generally infer such intent when a foreign state "agrees" to arbitration or the application of U.S. law to claims against it. *Inversora Murten*, 671 F. Supp. 2d at 155. But unlike Caja, Argentina itself did not expressly agree to the arbitration and choice of law provisions. Instead, it merely assumed liabilities arising from a contract in which *another* entity made such agreements. Given the D.C. Circuit's repeated admonition to "constru[e] the implied waiver provision narrowly," *Khochinsky*, 1 F.4th at 8 (citation omitted), Argentina's one-layer-removed assumption of Caja's liabilities under the contract is anything but "strong evidence" of Argentina's subjective intent to waive its immunity. *See, e.g.*, *Cargill Int'l S.A. v. M/T Pavel Dybenko*, 991 F.2d 1012, 1017 (2d Cir. 1993) (noting that courts ought not "extend" an implied "waiver in favor of third parties . . . absent strong evidence of the sovereign's intent"). Second, the fact that Argentina stated that it would handle Caja's claims and litigation matters does not, as TIG suggests, *see* TIG's

12

Suppl. Opp'n at 9, by itself reflect its subjective intent to submit to arbitration or the application of American law. To the contrary, Argentina could have chosen to handle Caja's claims by paying them only to the extent it desired, by asserting its sovereign immunity in litigation, or by insisting that claimants litigate Caja's liabilities in Argentina courts. Simply agreeing to handle Caja's claims and litigation, without any indication of how, provided no guidance on Argentina's subjective intent to subject itself to arbitration or to U.S. law.

This conclusion finds support in two examples involving Ireland's response to the 2008 financial crisis. Through different means, Ireland acquired contracts from private banks. In one case, its state-funded government entity, the National Asset Management Agency, acquired loans from Irish banks. *Shelbourne N. Water St. Corp. v. Nat'l Asset Mgmt. Agency*, 374 F. Supp. 3d 712, 717–18 (N.D. Ill. 2019). Although those loans "were expressly governed by Illinois law," the court nonetheless concluded that the government entity's acquisition of "pre-existing assets" and the government's acknowledgment that the transfer of those loans "must comply with the governing foreign law" did not "amount[] to a clearly expressed intent to be subject to suit in United States courts." *Id.* At 721. The court reasoned that the government entity "had no role in agreeing to the law governing the transfer or assignment of those assets." *Id.* A similar conclusion was drawn in a separate case concerning the Irish government's nationalization of Anglo Irish Bank. *Fir Tree Cap. Opportunity Master Fund, LP v. Anglo Irish Bank Corp.*, No. 11-cv-955, 2011 WL 6187077, at *1–2 (S.D.N.Y. Nov. 28, 2011). Prior to nationalization, the bank had contracts in which it had "consent[ed] to the jurisdiction of New York courts and to the application of New York law." *Id.* at *10. The court rejected the plaintiffs' contentions "that Ireland impliedly waived sovereign immunity simply by virtue of having nationalized the Bank, because the Bank, as a private entity, agreed . . . to the jurisdiction of New York courts and the application of New

York law." *Id.* at *11. Together, these cases suggest that a sovereign's assumption of another entity's liabilities is insufficient to amount to implied waiver even when the prior entity agreed to adjudicate those liabilities under American law.

Many of the cases to which TIG cites do not contradict this conclusion, and some do not even involve foreign sovereigns. For example, two of TIG's cited cases involve private entities. *See Porzig v. Dresdner Kleinwort Benson N. Am. LLC*, No. 98-cv-7670, 1999 WL 518833 (S.D.N.Y. July 21, 1999); *Circus Prods., Inc. v. Int'l Impresarios, Inc.*, No. 90-cv-414, 1990 WL 55684 (S.D.N.Y. Apr. 26, 1990). And three others address explicit, rather than implied, waivers. *See World Wide Minerals*, 296 F.3d 1154; *Exp.-Imp. Bank of the Republic of China v. Cent. Bank of Liberia*, No. 15-cv-9565, 2017 WL 1378271 (S.D.N.Y. Apr. 12, 2017), *vacated on other grounds*, 2018 WL 1871436 (S.D.N.Y. Feb. 6, 2018); *Belize Telecom Ltd. v. Gov't of Belize*, No. 05-cv-20470, 2005 WL 5643879 (S.D. Fla. Aug. 17, 2005). Two others deal with *forum non conveniens*, not implied waivers under the FSIA. *See Aguas Lenders Recovery Grp. LLC v. Suez, S.A.*, 585 F.3d 696, 701 (2d Cir. 2009); *In re Arb. Between Monegasque de Reassurances S.A.M. v. Nak Naftogaz of Ukraine*, 311 F.3d 488, 494 (2d Cir. 2002).

Finally, the key case on which TIG relies, *General Star National Insurance Co. v. Administratia Asigurarilor de Stat*, 289 F.3d 434 (6th Cir. 2002), is likewise inapposite. In that case, as here, a state-owned insurance company (ADAS) entered into reinsurance contracts with an American insurance company (General Star). *Id.* at 436. Then, in 1991, Romania dissolved ADAS and transferred all of ADAS's international and reinsurance interests to a new state-owned company (Astra), which was "to take over ADAS's insurance operations." *Id.* The Sixth Circuit concluded that Astra was ADAS's "successor-in-interest for the purposes of the reinsurance contracts at issue in this case" and then concluded, without further analysis, that its successor-in-

14

interest status meant that "Astra [wa]s bound by ADAS's surrender of its sovereign immunity pursuant to" the implied waiver exception. *Id.* at 440. But two differences set *General Star* apart from this case. First, the parties in *General Star* contested whether Astra was ADAS's successor-in-interest, not whether this status was sufficient to constitute an implied waiver of immunity. Although it is possible that the transfer of assets and liabilities from one instrumentality to another provides objective indications of implied waiver, in *General Star*, the Sixth Circuit did not assess whether the subjective intent requirement was met, as this Court must. Second, unlike in this case, ADAS and Astra were both state-owned insurance companies, and after ADAS transferred its assets to Astra, Astra continued ADAS's operations as an insurance company. *See Gen. Star*, 289 F.3d at 436. That instrumentality-to-instrumentality transfer, followed by an ongoing operation of an insurance company is unlike the factual circumstances here. In this case, Argentina—the sovereign itself—liquidated Caja, acted as its receiver, assumed some of its assets and liabilities, and then terminated its business. As relevant to determining Argentina's subjective intent when it assumed Caja's liabilities, Argentina's role as a liquidator is thus distinguishable from Astra's ongoing operation as an insurance company.

TIG has not established that the implied waiver exception to the FSIA extinguishes Argentina's sovereign immunity. And as previously decided, no other exceptions to the FSIA apply here. *See* Second Mem. Op. at 20–22. Therefore, the Northern District of Illinois lacked jurisdiction to enter the 2018 judgment. This renders the 2018 judgment null and void. *See, e.g.*, *Jerez v. Republic of Cuba*, 775 F.3d 419, 422 (D.C. Cir. 2014). Accordingly, the Court grants Argentina's motion as to the 2018 judgment.

### B. The 2001 Judgment

As a second basis for attaching Argentinian property, TIG relies on the 2001 judgment issued against Caja. *See* Clerk's Certification of J. to be Registered in Another District, No. 00-cv-6703 (July 5, 2001), Dkt. 1-1. As is clear from the Clerk's Certification and the original judgment, this judgment was issued against Caja, *not* Argentina. *See id.* at 1–3. Furthermore, there is no evidence on the Northern District of Illinois docket that the judgment has been altered or amended to include Argentina. *See generally Int'l Ins. Co*, No. 00-cv-6703. The general rule is that "[o]ne is not bound by a judgment in personam in a litigation in which he is not designated as a party or to which he has not been made a party by service of process." *Oster v. Republic of South Africa*, 530 F. Supp. 2d 92, 96 n.4 (D.D.C. 2007) (quoting *Hansberry v. Lee*, 311 U.S. 32, 40 (1940)). Thus, the judgment against Caja cannot be enforced against Argentina. Absent clear authority that this Court can amend the Northern District of Illinois's judgment, which TIG has failed to provide, this Court declines to do so. Accordingly, TIG must go before the Northern District of Illinois to amend or alter the judgment before it can serve as a basis for an enforcement action against Argentina.

TIG's arguments to the contrary are not availing. The cases on which TIG relies are those in which a judgment creditor has attempted to enforce a judgment against an alter ego of the judgment debtor. *See* TIG's Suppl. Opp'n at 15 (citing *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 333 F. Supp. 3d 380 (D. Del. 2018), *aff'd and remanded*, 932 F.3d 126 (3d Cir. 2019); *Weinstein v. Islamic Republic of Iran*, 624 F. Supp. 2d 272 (E.D.N.Y. 2009), *aff'd*, 609 F.3d 43 (2d Cir. 2010); *Gen. Star Nat'l Ins. Co. v. Administratia Asigurarilor de Stat*, 713 F. Supp. 2d 267 (S.D.N.Y. 2010)). But this Court has already rejected TIG's argument that Argentina is the alter ego of Caja. *See supra* note 5. And the Court declines to revisit that holding in this

16

posture. Finally, to the extent that Argentina is the successor-in-interest to Caja and this successorship is sufficient to enforce the 2001 judgment against Argentina, TIG must seek and obtain an amended judgment from the Northern District of Illinois.[6] The Court will address any remaining issues with respect to the 2001 judgment if and when the judgment is amended to include Argentina.

## CONCLUSION

For the foregoing reasons, the Court grants Argentina's motion to vacate the 2018 judgment. Because the 2001 judgment is not against Argentina, it cannot serve as a basis for this enforcement action. A separate order consistent with this decision accompanies this memorandum opinion.

*Dabney L. Friedrich*
───────────────────────
DABNEY L. FRIEDRICH
United States District Judge

August 23, 2022

---

[6] The Court expresses no opinion on whether the Northern District of Illinois had jurisdiction to enter the 2001 judgment because such a determination is not necessary to the decision of the pending motion.